# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

FEDERAL TRADE COMMISSION, and

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

      Plaintiffs,

    vs.

LIFE MANAGEMENT SERVICES OF
ORANGE COUNTY, LLC, a Florida limited
liability company,

LOYAL FINANCIAL & CREDIT SERVICES,
LLC, a Florida limited liability company, also
d/b/a FOC Credit, and Reward Services,

IVD RECOVERY, LLC, a Florida limited
liability company,

KWP SERVICES, LLC, a Florida limited liability
company,

KWP SERVICES OF FLORIDA LLC, a Florida
limited liability company,

LPSOFFLA LLC, a Florida limited liability
company,

LPSOFFLORIDA L.L.C., a Florida limited
liability company,

PW&F CONSULTANTS OF FLORIDA LLC, a
Florida limited liability company,

UAD SECURE SERVICES LLC, a Florida
limited liability company,

Case No. _____

  6:16-cv-982-Orl-41TB

[FILED UNDER SEAL]

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
RELIEF**

UAD SECURE SERVICE OF FL LLC, a Florida
limited liability company,

URB MANAGEMENT, LLC, a Florida limited
liability company,

YCC SOLUTIONS LLC, a Florida limited
liability company,

YFP SOLUTIONS LLC, a Florida limited
liability company, and

KEVIN W. GUICE, individually
and as an officer of LOYAL FINANCIAL &
CREDIT SERVICES, LLC,

CHASE P. JACKOWSKI, individually and as an
officer of LPSOFFLA LLC, LPSOFFLORIDA
L.L.C., and YFP SOLUTIONS LLC,

LINDA N. MCNEALY, individually
and as an officer of LOYAL FINANCIAL &
CREDIT SERVICES, LLC,

CLARENCE H. WAHL, a/k/a Harry C. Wahl,
individually and as an officer of KWP
SERVICES OF FLORIDA LLC, and LIFE
MANAGEMENT SERVICES OF ORANGE
COUNTY, LLC,

KAREN M. Wahl, individually and as an officer
of KWP SERVICES, LLC,

     Defendants, and

ROBERT GUICE, individually,

TIMOTHY WOODS, individually,

     Relief Defendants.

Plaintiffs, the Federal Trade Commission ("FTC"), and the Office of the Attorney

General, State of Florida, Department of Legal Affairs ("State of Florida"), for their Complaint

allege:

1.     The FTC brings this action under Sections 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, consumer redress, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

2.     The State of Florida brings this action pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), to obtain temporary and permanent injunctions, consumer restitution, civil penalties and other equitable relief, and reimbursement of costs and attorneys' fees for Defendants' acts or practices in violation of the TSR and FDUTPA.  The State of Florida has conducted an investigation, and the head of the enforcing authority, Attorney General Pamela Jo Bondi, has determined that an enforcement action serves the public interest as required by FDUTPA Section 501.207(2), Florida Statutes.

## SUMMARY OF THE CASE

3.     Since at least January 2013, Defendants Kevin W. Guice, Chase P. Jackowski, Linda N. McNealy, Clarence H. Wahl, and Karen M. Wahl, through a maze of interrelated companies called Life Management Services of Orange County, LLC, Loyal Financial & Credit Services, LLC, IVD Recovery, LLC, KWP Services, LLC, KWP Services of Florida LLC, LPSofFLA LLC, LPSofFlorida L.L.C., PW&F Consultants of Florida LLC, UAD Secure Service of FL LLC, UAD Secure Services LLC, URB Management, LLC, YCC Solutions LLC, and YFP

Solutions LLC (collectively, "Defendants"), have engaged in a telemarketing scheme that defrauds financially distressed consumers by selling them two types of phony debt relief services: credit-card interest-rate-reduction services ("rate-reduction services") and credit-card debt-elimination services ("debt-elimination services"). Defendants sell these services by false guarantees that they will get consumers substantially and permanently lower interest rates on their credit cards, or access a government fund to pay off consumers' credit-card debt.

4.      Defendants have operated as a common enterprise while engaging in these deceptive acts, and the thirteen corporate defendants have played various roles to further Defendants' telemarketing scheme. Two corporate defendants (Life Management Services of Orange County, LLC, and Loyal Financial & Credit Services, LLC) employ the telemarketers that contact consumers. One corporate defendant (PW&F Consultants of Florida LLC) has received money from numerous corporate defendants, and has sent money to numerous Defendants, including Kevin Guice. The ten remaining corporate defendants (IVD Recovery, LLC, KWP Services, LLC, KWP Services of Florida LLC, LPSofFLA LLC, LPSofFlorida L.L.C., UAD Secure Service of FL LLC, UAD Secure Services LLC, URB Management, LLC, YCC Solutions LLC, and YFP Solutions LLC) hold accounts at financial institutions where consumers' up-front fees are deposited and ultimately deliver profits from the enterprise to the individual and relief defendants.

5.      During these campaigns, Defendants have initiated hundreds of thousands of illegal telephone calls to consumers throughout the United States, including many consumers whose telephone numbers appear in the "do-not-call" registry (the "National Do Not Call Registry" or "Registry") maintained by the FTC. Many of Defendants' calls deliver a prerecorded message, also known as a "robocall," which instructs consumers to "press 1 now" if

they are interested in lowering their credit-card interest rates.  Consumers who press "1" on their telephone keypad are connected to a live telemarketer who works for Defendants.

6.     During many of these telemarketing calls, Defendants use generic names such as "Bank Card Services" and "Credit Assistance Program," claim to be a "licensed enrollment center" for major credit-card associations such as MasterCard and Visa, and falsely represent that they work directly with a consumer's bank or other credit-card issuer.  These claims have tricked many consumers into thinking that Defendants are legitimate businesses that have some affiliation with the consumer's bank or credit-card company.

7.     After gaining a consumer's trust through these misrepresentations, Defendants guarantee they will substantially and permanently lower the consumer's credit-card interest rates. Defendants also promise they will save the consumer thousands of dollars in interest in a short period.

8.     Defendants, in violation of the TSR, request or receive up-front payments ranging from $500 to $5,000 for their purported rate-reduction services.  While requesting or receiving this up-front payment, Defendants do not disclose that their services may result in consumers paying a variety of additional bank fees that can total three to five percent of a consumer's credit-card debt.

9.     Consumers who pay Defendants' up-front fee do not receive what they are promised.  Defendants often make some rudimentary efforts to reduce a consumer's credit-card interest rates, such as asking the consumer's credit-card issuer for a lower interest rate, or opening a new credit card with a lower, promotional interest rate that lasts for a limited period before increasing significantly.  These tactics, however, almost never result in consumers obtaining a lower interest rate that is permanent or saving thousands of dollars in interest

payments.

10.     Consumers who pay Defendants' up-front fee often receive a follow-up call pitching Defendants' bogus debt-elimination services.  Defendants also telemarket their debt-elimination services to individuals who have not purchased their rate-reduction services.  In at least some instances, Defendants tailor their debt-elimination pitch to individuals over the age of 60.

11.     Defendants' debt-elimination pitch is simple, persuasive, and wholly deceptive. Defendants tell consumers about an alleged government "fund" that contains money that consumers can use to pay off their credit-card debt within 18 months.  Defendants claim that the fund is paid for by credit-card companies who were found to be charging excessive interest rates. These claims are false because no such fund exists.

12.     Defendants, in violation of the TSR, also request and collect an up-front fee for their debt-elimination services.  Those fees range from $2,500 to approximately $20,000.

13.     As part of their debt-elimination pitch, Defendants instruct consumers that they must (i) pay a hefty up-front fee, (ii) make minimum payments on their credit cards for a period ranging from three to six months, and (iii) then stop paying their credit-card bills.

14.     Defendants, in violation of the TSR, do not warn consumers that failing to pay their credit-card bills can result in late fees, higher interest rates, a lower credit score, and collection suits.

15.     Few, if any consumers actually become debt free using Defendants' debt-elimination services.  Most consumers who enroll in Defendants' program suffer significant harm in the form of reduced creditworthiness, higher interest rates on their existing credit-card debt, and higher overall credit-card debt due to the accrual of late fees and interest charges.

16.     Defendants typically do not refund consumers' up-front payment and, in some instances, have threatened consumers who sought a refund.  Defendants have also intimidated consumers who hesitated or refused to pay the up-front fee after verbally agreeing to do so.

17.     Since January 2013, Defendants have collected well over $15.6 million dollars from consumers who have purchased their bogus rate-reduction or debt-elimination services.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

19.     This Court has supplemental jurisdiction over the State of Florida's claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 53(b).

## PLAINTIFF

21.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

22.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, consumer redress, and other relief.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 6102(c), and 6105(b).

23.     The State of Florida is the enforcing authority under FDUTPA pursuant to Florida

7

Statutes Section 501.203(2) and is authorized to pursue this action pursuant to 15 U.S.C. §

6103(a) to enjoin violations of the TSR, and in each such case, to obtain restitution, and other

compensation on behalf of Florida residents.  The State of Florida is authorized to pursue this

action to enjoin violations of FDUTPA and to obtain legal, equitable or other appropriate relief

including rescission or reformation of contracts, restitution, the appointment of a receiver,

disgorgement of ill-gotten monies, or other relief as may be appropriate.  § 501.207, Fla. Stat.

(2015).

## DEFENDANTS

24.    Defendant Life Management Services of Orange County, LLC ("Life

Management Services"), is a Florida limited liability company with its principal place of

business at 12001 Science Drive, Suite 125, Orlando, Florida 32826.  Life Management Services

transacts or has transacted business in this district and throughout the United States.

25.    Defendant Loyal Financial & Credit Services, LLC, also doing business as FOC

Credit, and Reward Services ("Loyal Financial"), was a Florida limited liability company with

its principal place of business at 11549 Lake Underhill Road, Orlando, Florida 32825.  Loyal

Financial transacts or has transacted business in this district and throughout the United States.

26.    Defendant IVD Recovery, LLC was a Florida limited liability company with its

principal place of business at 11561 Lake Underhill Road, Suite A, Orlando, Florida 32825.

IVD Recovery, LLC, transacts or has transacted business in this district and throughout the

United States.

27.    Defendant KWP Services, LLC, is a Florida limited liability company with its

principal place of business at 2574 Sheffield Avenue, Orlando, Florida 32806.  KWP Services,

LLC, transacts or has transacted business in this district and throughout the United States.

28.    Defendant KWP Services of Florida LLC is a Florida limited liability company

with its principal place of business at 2574 Sheffield Avenue, Orlando, Florida 32806. KWP Services of Florida LLC transacts or has transacted business in this district and throughout the United States.

29.     Defendant LPSofFLA LLC was a Florida limited liability company with its principal place of business at 2521 Marzel Avenue, Orlando, Florida 32806. LPSofFLA LLC transacts or has transacted business in this district and throughout the United States.

30.     Defendant LPSofFlorida L.L.C. is a Florida limited liability company with its principal place of business at 4865 Darwood Drive, Orlando, Florida 32812. LPSofFlorida L.L.C. transacts or has transacted business in this district and throughout the United States.

31.     Defendant PW&F Consultants of Florida LLC ("PW&F Consultants") was a Florida limited liability company with its principal place of business at 7611 Simms Avenue, Orlando, Florida 32812. PW&F Consultants transacts or has transacted business in this district and throughout the United States.

32.     Defendant UAD Secure Service of FL LLC was a Florida limited liability company with its principal place of business at 2102 Pine Street, Orlando, Florida 32824. UAD Secure Service of FL LLC transacts or has transacted business in this district and throughout the United States.

33.     Defendant UAD Secure Services LLC was a Florida limited liability company with its principal place of business at 2102 Pine Street, Orlando, Florida 32824. UAD Secure Services LLC transacts or has transacted business in this district and throughout the United States.

34.     Defendant URB Management, LLC, was a Florida limited liability company with its principal place of business at 1000 Winderley Place, Suite 146, Maitland, Florida 32751.

URB Management, LLC, transacts or has transacted business in this district and throughout the United States.

35.    Defendant YCC Solutions LLC is a Florida limited liability company with its principal place of business at 1120 Sharon Drive, Titusville, Florida 32796. YCC Solutions LLC transacts or has transacted business in this district and throughout the United States.

36.    Defendant YFP Solutions LLC is a Florida limited liability company with its principal place of business at 4865 Darwood Drive, Orlando, Florida 32812. YFP Solutions LLC transacts or has transacted business in this district and throughout the United States.

37.    Defendant Kevin W. Guice was an officer and managing member of Loyal Financial. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Kevin Guice resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

38.    Defendant Chase P. Jackowski is an officer of LPSofFlorida L.L.C. and YFP Solutions LLC, and was an officer of LPSofFLA LLC. Since at least July 2014, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Jackowski resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

39.    Defendant Linda N. McNealy was an officer of Loyal Financial. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this

Complaint. Defendant McNealy resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

40.     Defendant Clarence H. Wahl, also known as Harry C. Wahl ("Harry Wahl"), is an officer of KWP Services of Florida LLC, and Life Management Services. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Harry Wahl resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

41.     Defendant Karen M. Wahl is an officer of KWP Services, LLC. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Karen Wahl resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

42.     Relief Defendant Robert Guice is an individual who has received funds that can be traced directly to Defendants' deceptive acts or practices alleged below, and he has no legitimate claim to those funds. Defendant Robert Guice resides in this district.

43.     Relief Defendant Timothy Woods is an individual who has received funds that can be traced directly to Defendants' deceptive acts or practices alleged below, and he has no legitimate claim to those funds. Timothy Woods resides in this district.

## COMMON ENTERPRISE

44.     Defendants Life Management Services, Loyal Financial, IVD Recovery, LLC, KWP Services, LLC, KWP Services of Florida LLC, LPSofFLA LLC, LPSofFlorida L.L.C., PW&F Consultants, UAD Secure Service of FL LLC, UAD Secure Services LLC, URB Management, LLC YCC Solutions LLC, and YFP Solutions LLC (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices, and other violations of law alleged herein.  Defendants have conducted the business practices described herein through an interrelated network of companies that have common ownership, officers, managers, business functions, business locations, and employees; that commingled funds; and that engaged in a common scheme.  Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Kevin Guice, Chase Jackowski, Linda McNealy, Harry Wahl, and Karen Wahl have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants that constitute the common enterprise.

## COMMERCE

45.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Florida Statutes Section 501.203(8).

## DEFENDANTS' BUSINESS PRACTICES

46.     Since at least January 2013, Defendants have engaged in a plan, program, or campaign to advertise, market, promote, offer for sale, or sell rate-reduction services and debt-elimination services through interstate telephone calls to consumers throughout the United States.

47.     Defendants induce the sale of their rate-reduction services and debt-elimination services by making numerous material misrepresentations.

48.     Defendants request or receive up-front payments from consumers for their purported rate-reduction services and debt-elimination services.

49.     In many instances, Defendants instruct consumers to pay the up-front fee by taking a cash advance against their credit cards and sending a personal or credit-card check by mail or courier to Post Office Boxes and UPS Stores in the Orlando, Florida area.

50.     Consumers rarely get the services promised by Defendants during their initial telemarketing call, and Defendants, in most instances, do not refund consumers' up-front payment.

## Defendants' Rate-Reduction Campaign

51.     In numerous instances, Defendants have initiated, or directed others to initiate, telemarketing calls that deliver a prerecorded message that offers consumers a chance to lower their credit-card interest rates and instructs consumers to press a number on their telephone to be connected to a live representative.  When a consumer presses the number on his telephone keypad, he is connected to a live representative who works for Defendants.

52.     Once a consumer is connected with a live telemarketer, Defendants do not disclose their actual company name, but instead use generic names such as "Bank Card Services," "Credit Assistance Program," and "American Credit Assistance," among others.

53.     The fake company names Defendants provide consumers deceive consumers into thinking that Defendants are legitimate and that they have a relationship or affiliation with the consumer's credit-card issuer when, in fact, they do not.

54.     During telemarketing calls to sell their purported rate-reduction services, Defendants often claim to be a licensed enrollment center for, or affiliate of, Visa, MasterCard,

13

American Express, and Discover.

55.     Defendants are not a licensed enrollment center for, or an affiliate of, Visa, MasterCard, American Express, or Discover.

56.     Defendants also represent to consumers that they have a business relationship with banks and other credit-card issuers that allow Defendants to obtain favorable interest rates for consumers.

57.     Defendants do not have any business relationship with banks or other credit-card issuers that allow them to obtain favorable interest rates for consumers.

58.     During telemarketing calls to sell their purported rate-reduction services, Defendants guarantee that they will substantially and permanently reduce consumers' credit-card interest rates.

59.     During telemarketing calls, Defendants often claim that their rate-reduction services will allow consumers to pay off their credit-card balances three to five times faster as a result of the substantially and permanently lowered credit-card interest rates.

60.     During telemarketing calls, Defendants tell consumers that they must pay an up-front fee ranging from $500 to $5,000 to obtain the lower credit-card interest rates.

61.     Defendants tell consumers that the cost of Defendants' services will be paid for by the thousands of dollars the consumers will achieve in savings due to their lowered interest rate.

62.     Defendants fail to inform consumers before collecting their up-front fee that consumers will likely have to pay additional fees to obtain the reduced interest rates.

63.     If a consumer agrees to purchase Defendants' purported rate-reduction services, the live representative tells the consumer that her assent will be recorded and, once that recording

is complete, tells the consumer that she is bound by a verbal agreement.

64.     Consumers who pay Defendants' fee typically receive an invoice that documents their up-front payment.  The invoice notes, "Your ONE time service charge has already been applied today per our verbal agreement."  Defendants also represent in the invoice that the consumer will receive a full refund of her purchase price if Defendants are unable to show the consumer a minimum savings through their program, usually $2,000.

### *Defendants Fail to Deliver Promised Rate-Reduction Services*

65.     After a consumer has paid the up-front fee, Defendants, in some instances, initiate a telephone conference call with the consumer and the consumer's credit-card issuer during which Defendants ask the issuer to lower the consumer's interest rate.

66.     During these calls, most credit-card issuers will agree to only a modest interest-rate reduction, if they will agree to any reduction at all.

67.     The telephone conference calls initiated by Defendants with consumers and their credit-card issuers rarely, if ever, result in a consumer obtaining a substantially lower interest rate that is permanent.

68.     The telephone conference calls initiated by Defendants with consumers and their credit-card issuers rarely result in a consumer saving thousands of dollars in interest payments in a short time.

69.     In some instances, Defendants also try to deliver on their promise of substantially and permanently lowering a consumer's interest rates by obtaining new credit cards that have a low introductory interest rate ("promotional rate"), and then having the consumer transfer his existing credit-card balances to those new cards.

70.     As part of this process, consumers often pay a three to five percent balance-transfer fee to move their existing credit-card balances to the promotional-rate cards.

71.     Defendants do not disclose the balance-transfer fee to consumers before requesting or collecting their up-front fee.

72.     The promotional-rate cards Defendants obtain for consumers rarely, if ever, result in a consumer obtaining a permanently lower interest rate.  In most cases, the interest rates on these credit cards increase significantly at the end of the promotional term.

73.     The promotional-rate cards obtained for consumers by Defendants rarely, if ever, result in a consumer saving the thousands of dollars in interest payments in a short period that Defendants guaranteed.

### *Defendants' Claims Are False and Deceptive*

74.     Defendants' claim that they will obtain permanently lower interest rates for consumers is false and deceptive.

75.     Defendants' claim that they will save consumers thousands of dollars in a short time by substantially reducing consumers' credit-card interest rates is false and deceptive.

76.     Defendants' claim that they will help consumers pay off their credit-card debts three to five times faster is false and deceptive.

77.     When Defendants are unable to deliver on their guarantees to a consumer, Defendants often stop returning the consumer's phone calls and otherwise cease all communication.

### **Defendants' Debt-Elimination Campaign**

78.     Defendants also initiate telemarketing calls to sell consumers services they claim will eliminate the consumer's credit-card debt.

79.     Defendants target their debt-elimination services to consumers who have

previously purchased their rate-reduction services.  Defendants also market their debt-elimination services to consumers who have not purchased their rate-reduction services.

80.     In some instances, Defendants specifically tailor their debt-elimination pitch to consumers who are over the age of 60.

81.     During their debt-elimination pitch, Defendants claim that they will access money from a special government fund and use it to eliminate a consumer's credit-card debt within 18 months.  Defendants represent to consumers that the government fund is maintained by payments from credit-card companies that were found to be charging excessive interest rates.

82.     Defendants tell consumers that in order to eliminate their credit-card debt, a consumer must do three things.  First, the consumer must pay Defendants an up-front fee that ranges from $2,500 to approximately $20,000.  Second, the consumer must make the minimum payments on her credit cards for a period of three to six months.  Third, the consumer must then stop paying her credit-card bills.

83.     Defendants do not inform consumers that their failure to make timely payments to their creditors will likely result in a reduced credit score.

84.     Defendants do not inform consumers that their failure to make timely payments to their creditors may result in collection suits, higher interest rates on existing credit-card debt, or higher credit-card debt due to the accrual of fees and interest.

85.     If a consumer agrees to purchase Defendants' purported debt-elimination services, the live representative tells the consumer that her assent will be recorded and, once that recording is complete, tells the consumer that she is bound by a verbal agreement.

86.     Consumers who purchase Defendants' debt-elimination services typically receive a "New Client Packet" in the mail two to three months later.  The New Client Packet documents

the consumer's up-front payment, the date of enrollment, and the amount of the consumer's unsecured debt. Defendants also represent in the New Client Packet that the consumer will receive a full refund of her purchase price if Defendants are unable to cancel the consumer's unsecured debt within 18 months.

### *Defendants Fail to Deliver Promised Debt-Elimination Services*

87.     Defendants' claim that there is a special fund is false and deceptive because there is no government fund, paid for by credit-card companies, that contains money that can be used to pay off a consumer's credit-card debt.

88.     No consumer who has purchased Defendants' debt-elimination services has had her credit-card debt paid off using money from a government fund.

89.     When Defendants do act on a consumer's behalf, Defendants try to modify or settle the consumer's credit-card debt through negotiations with the consumer's creditors.

90.     During their debt-elimination pitch, Defendants do not tell consumers that any reduction in a consumers' credit-card debt will be achieved through Defendants negotiating a modification or settlement with the consumer's creditors using a portion of the consumer's up-front payment, rather than by fully repaying the debt using money from the purported government fund.

91.     Defendants only try to modify or settle a consumer's credit-card debt if the consumer stops paying his creditors.

92.     Consumers who follow Defendants' instructions and stop paying their credit-card bills suffer significant financial harm. A consumer's failure to pay creditors often results in a reduced credit score, collection suits, higher interest rates, and higher credit-card debt due to the accrual of late fees and interest charges.

## Defendants' Abusive Telemarketing Practices

93.     Defendants, acting directly or through one or more intermediaries, have made numerous outbound calls to telephone numbers on the National Do Not Call Registry to sell their services.

94.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated outbound telemarketing calls to consumers that delivered a prerecorded message to sell their services.

95.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated outbound telemarketing calls to telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the National Do Not Call Registry.

## VIOLATIONS OF THE FEDERAL TRADE COMMISSION ACT

96.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

97.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

### COUNT ONE
**Misrepresentations in Violation of Section 5(a) (15 U.S.C. § 45(a))**
**(By Plaintiff FTC)**

98.     In numerous instances, since at least January 1, 2013, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' rate-reduction services and debt-elimination services, Defendants have represented, directly or indirectly, expressly or by implication, that:

      A.     Defendants were representatives of, or otherwise affiliated with, consumers' banks or other credit-card issuers, or credit-card associations

such as MasterCard and Visa;

B.    Consumers who purchased Defendants' rate-reduction services would have their credit-card interest rates reduced substantially and permanently;

C.    Consumers who purchased Defendants' rate-reduction services would save thousands of dollars in a short time;

D.    Consumers who purchased Defendants' rate-reduction services would be able to pay off their debts much faster, typically three to five times faster; and

E.    Consumers who purchased Defendants' debt-elimination services would receive a service whereby Defendants would use money obtained from a government fund, paid for by credit-card companies, to pay off consumers' credit-card debts within 18 months.

99.    In truth and in fact, the representations set forth in Paragraph 98 of this Complaint were false or not substantiated at the time the representations were made.

100.    Therefore, Defendants' representations as set forth in Paragraph 98 of this Complaint were false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO
**Deceptive Omissions/Failures to Disclose in Violation of Section 5(a) (15 U.S.C. § 45(a))**
**(By Plaintiff FTC)**

101.    In numerous instances, since at least January 1, 2013, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' rate-reduction and debt-elimination services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants were offering their services to consumers at a particular price.

102.    In numerous instances, since at least January 1, 2013, Defendants have failed to disclose, or failed to disclose adequately to consumers material terms and conditions of their offer, including that Defendants' rate-reduction and debt elimination services may result in a consumer having to pay a variety of fees to credit-card issuers including, among others, balance-transfer fees, which can total three to five percent of a consumer's credit-card debt.

103.    Defendants' failure to disclose, or disclose adequately, the material information described in Paragraph 101 of this Complaint constitute a deceptive omission in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

104.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, and extensively amended it in 2003 and 2010.  The 2010 amendments to the TSR address the telemarketing of debt relief services.

105.    Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

106.    Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service" means any program or service

represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

107.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.  16 C.F.R. § 310.3(a)(2)(x).

108.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii).

109.    The TSR prohibits sellers and telemarketers from failing to disclose, in a clear and conspicuous manner, before a consumer consents to pay for the goods or services offered, the total costs to purchase, receive, or use any goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(i).

110.    The TSR prohibits sellers and telemarketers from failing to disclose, in a clear and conspicuous manner, before a consumer consents to pay for a debt relief service that relies upon or results in the consumer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the consumer's creditworthiness, may result in the consumer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the consumer owes due to the accrual of fees and interest.  16 C.F.R. § 310.3(a)(1)(viii)(C).

111.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

A.  The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

B.  The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

   i.  Bears the same proportional relationship to the total fee for renegotiating settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

   ii.  Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

16 C.F.R. § 310.4(a)(5)(i).

112.    The 2003 amendments to the TSR established the National Do Not Call Registry, maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing

calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

113.    Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at www.donotcall.gov, or by otherwise contacting law enforcement authorities.

114.    The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at www.telemarketing.donotcall.gov, to pay any required fee(s), and to download the numbers not to call.

115.    The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the call is made has paid the annual fee for access to the telephone numbers within that area code included in the Registry.  16 C.F.R. § 310.8.

116.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to telephone numbers on the Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

117.    The TSR prohibits initiating a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  16 C.F.R. § 310.4(b)(1)(v)(A).

118.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the

FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT THREE
### Misrepresentations of Material Aspects of Debt
### Relief Services (16 C.F.R. § 310.3(a)(2)(x))
### (By Both Plaintiffs)

119.    In numerous instances since at least January 1, 2013, in connection with the telemarketing of debt relief services, Defendants have misrepresented, directly or by implication, material aspects of the debt relief services, including, but not limited to, that:

A.    Consumers who purchased Defendants' rate-reduction services would have their credit-card interest rates reduced substantially and permanently;

B.    Consumers who purchased Defendants' rate-reduction services would save thousands of dollars in a short time;

C.    Consumers who purchased Defendants' rate-reduction services would be able to pay off their debts much faster, typically three to five times faster; and

D.    Consumers who purchased Defendants' debt-elimination services would receive a service whereby Defendants would use money obtained from a government fund, paid for by credit-card companies, to pay off consumers' credit-card debts within 18 months.

120.    Defendants' acts and practices, as described in Paragraph 119 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(x).

## COUNT FOUR
### Misrepresenting Affiliation with
### Financial Institutions (16 C.F.R. § 310.3(a)(2)(vii))
### (By Both Plaintiffs)

121.    In numerous instances since at least January 1, 2013, in connection with the

telemarketing of debt relief services, Defendants have misrepresented, directly or by implication,

that they were representatives of, or otherwise affiliated with, consumers' banks or other credit-

card issuers, or credit-card associations such as MasterCard and Visa.

122.    Defendants' acts and practices, as described in Paragraph 121 above, are

deceptive telemarketing practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

## COUNT FIVE
### Failing to Disclose the Total Cost of the
### Debt Relief Services - 16 C.F.R. § 310.3(a)(1)(i)
### (By Both Plaintiffs)

123.    In numerous instances since at least January 1, 2013, in the course of

telemarketing debt relief services, Defendants have failed to disclose, in a clear and conspicuous

manner, before a consumer pays for the goods or services offered, that their services may result

in a consumer having to pay additional fees to credit-card issuers including, among others,

balance-transfer fees, which can total three to five percent of a consumer's credit-card debt.

124.    Defendants' acts and practices, as described in Paragraph 123 above, are

deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(i).

## COUNT SIX
### Failing to Disclose Material Aspects of the
### Debt Relief Services - 16 C.F.R. § 310.3(a)(1)(viii)(C)
### (By Both Plaintiffs)

125.    In numerous instances since at least January 1, 2013, in connection with the

telemarketing of debt relief services, Defendants have failed to disclose that their debt-

elimination services, which rely upon a consumer's failure to make timely payments to creditors

or debt collectors, will likely adversely affect the consumer's creditworthiness, may result in the consumer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the consumer owes due to the accrual of fees and interest.

126.    Defendants' acts or practices, as described in Paragraph 125 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(viii)(C).

## COUNT SEVEN
### Charging or Receiving a Fee in Advance of Providing Debt Relief Services (16 C.F.R. § 310.4(a)(5)(i)) (By Both Plaintiffs)

127.    In numerous instances since at least January 1, 2013, in the course of telemarketing debt relief services, Defendants have requested or received payment of a fee or consideration for a debt relief service before:  (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the consumer; and (b) the consumer has made at least one payment pursuant to that agreement.

128.    Defendants' acts or practices, as described in Paragraph 127 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT EIGHT
### Violating the National Do Not Call Registry - 16 C.F.R. § 310.4(b)(1)(iii)(B)) (By Both Plaintiffs)

129.    In numerous instances since at least January 1, 2013, in connection with telemarketing, Defendants have engaged, or caused a telemarketer to engage in, initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT NINE
### Initiating Unlawful Prerecorded Messages (16 C.F.R. § 310.4(b)(1)(v)(A))
### (By Both Plaintiffs)

130.   In numerous instances since at least January 1, 2013, Defendants have made, or

caused others to make, outbound telephone calls that delivered prerecorded messages to induce

the purchase of goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v)(A).

## COUNT TEN
### Failing to Pay National Registry Fees (16 C.F.R. § 310.8)
### (By Both Plaintiffs)

131.   In numerous instances since at least January 1, 2013, Defendants have initiated, or

caused others to initiate, an outbound telephone call to a telephone number within a given area

code when Defendants had not, either directly or through another person, paid the required

annual fee for access to the telephone numbers within that area code that are included in the

National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

132.   Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act, Chapter

501, Part II, Florida Statutes, prohibits "unfair or deceptive acts or practices in the conduct of

any trade or commerce."

## COUNT ELEVEN
### Violating the Florida Deceptive and Unfair Trade Practices Act
### FDUTPA, Section 501.204
### (By Plaintiff State of Florida)

133.   In numerous instances on or after January 1, 2013, in connection with the

telemarketing of debt relief services, Defendants have misrepresented, directly or by implication,

material aspects of the debt relief services, including, but not limited to, that:

A.   Defendants were representatives of, or otherwise affiliated with,

28

consumers' banks or other credit-card issuers, or credit-card associations such as MasterCard and Visa;

B.    Consumers who purchased Defendants' rate-reduction services would have their credit-card interest rates reduced substantially and permanently;

C.    Consumers who purchased Defendants' rate-reduction services would save thousands of dollars in a short time;

D.    Consumers who purchased Defendants' rate-reduction services would be able to pay off their debts much faster, typically three to five times faster; and

E.    Consumers who purchased Defendants' debt-elimination services would receive a service whereby Defendants would use money obtained from a government fund, paid for by credit-card companies, to pay off consumers' credit-card debts within 18 months.

134.    Defendants' representations as set forth in Paragraph 133 above are false or not substantiated and misleading, and likely to mislead consumers acting reasonably. Consumers within the State of Florida and elsewhere were actually misled by Defendants' misrepresentations in violation of Section 501.204 of the FDUTPA.

135.    Defendants knew or should have known their rate-reduction services and debt-elimination services are unfair, deceptive, or prohibited by law.

### COUNT TWELVE
**Relief Defendants**
**(By Both Plaintiffs)**

136.    Relief Defendants Robert Guice and Timothy Woods ("Relief Defendants") have received, directly or indirectly, funds from Defendants that are traceable to funds obtained from

consumers through the deceptive acts or practices described herein.

137.    Relief Defendants have no legitimate claim to such consumers' funds, and Relief Defendants would be unjustly enriched if they are not required to disgorge the funds or the value of the benefit they received as a result of Defendants' deceptive acts or practices.

138.    By reason of the foregoing, Relief Defendants hold funds and assets in constructive trust for the benefits of Defendants' consumers.

## CONSUMER INJURY

139.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the FDUTPA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

140.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

141.    Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

142.    Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), empowers this Court

to grant the State of Florida injunctive and such other relief as the Court may deem appropriate to halt violations of the TSR and to redress injury to consumers, including the award of restitution or other compensation.

143.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Florida to enforce its state law claims against Defendants in this Court for violations of the FDUTPA, and to grant such relief as provided under state law, including injunctive relief, restitution, civil penalties, costs and attorneys' fees, and such other relief to which the State of Florida may be entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) and the Court's own equitable powers; and Plaintiff State of Florida, pursuant to Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), and the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, and the Court's own equitable powers, request that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, an order granting Plaintiffs immediate access to Defendants' business premises, and the appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the FDUTPA by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the FDUTPA,

including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.      Award the State of Florida civil penalties in an amount up to $10,000 per transaction pursuant to Section 501.2075, Florida Statutes, and up to $15,000 per transaction pursuant to Section 501.2077, Florida Statutes, for the willful acts and practices of Defendants in violation of the FDUTPA; and

E.      Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: June 7, 2016.                     Respectfully submitted,

                                         DAVID C. SHONKA
                                         Acting General Counsel

                                         Tejasvi M. Srimushnam
                                         Tel:  (202) 326-2959
                                         E-mail:  tsrimushnam@ftc.gov

                                         Joshua A. Doan
                                         Tel:  (202) 326-3187
                                         E-mail:  jdoan@ftc.gov

                                         Federal Trade Commission
                                         600 Pennsylvania Ave., NW, Mail Stop H-286
                                         Washington, DC 20580
                                         Fax:  (202) 326-3395

                                         Attorneys for Plaintiff
                                         FEDERAL TRADE COMMISSION

Dated: June __, 2016.                    PAMELA JO BONDI
                                         Attorney General
                                         State of Florida

Jennifer Hinton Knutton
Assistant Attorney General
Florida Bar # 92771
Email: Jennifer.Knutton@myfloridalegal.com

Denise Beamer
Assistant Attorney General
Florida Bar #69369
Denise.Beamer@myfloridalegal.com

Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 670
Orlando, Florida 32801
Telephone:  (407) 316-4840
Facsimile:  (407) 245-0365

Attorneys for Plaintiff
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
DEPARTMENT OF LEGAL AFFAIRS