UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | Case No. _____ |
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS, | [FILED UNDER SEAL] |
| Plaintiffs, | |
| vs. | |
| LIFE MANAGEMENT SERVICES OF ORANGE COUNTY, LLC, a Florida limited liability company, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A RECEIVER, OTHER EQUITABLE RELIEF AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION <u>SHOULD NOT ISSUE</u>**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION...............................................................................1

II.  DEFENDANTS' BUSINESS PRACTICES....................................................4

    A. The Rate-Reduction Scheme: Defendants Falsely Promise Consumers
       Permanent and Substantial Credit-Card Interest-Rate Reductions...............4

       1.  Defendants Make Illegal Telemarketing Calls to Locate Victims.........4

       2.  Defendants Guarantee Substantial and Permanent Rate Reductions
          That Will Save Consumers Thousands of Dollars..............................5

       3.  Defendants Extract an Illegal Up-Front Fee.................................7

       4.  Consumers Almost Never Receive the Promised Results...................7

    B. The Debt-Elimination Scheme: Defendants Fraudulently Guarantee Debt
       Elimination Through a Nonexistent Government Fund Paid for By Credit-
       Card Companies...............................................................................9

       1.  Defendants Collect Up to $20,000 and Instruct Consumers to Stop Paying
          their Credit-Card Bills.......................................................9

       2.  There is No Government Fund, and Consumers Suffer Serious Harm
          By Not Paying Their Credit-Card Bills.....................................10

    C. Defendants Instruct Consumers to Pay the Up-Front Fees Using Credit-
       Card Cash Advances........................................................................12

    D. Defendants' Abusive Telemarketing Practices........................................13

    E. Consumer Harm............................................................................14

III. DEFENDANTS...............................................................................14

    A. The Corporate Defendants..............................................................16

       1.  Telemarketer Corporate Defendants.....................................17

       2.  Shell Corporate Defendants................................................18

    B. Individual Defendants....................................................................23

    C. Relief Defendants.........................................................................26

# TABLE OF CONTENTS

**Page**

IV. **THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER**.........27

   A. Section 13(b) of the FTC Act Authorizes the Court to Grant the
Requested Relief...................................................................................27

   B. Plaintiffs Have Shown a Likelihood of Success on the Merits....................29

      1. Plaintiffs Have Demonstrated a Likelihood of Success in Establishing
that Defendants' Deceptive Practices Have Violated the FTC Act (Counts
One and Two) and the FDUTPA (Count Eleven)...................................29

         a. Defendants Misrepresent the Results They Will Achieve for Consumers......30

         b. Defendants Fail To Disclose the True Cost of Their Debt-Relief Services.....31

      2. Plaintiffs Have Demonstrated a Likelihood of Success in Proving that
Defendants have Violated the TSR (Counts Three Through Ten).......................32

         a. Defendants Misrepresent the Performance, Nature or Essential
Characteristics of Their Debt-Relief Services (Counts Three and Four).........32

         b. Defendants Fail to Disclose Material Aspects of their Debt-Relief
Services (Counts Five and Six)........................................................33

         c. Defendants Unlawfully Charge an Advance Fee for Their Debt-Relief
Services (Counts Seven)................................................................33

         d. Defendants Violated the Do Not Call and Robocall Provisions of the TSR
(Counts Eight, Nine, and Ten).......................................................34

   C. The Equities Heavily Favor the Requested Relief.....................................34

V. **THE TRO AND PRELIMINARY INJUNCTION SHOULD EXTEND TO ALL
DEFENDANTS**.............................................................................36

   A. Corporate Defendants are Jointly and Severally Liable as a Common Enterprise......36

   B. The Individual Defendants Are Personally Liable and Subject to Monetary
and Injunctive Relief....................................................................38

   C. Relief Defendants Should Disgorge Ill-Gotten Funds.................................39

# TABLE OF CONTENTS

**Page**

VI.   **AN EX PARTE TRO WITH ADDITIONAL EQUITABLE RELIEF IS
NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF**...............................40

    A.  An Asset Freeze Is Necessary...................................................................................41

    B.  Appointing a Receiver Will Prevent Further Mismanagement and Assist the
Court's Ability to Provide Effective Final Relief.........................................................42

    C.  Immediate Access and Limited Expedited Discovery.................................................43

    D.  The TRO Should Be Issued *Ex Parte*.......................................................................44

VII.   **CONCLUSION**..................................................................................................................45

# TABLE OF AUTHORITIES

**Opinions**                                                   **Page**

*AT&T Broadband v. Tech Commc'ns Inc.*, 381 F.3d 1309 (11th Cir. 2004) ...............44

*Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187
    4th Cir. 2002) ....................................................................................................39

*Delaware Watch Co., v. FTC*, 332 F.2d 745(2d Cir. 1964).................................36, 37

*FTC v. Amy Travel Service*, 875 F.2d 564 (7th Cir. 1989) ...............................30, 38

*FTC v. Direct Benefits Group, LLC*, 6:11-cv-1186-Orl-28TBS, 2013 WL 3771322,
    (M.D. Fla. July 18, 2013)....................................................................................37

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)...............................29

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996)............................27, 38, 41

*FTC v. HES Merch. Servs.*, 2014 U.S. Dist. LEXIS 17292 (M.D. Fla. Nov. 18, 2014)...............38

*FTC v. Holiday Enters.*, 2008 U.S. Dist. LEXIS 35858 (N.D. Ga. Feb. 5, 2008)........................39

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ............................30

*FTC v. Inbound Call Experts*, 14-81395-CIV-MARRA, 2014 U.S. Dist. LEXIS 182857,
    (S.D. Fla. Dec. 22, 2014)....................................................................................29

*FTC. v. Info. Mgmt. Forum, Inc.*, 2013 U.S. Dist. LEXIS 91242, (M.D. Fla. June 28, 2013)......29

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000).............................37

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 127 (9th Cir. 2010) .........................39

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)..........................................29, 30

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247(S.D. Fla. 2007)............38, 39

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)...............27, 28, 41, 42

*FTC v. Univ. Health*, 938 F.2d 1206 (11th Cir. 1991) ............................................28

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) ........................................30, 38

*FTC v. Windward Mktg.*, 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114,
    (N.D. Ga. Sept. 30, 1997) .............................................................................32, 38

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988).................34, 35, 41

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ......................35, 36

*In re Removatron Int'l Corp.*, 111 F.T.C. 206, 309 (1988), *aff'd* 884 F.2d 1489
    (1st Cir. 1989) ....................................................................................................32

*Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d 1271
    (7th Cir. 1993)....................................................................................................35

*Millennium Commnc's & Fulfillment, Inc.*, 761 So. 2d 1256 (Fla. 3d DCA 2000).................28

*Partners In Health Care Ass'n*, 2015 U.S. Dist LEXIS 71027,
    (S.D. Fla. May 31, 2016) ....................................................................................30

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842. So.2d 773, 777 (Fla. 2003)...................29

*Republic of the Congo v. Air Capital Grp., LLC*, 614 F.App'x 460 (11th Cir. 2015) ...............29

*Rollins v. Metro. Life Ins. Col*, 863 F.2d 1346 (7th Cir. 1988)...............................39

*SEC v. Antar*, 831 F. Supp. 380 (D.N.J. 1993).....................................................39

*SEC v. First Fin. Group of Texas*, 645 F.2d 429 (5th Cir. 1981) .......................42, 43

**Filed Cases**                                                   **Page**

*FTC v. 2145183 Ontario Inc., also d/b/a Dynamic Fin. Resolutions Inc.*,
    No. 09C-7423(N.D. Ill. Nov. 30, 2009)................................................................2

*FTC V. A+ Fin. Center, LLC*, No. 12-cv-14373 (S.D. Fla. Oct. 23, 2012) ...................2

# TABLE OF AUTHORITIES

**Filed Cases (Cont'd)**                                                                                          **Page**

*FTC v. All US Marketing LLC,* No. 6:15-cv-01016-ORDL-28GJK (M.D. Fla. June 22, 2015)........................................................................................................................2, 36

*FTC v. Ambrosia Web Design LLC,* No. 2248-PHX-FJM (D. Ariz. Oct. 22, 2012) ......................2

*FTC v. Direct Fin. Mgmt.,* No. 10C-7149 (N.D. Ill. Nov. 8, 2010)............................................2

*FTC v. Econ. Relief Techs., LLC,* No. 09-CV-3347 (N.D. Ga. Nov. 30, 2009) ............................2

*FTC v. ELH Consulting, LLC,* No.. CV-12-2246-PHX-FJM (D. Ariz. Oct. 22, 2014)...................2

*FTC v. Home Assure, LLC,* 2009 U.S. Dist. LEXIS 32055, (M.D. Fla. Apr. 16, 2009)...............41

*FTC v. Innovative Wealth Builders, Inc.,* No. 8:13-CV-00123-VMC-EAJ (M.D. Fla. Jan. 14, 2013)........................................................................................................................2, 36

*FTC v. JPM Accelerated Servs. Inc.,* No. 6:09-CV-2021-ORL-28-KRS (M.D. Fla. Nov. 30, 2009) ..........................................................................................................................2

*FTC v. Lifewatch Inc.,* No:15-c-5781, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016) .35

*FTC v. Millennium Telecard, Inc.,* 2001 U.S. Dis. LEXIS 74951(D.N.J. July 11, 2011) ..........42

*FTC v. Nat'l Card Monitor, LLC,* No. CV-12-2521-PHX-JAT (D. Ariz. Nov. 27, 2013) ..............2

*FTC v. The Green Savers, LLC,* No. 12-CV-1588 (M.D. Fla. Oct. 22, 2012).........................2, 36

*FTC v. Wash. Data Res.,* 856 F. Supp.2d 1247(M.D. Fla. 2012) ..........................................37

*FTC v. Weyerhaeuser Co.,* 665 F.2d 1072 (D.C. 1981) ......................................................34

*FTC v. WV Universal Mgmt., LLC,* No. 12-CV-1618 (M.D. Fla. Oct 29, 2012) ....................2, 36


**Statutes, Regulations, and Rules**                                                                             **Page**

15 U.S.C.A. § 45(a) ...................................................................................................28, 29

15 U.S.C.A. § 57b(a)(1) & (b) ........................................................................................28

15 U.S.C.A. § 1601 ........................................................................................................13

15 U.S.C.A. § 6105(b) ....................................................................................................28

16 C.F.R. Part 310..........................................................................................................28

16 C.F.R. § 310.2 ...........................................................................................................32

16 C.F.R. § 310.3 .............................................................................................31, 32, 33

16 C.F.R. § 310.4 ...........................................................................................................34

16 C.F.R. § 310.8 ...........................................................................................................34

Fed. R. Civ. P. 65(b) .......................................................................................................41

Fed. R. Civ. P. 26(d) .......................................................................................................44

Fed. R .Civ. P. 34(b) .......................................................................................................44

Chapter 501, Part II, Florida Statutes................................................................................28

§ 501.204, Florida Statutes (2015)..................................................................................29

## I.      INTRODUCTION

The Federal Trade Commission ("FTC") and the State of Florida ("State of Florida")[1] ask

that this Court immediately halt an ongoing telemarketing scheme that has stolen well over $15

million from nearly 3,000 consumer victims struggling with credit-card debt.[2]  Defendants

bombard consumers with robocalls that pitch a service that Defendants falsely promise will

result in a permanent and substantial reduction in consumers' interest rates, save consumers

thousands of dollars, and enable consumers to pay off their debts much faster ("rate-reduction

service").  Defendants collect an illegal up-front fee for their "service" ranging from $500 to

$5,000, but rarely, if ever, deliver the promised results.  This scheme is nearly identical to ones

---

[1] Plaintiffs submit six volumes of exhibits in support of this motion, including sworn declarations from: 42 victims of Defendants' scheme; three financial institutions; an expert in the credit-card and retail-banking industry; three investigators from the FTC and the State of Florida; a Bureau Chief for the Florida Department of Agriculture and Consumer Services ("FDACS"); and a detective with the Orlando Police Department.  Plaintiffs' evidence also includes call transcripts highlighting Defendants' deceitful sales tactics, and business records demonstrating Defendants' financial and operational integration.  Exhibits are marked beginning with Plaintiffs' Exhibit 1 and cited with the abbreviations "PX" followed by the exhibit number.  Exhibits that are declarations also include a citation to the declarant and the paragraph number for the relevant testimony.

[2] The total monetary harm is likely significantly higher.  PX 45 ¶11 (Dec. of FTC Forensic Accountant Emil George).  Mr. George's financial analysis is for the period January 2013 to May 2015, and Defendants scheme is ongoing.  Indeed just two weeks ago, on May 24, 2016, the Orlando version of craigslist.org contained a job posting seeking to fill seven "fronter" and "qualifier" positions.  The posting asked interest parties to call a telephone number tied to an employee of Corporate Defendant Life Management Services.  *Compare* PX 60 ("Call 386-456-8715 to set up an interview with John"), *with* PX 43 ¶ 115 (Ex. 66) (Dec. of Patricia Compton) (stating that the FDACS's records show that 386-456-8715 is the telephone number for John Kunz, who has been employed by Corporate Defendant Life Management Services since May 2014, and before that was employed by Corporate Defendant Loyal Financial); *see also* PX 47 ¶¶ 46-55 (Dec. of Florida Investigator Jacquelyn Randolph) (Ex. 23) (describing April 2016 undercover site visit to Defendants' call center in response to Craigslist job posting seeking 8 telemarketers); PX 111 ¶¶ 43-46 (Dec. of Donna White) (paid Corporate Defendant YCC Solutions in February 2016 and received New Client Packet in April 2016).

that have been the subject of numerous successful FTC law enforcement actions involving the infamous "Rachel from Cardholder Services" messages.[3]

Unfortunately, Defendants' scam goes even further. In addition to their rate-reduction scheme, Defendants also market a credit-card debt-elimination service ("debt-elimination service") that results in more pervasive consumer harm. Defendants promise consumers that for another illegal up-front fee, which can be as high as $20,000,[4] Defendants will pay off their credit-card balances by using money obtained from a special government fund.[5] In truth, no such fund exists,[6] and consumers who pay Defendants' hefty up-front fees do not have their debt eliminated and are often left deeper in debt and with severely damaged credit.[7]

In addition, Defendants' use of prerecorded telemarketing solicitations, or "robocalls," to search for potential victims is itself a separate form of abuse inflicted on the American public. Consumers whose telephone numbers are listed on the National Do Not Call Registry are doubly harassed, as they should not be receiving any telemarketing calls from Defendants, let alone

---

[3] See, e.g., FTC v. All US Mktg. LLC, No. 6:15-cv-01016-ORDL-28GJK (M.D. Fla. June 22, 2015); FTC v. ELH Consulting, LLC, No. CV-12-2246-PHX-FJM (D. Ariz. Oct. 22, 2014); FTC v. Innovative Wealth Builders, Inc., No. 8:13-CV-00123-VMC-EAJ (M.D. Fla. Jan. 14, 2013); FTC v. Nat'l Card Monitor, LLC, No. CV-12-2521-PHX-JAT (D. Ariz. Nov. 27, 2012); FTC v. WV Universal Mgmt., LLC, No. 12-CV-1618 (M.D. Fla. Oct. 29, 2012); FTC v. A+ Fin. Center, LLC, No. 12-CV-14373 (S.D. Fla. Oct. 23, 2012); FTC v. The Green Savers, LLC, No. 12-CV-1588 (M.D. Fla. Oct. 22, 2012); FTC v. Ambrosia Web Design LLC, No. 2248-PHX-FJM (D. Ariz. Oct. 22, 2012); FTC v. Direct Fin. Mgmt., No. 10C-7149 (N.D. Ill. Nov. 8, 2010); FTC v. 2145183 Ontario Inc., also d/b/a Dynamic Fin. Resolutions Inc., No. 09C-7423 (N.D. Ill. Nov. 30, 2009); FTC v. JPM Accelerated Servs. Inc., No. 6:09-CV-2021-ORL-28-KRS (M.D. Fla. Nov. 30, 2009); FTC v. Econ. Relief Techs., LLC, No. 09-CV-3347 (N.D. Ga. Nov. 30, 2009).

[4] See PX 31 ¶¶ 6 & 10 (Dec. of James Pompati) (noting payments of $2,500 and $19,500 to Corporate Defendant URB Management); PX104 at 1-2 ($21,029); see also PX 20 ¶¶ 11 & 20 (Dec. of William Healey) (noting payments of $4,000 and $13,199 to Corporate Defendant LPS); PX104 at 3-4 ($16,000), 5 ($17,000), 6 ($16,400), 7($14,200) & 8 ($14,500).

[5] See e.g. PX 3 ¶ 16 (Dec. of Jason Adkins); PX 9 ¶ 8 (Dec. of Sharon Burke); PX 20 ¶ 16 (Healey Dec.); PX 30 ¶ 16 (Dec. of Kim Myre-Napieralski); PX 31 ¶ 8 (Pompati Dec.); PX 111 ¶ 27 (Dec. of Donna White); PX 112 ¶ 5 (Dec. of Patti Fraver).

[6] See PX 42 ¶ 105 (Dec. of Industry Expert Lisa Wilhelm) ("I can categorically say that no multi-billion government fund paid for by the credit card industry to eliminate consumers' credit-card debts exists").

[7] See id. at ¶¶ 107-109.

robocalls.  Consumers have filed at least 8,500 complaints with the FTC regarding Defendants' illegal telemarketing calls.[8]

Defendants conceal their misconduct from consumers and law enforcement by operating through a maze of shell companies, aliases, and fake addresses.[9]  Within the past three years, Defendants have faced legal action from three states for their unlawful conduct, including the State of Florida.[10]  In response, Defendants have simply created new companies, moved their call center, or shifted banking or management responsibilities to other Defendants so that they could continue to engage in the same illegal conduct.[11]

Given Defendants' ongoing, pervasive, and undeterred fraud, Plaintiffs ask this Court to enter an *ex parte* Temporary Restraining Order ("TRO") to halt Defendants' illegal conduct. The proposed TRO would enjoin Defendants' unlawful practices, freeze Defendants' assets,[12] appoint a temporary receiver for all Corporate Defendants, grant Plaintiffs and the receiver immediate access to Defendants' telemarketing room to preserve and collect records, and

---

[8] *See* PX 46 ¶¶ 40 & 41 (Dec. of FTC Investigator Reeve Tyndall) (listing do not call complaints against phone numbers (248) 215-0437 and (361) 271-4848)); *id.* at ¶¶ 1-10 (linking (248) 215-0437 to Defendants); *id.* at ¶¶ 25-36 (linking (361) 271-4848 to Defendants).

[9] PX 47 ¶¶ 23-26 (Randolph Dec.); PX 44 ¶¶ 9-10 &15-16 (Exs. 2 & 6) (Dec. Detective Gary Kleier, Orlando Police Department).

[10] *See* PX 43 ¶¶ 29-33 (Dec. of FDACS Bureau Chief Patricia Compton) (2013: Florida); PX 106 (2016: Oregon Department of Justice); PX 108 & PX 109 (2014: Mississippi Public Service Commission).

[11] As detailed below, Individual Defendant Kevin Guice was cited by FDACS in February 2013 after an onsite visit to Loyal Financial revealed unlawful telemarketing activity. He was arrested during that same inspection for running an unlicensed telemarketing operation for a different entity in a suite adjacent to Loyal Financial's. PX 43 ¶¶ 29-32 (Compton Dec.). After FDACS rejected Loyal Financial's application to renew its telemarketing license due to these violations, Kevin Guice was replaced as the company's manager by Individual Defendant Linda McNealy. PX 43 ¶ 43 (Ex. 12). Loyal Financial's renewal application was thereafter approved, but the company did not submit another one. Instead, Corporate Defendant Life Management Services was formed in February 2014 and submitted a telemarketing license application in March 2014. PX 47 at ¶ 10 (date of formation) (Randolph Dec.); PX 43 at ¶ 45 (date of application). After Life Management Services obtained a telemarketing license in April 2014, 42 telemarketers shifted employment from Loyal Financial to Life Management Services, and Loyal Financial's telemarketing license expired. PX 43 ¶¶ 40 & 56-57. At or about the same time, Defendants shifted their call centers from Loyal Financial to Life Management Services. *See* PX 102 at 3 (reflecting rent check paid for Science Drive, dated June 2014).

[12] The complaint names two individuals who received proceeds from the fraud as relief defendants. The proposed TRO would also freeze Relief Defendants' assets.

3

provide for certain expedited discovery. Such relief is necessary to stop ongoing consumer harm, to prevent the destruction of records, and to halt the continued dissipation of assets,[13] thereby preserving the Court's ability to provide effective final relief to the victims of Defendants' unlawful activities.

## II.   DEFENDANTS' BUSINESS PRACTICES

### A.   The Rate-Reduction Scheme: Defendants Falsely Promise Consumers Permanent and Substantial Credit-Card Interest-Rate Reductions

#### 1.   Defendants Make Illegal Telemarketing Calls to Locate Victims

Consumers' first contact with Defendants is typically through an unsolicited robocall instructing recipients to "press 1" if they want to have their credit-card interest-rates lowered.[14] Defendants send these robocalls to consumers regardless of whether they are on the National Do Not Call Registry.[15]

---

[13] Defendants have withdrawn $2.53 million in cash from corporate accounts between January 2013 and June 2015. PX 45 ¶ 22 (George Dec.). On 84 occasions, Defendants withdrew more than $10,000 in cash from corporate accounts in a single day. *Id.* at ¶¶ 23-24.

[14] PX 46 ¶¶ 14 & 26 (Tyndall Dec.);  PX 51 at 4 ; PX 52 at 4; *see also* PX 1 ¶¶ 3-5 (Dec. of Jim Anderson); PX 4 ¶¶ 5-7 (Dec. of Marilyn Bishop); PX 7 ¶ 5 (Dec. of Jacqueline Brabson); PX 10 ¶ 6 (Dec. of Betty Cherry); PX 11 ¶ 5 (Dec. of Colin Cherry); PX 12 ¶¶ 5-6 (Dec. of Reed Coombs); PX 15 ¶¶ 3-4 (Dec. of Dennise Gannon); PX 16 ¶¶ 5-6 (Dec. of Deborah Gascon); PX 19 ¶¶ 4-6 (Dec. of Patricia Grinnan); PX 23 ¶¶ 3-4 (Dec. of Sara Jorolemon); PX 29 ¶¶ 6, 8 (Dec. of Rosa Mussallem); PX 32 ¶¶ 4-5 (Dec. of Joseph Railey); PX 33 ¶¶ 5-6 (Dec. of Gerald Schallon); PX 34 ¶¶ 3-4 (Dec. of Jessica Schley); PX 35 ¶¶ 5-6 (Dec. of Ann Scholzen); PX 36 ¶ 3 (Dec. of Elaine Thomas); PX 37 ¶¶ 5-6 (Dec. of Joan Wedemeyer); PX 111 ¶ 5 (Dec. of Donna S. White); PX 155 ¶ 4 (Dec. of Jeffrey Franklin).

[15] PX 1 ¶ 11 (Anderson Dec.); PX 2 ¶ 3 (Dec. of Erika Adkins); PX 4 ¶ 3 (Bishop Dec.); PX 7 ¶ 3 (Brabson Dec.); PX 8 ¶ 3 (Dec. of Mitchell Brown); PX 10 ¶ 4 (Betty Cherry Dec.); PX 11 ¶ 5 (Colin Cherry Dec.); PX 12 ¶ 3 (Coombs Dec.); PX 15 ¶ 2 (Gannon Dec.); PX 16 ¶ 3 (Gascon Dec.); PX 18 ¶ 2 (Dec. of Sylvia Graham); PX 19 ¶ 3 (Grinnan Dec.); PX 20 ¶ 3 (Healey Dec.); PX 21 ¶ 3 (Dec. of Jimmy F. Henderson); PX 22 ¶ 3 (Dec. of JoAnn James); PX 23 ¶ 2 (Jorolemon Dec.); PX 24 ¶ 3 (Dec. of Nona L. Knauss); PX 25 ¶ 4 (Dec. of Donald R. Kubeny); PX 27 ¶ 2 (Dec. of Norma Jean Lohr); PX 28 ¶ 3 (Dec. of Hannah Maxwell); PX 29 ¶4 (Mussallem Dec.); PX 30 ¶ 2 (Dec. of Kim Myre-Napieralski); PX 32 ¶ 10 (Railey Dec.); PX 33 ¶ 3 (Schallon Dec.); PX 35 ¶ 3 (Scholzen Dec.); PX 37 ¶ 3 (Wedemeyer Dec.); PX 38 ¶ 3 (Dec. of Harley Wiley); PX 111 ¶ 3 (White Dec.).

Consumers who "press 1" are transferred to a call center staffed by Defendants' telemarketers.[16] The telemarketers typically tell consumers that they are eligible for lower interest rates on their existing credit cards if they have at least $2,000 in credit card-debt, interest rates over nine percent, and at least one credit card "in good standing." In reality, Defendants are screening and identifying consumers with sufficient available credit on their card to pay Defendants' fees.[17]

Defendants ask consumers to disclose highly sensitive personal information including full credit-card numbers, social security numbers, home addresses, dates of birth, and mothers' maiden name.[18] After obtaining this information, Defendants contact consumers' credit-card issuers to determine whether the consumer has sufficient available credit to pay Defendants' fee.[19] Consumers with enough available credit to pay Defendants' fees are told that they have "qualified" for the rate-reduction services.

**2.      Defendants Guarantee Substantial and Permanent Rate Reductions That Will Save Consumers Thousands of Dollars**

To promote the fiction that Defendants offer a legitimate service, Defendants' telemarketers tell eligible consumers that they work for "Bank Card Services," "Credit Assistance Program," or other generic names commonly associated with credit-card issuers.[20] Building on this ruse, Defendants tell consumers that they are a "licensed enrollment center" for major credit-card associations, such as MasterCard and Visa, and represent that they work

---

[16] As detailed below in Section III(A), since 2013 Defendants' telemarketers have been employed by Corporate Defendants Life Management Services and Loyal Financial, but financial records show that the telemarketers have also been paid by Corporate Defendants URB Management and KWP Services.  PX 46¶ 90 (Tyndall Dec.) & PX 114.

[17] PX 46 ¶¶ 17 & 28 (Tyndall Dec.); PX 51 at 6-7; PX 5 ¶¶ 6-8 (Dec. of Dorothy Blakely).

[18] *See, e.g.*, PX 13 ¶ 9 (Dec. of Amy DeMarco); PX 34 ¶ 9 (Dec. of Jessica Schley).

[19] PX 46 ¶¶ 18 & 19 (Tyndall Dec.); PX 51 at 7-13.

[20] PX 46 ¶¶ 15 & 29 (Tyndall Dec.); PX 51 at 8; PX 52 at 7; PX 19 ¶ 9 (Grinnan Dec.); PX 48 (Ex. 1) (Caplan Dec.).

directly with consumers' bank or other credit-card issuers.[21]  These representations are false, as Defendants have no relationship with these entities.[22]  Nevertheless, Defendants' claims have tricked consumers into believing that Defendants have some affiliation with consumers' banks or credit-card companies.[23]

After gaining a consumer's trust with these false affiliations, Defendants guarantee that they can substantially and permanently lower the consumer's credit-card interest rates.[24] Defendants also promise to save the consumer thousands of dollars in a short time[25] and claim that the consumer will become debt-free faster, typically three-to-five times faster, than she would without Defendants' program.[26]  In fact, Defendants' own telemarketing scripts direct employees to guarantee consumers they will get out of debt "3-5 times faster," save them at least $2500, and have "absolutely no out of pocket expense."[27]

---

[21] PX 46 ¶¶ 16 & 29; PX 51 at 8-9; PX 52 at 7.

[22] See PX 39 ¶¶ 27-32 (Dec. of Gail Kilmer (Citibank)); PX 40 ¶¶ 4-5 (Dec. of John Brady (MasterCard)); PX 41 ¶¶ 7-11 (Dec. of Martin Elliott (Visa)).

[23] See, e.g., PX 36 ¶ 8 ("I thought Samantha Anderson [telemarketer] was working with a bank") (Thomas Dec.); PX 2 ¶ 13 (telemarketer claimed that "UAD was a credit-counselling service and had a history of working directly with credit-card companies. Based on this, I believed that UAD had a close working relationship with these companies, and could get us lower interest rate than what was available to the general public.") (Erika Adkins Dec.); PX 26 ¶8 (was told by telemarketer that "IVD had a relationship with GM and Chase" and "referred to the GM MasterCard and the Chase Visa credit card as 'our cards'") and ¶ 9 ("I believed that IVD had some kind of arrangement with GM and Chase. I also believed that IVD could obtain an interest rate on these cards that was not available to the broader public.") (Dec. of Luann Laxton).

[24] See, e.g., PX 19 at 77:4-6 (Ex. 1 – Grinnan Call Transcript). See also, e.g. PX 5 ¶¶ 5-6 (Dec. of Dorothy Blakely); PX 19 ¶¶ 20-22; PX 22 ¶ 8 (Dec. of JoAnn James); PX 36 ¶ 8 (Dec. of Elaine Thomas); PX 51 at 14; PX 111 ¶ 10 (White Dec.); PX 112 ¶ 6 (Fraver Dec.).

[25] See, e.g., PX 28 ¶ 6 (Dec. of Hannah Maxwell); PX 22 ¶ 8 (James Dec.).

[26] See, e.g., PX 19 at 46:18-22 (Ex. 1 – Grinnan Call Transcript) ("We are required to show every cardholder a bare minimum savings of at least $2,000 in interest charges and guarantee that that will allow you to pay off your account three to five times faster than your current payment practice"); PX 12 ¶ 6 (Coombs Dec.).

[27] PX 43 (Exs. 2, 19, 28, 31) (Compton Dec.).

### 3.      Defendants Extract an Illegal Up-Front Fee

Defendants quote an up-front fee for their rate-reduction services that ranges from $500 and $5,000.[28]  To convince consumers to pay, Defendants assert that the thousands of dollars consumers will save with Defendants' lower interest rate will easily offset their fee.[29] Defendants' telemarketers instruct consumers to pay one of ten Corporate Defendants whose function is to maintain bank accounts where such payments are deposited.[30]  Defendants' telemarketers tell consumers that these Corporate Defendants are "processing centers."[31]

Consumers who pay Defendants frequently receive an invoice by email documenting the up-front payment.[32]  The invoices specifically note: "Your ONE time service charge has already been applied today per our verbal agreement."[33]

### 4.      Consumers Almost Never Receive the Promised Results

Defendants seldom, if ever, attain the results promised to consumers.[34]  In some instances, Defendants call consumers' credit-card issuers and request a lower interest rate.[35]

---

[28] See, e.g. PX 24 ¶ 26 (Knauss Dec.) (paid $500); PX 33 ¶ 27 (Schallon Dec.) (paid $5,000).

[29] See, e.g., PX 4 ¶ 17 (Bishop Dec.); PX 5 ¶¶ 9-11 & 12 (Blakely Dec.); PX 20 ¶ 9 (Healey Dec.); PX 22 ¶ 8 (James Dec.).

[30] These Corporate Defendants are IVD Recovery, LLC, KWP Services, LLC, KWP Services of Florida LLC, LPSofFlorida L.L.C., LPSofFLA LLC, URB Management, LLC, UAD Secure Services LLC, UAD Secure Service of FL LLC, YCC Solutions LLC, and YFP Solutions LLC.  As detailed in Sections III(A)(2) and V(A), Corporate Defendants hold accounts at financial institutions where consumer up-front fees are deposited, use those accounts to pay many of the expenses of the enterprise, and ultimately deliver profits from the enterprise to Individual and Relief Defendants.

[31] PX 19 ¶ 82 and 103:4-6 (Ex. 2) (Grinnan Dec.).

[32] PX 22 (Ex. 2) (James Dec.); PX 36 (Ex. 1) (Thomas Dec.); PX 5 (Ex. 3) (Blakely Dec.); PX 155 (Ex. 2) (Franklin Dec.).

[33] E.g., PX 12 at 6 (Ex. 1) (Coombs Dec.); PX 22 at 7 (Ex. 2) (James Dec.); PX 36 at 6 (Ex. 1) (Thomas Dec.); PX 155 at 7 (Ex. 2) (Franklin Dec.).

However, it is highly unlikely for consumers who have fixed-rate credit-cards to obtain any goodwill reductions from their issuers.[36] Consumers with variable interest-rate credit cards in good standing may receive a one-to-three-percent reduction,[37] if they receive anything at all, but even this modest interest-rate reduction is not the permanent or substantial reduction Defendants promised.[38]

In other instances, Defendants obtain new credit cards for consumers with low introductory rates ("promotional rates") and help consumers transfer their credit-card debt to those new cards ("balance transfer").[39] These "promotional rate" cards rarely, if ever, offer permanently lower interest rates, and in most cases, the interest rate on these credit cards increases substantially at the end of the promotional term.[40] Moreover, these rate-lowering tactics (calling to request a lower rate or transferring a balance to a new promotional-rate card) do not require any specialized expertise and are tasks consumers could easily perform on their

---

[34] See, e.g. PX 33 (Schallon Dec.); PX 20 (Healey Dec.); PX 2 & 3 (Decs. of Erika Adkins and Jason Adkins); PX 18 (Graham Dec.); PX 15 (Franklin). Defendants' blanket guarantees are inherently fraudulent. At the time they make these guarantees, Defendants possess little to no information about the consumer; cf. PX42 ¶45 (Wilhelm Dec.) (Defendants would need a "basic understanding" of consumer's financial profile before they could "credibly promise a substantially reduced interest rate, or identify payoff timeframe."). By contrast, credit card issuers possess detailed credit profiles of consumers and engage in a sophisticated analysis of several factors relating to those profiles when evaluating interest rate reduction requests. Id. at ¶¶ 48-49. Without an understanding of these factors, Defendants cannot predict, much less guarantee, whether a creditor would agree to lower a cardholder's interest rate. Id. at ¶ 48; see also id. ¶102 ("I can reach no other conclusions than that . . . Defendants' representations and promises made to consumers while pitching their rate reduction services were unachievable[.]").

[35] E.g., PX 12 ¶¶ 24-26 (Coombs Dec.).

[36] PX 42 ¶ 49 (Wilhelm Dec.).

[37] Id. at ¶ 52.

[38] Issuers can alter interest rates on variable-rate credit cards based on changes to the Prime Rate. PX 42 ¶ 22 (Wilhelm Dec.).

[39] See, e.g., PX 2 (Erika Adkins Dec.); PX 12 (Coombs Dec.); PX 13 (DeMarco Dec.); and, PX 16 (Gascon Dec.).

[40] In theory, Defendants could move a consumer from one promotional card to the next indefinitely. In practice however, rolling debt from one promotional card to another is reflected in, and negatively impacts, the consumer's credit profile. Over time it becomes less likely issuers will approve the consumer's card application. PX 42 at 31 n. 44 (Wilhelm Dec.). In any event, Plaintiffs are aware of no consumer who has obtained consecutive promotional rate cards through Defendants' rate-reduction scheme.

own for free.[41]

In sum, despite Defendants' promises to the contrary, consumers who pay Defendants' up-front fees almost never obtain a permanent and substantially lower interest rate, save thousands of dollars in interest payments, or pay off their credit-card debts three-to-five times faster.

**B.    The Debt-Elimination Scheme: Defendants Fraudulently Guarantee Debt Elimination Through a Nonexistent Government Fund Paid for By Credit-Card Companies**

**1.    Defendants Collect Up to $20,000 and Instruct Consumers to Stop Paying their Credit-Card Bills**

For their debt-elimination scheme, Defendants mainly target consumers who have already paid the up-front fee for their purported rate-reduction services.[42] Defendants' debt-elimination pitch is simple, effective, and wholly deceptive.  Defendants promise consumers that they can obtain money from a government fund that they can use to pay off consumers' credit-card balances within 18 months.[43]  Defendants further claim that the government fund is paid for by credit-card companies that were found to be charging excessive interest rates.[44]  In other instances, Defendants target senior citizens by claiming the government has a "new program" which will eliminate their credit-card debt.[45]

To have their debt eliminated, Defendants claim that a consumer need only do three

---

[41] *See, e.g.,* PX 5 ¶ 39 (Blakely Dec.); PX 28 (Ex. 7) (Maxwell Dec.) (letter from Chase bank detailing the consumer's ability to settle their debt or negotiate lower interest rates on their own behalf with Chase).

[42] *See, e.g.* PX 2 & 3 (Decs. of Erika Adkins and Jason Adkins); PX 4 (Bishop Dec.); PX 7 (Brabson Dec.); PX 10 (Betty Cherry Dec.); PX 18 (Graham Dec.); PX 20 (Healey Dec.); PX 21 (Henderson Dec.);PX 25 (Kubeny Dec.); PX 26 (Laxton Dec.); PX 36 (Thomas Dec.); PX 38 (Wiley Dec.); PX 110 (Dec. of Florence Schuldt); PX 111 (White Dec.).

[43] *Supra* note 5.

[44] *See, e.g.* PX 20 ¶ 16 (Healey Dec.); PX 110 ¶ 11 (White Dec.).

[45] PX 112 ¶ 5 (Fraver Dec.); PX 7 ¶ 25 (Brabson Dec.).  Some consumer declarants have also reported that Defendants describe their rate-reduction service as being designed to help senior citizens.  *See* PX 18 ¶¶ 6-9 (Graham Dec.); PX 30 ¶ 10 (Myre-Napieralski Dec.).

things.  First, the consumer must pay the Defendants an up-front fee, which can range from approximately $2,500 to $20,000.[46]  Second, the consumer must make minimum payments on her credit cards for a period ranging from three to six months.  Third, the consumer must then stop paying her credit-card bills.[47]

When making their debt-elimination pitch, Defendants do not tell consumers that failing to make timely payments to their creditors could have serious consequences, including collection lawsuits, higher interest rates on existing credit-card debt, and higher credit-card debt due to the accrual of fees and interest.  Defendants also do not tell consumers that failing to pay their credit-card bills will likely reduce their creditworthiness.[48]

Consumers who purchase Defendants' debt-elimination services typically receive a "New Client Packet" in the mail two to three months later.[49]  The New Client Packet documents the consumer's up-front payment, the date of enrollment, and amount of the consumer's unsecured debt to be eliminated.[50]  Defendants also represent in the New Client Packet that the consumer will receive a full refund of her purchase price if Defendants are unable to pay off the consumer's unsecured debt within 18 months.[51]

### 2. There is No Government Fund, and Consumers Suffer Serious Harm By Not Paying Their Credit-Card Bills

Defendants' conduct after receiving a consumer's up-front payment is, in at least some instances, indistinguishable from outright theft.  For example, one consumer reports that she paid Defendants $7,500 and did not even receive the New Client Packet before Defendants stopped

---

[46] *See* PX 7 ¶ 28 (Brabson Dec.) ($2,462) *and supra* note 4.

[47] *See, e.g.,* PX 2 ¶ 32 (Erika Adkins Dec.).

[48] *See, e.g.,* PX 28 ¶¶ 21-22 (Maxwell Dec.); PX 111 ¶¶ 33-36 (White Dec.).

[49] *See, e.g.,* PX 7 ¶ 33 (J. Brabson Dec.); PX 111 ¶¶ 43-46 (White Dec.).

[50] *See, e.g.,* PX 20 at 19-20 (Ex. 4) (Healey).

[51] *See, e.g., id.* at 18-19, 22 (Ex. 4).

returning her calls.[52] Defendants also cut off contact with consumers who continue to pay their credit card bills, or who refuse to sign and return a Power of Attorney form that is included in the New Client packet.[53]

When Defendants do take action on a consumer's behalf, the services that they provide are materially different from what they had promised. Defendants do not pay off consumers' credit-card debt by accessing a government fund because there is no such fund. Instead, in some circumstances, Defendants attempt to settle consumers' credit-card debt. After convincing consumers to execute the Power of Attorney form and stop paying their credit card bills, Defendants contact a consumer's creditors, hold themselves out as the consumer's agent, and try to negotiate a deal to pay the creditors less than the full amount of the consumer's unsecured debt. These efforts are rarely successful.[54]

---

[52] PX 26 ¶¶ 44-47 (Laxton Dec.).

[53] See, e.g., PX 16 ¶¶ 46-47 (Gascon Dec.); PX 18 ¶¶ 66-77 (Graham Dec.); PX 30 ¶¶ 53-64 (Myre-Napieralski Dec.).

[54] The experience of Jason and Erika Adkins is particularly instructive. In 2014, the Adkinses purchased Defendants' debt-elimination services after being promised full debt elimination via a $25 billion government fund. The Adkinses paid UAD Secure Services $9,389 and, per Defendants' instructions, stopped paying their credit-card bills in late 2014. PX 3 ¶ 36 (Ex. 3 at 18) (sum listed on New Client Packet). The Adkinses initially received a number of delinquency notices, but those notices soon ceased. See id. at ¶ 38 (telemarketer stated that "UAD was taking care of the issue."). Defendants responded to Jason Adkins's uneasiness with claims about past successes. Id. at ¶ 39. In April 2014, the Adkinses began receiving debt-collection notices. In one letter, the creditor claimed to accept less than the full amount due as "settlement in full." Id. at ¶ 41 (Ex. 6). Per Defendants' instructions, the Adkinses faxed all correspondence to their point of contact using the provided fax number (877) 733-5445. PX 2 at ¶ 52 (faxing delinquency notices) (Ex. 6) (fax transmission receipt), ¶ 55 (faxing debt-collection notice) (Ex. 8) (fax receipt).

In May 2015, Defendants called Jason Adkins and asked for more money to settle his debt. When asked why additional funds were needed, Defendants claimed that they had been "unable to access the $25 billion fund," had "fired the law firm responsible for accessing the fund," and that everyone was "learning as we go." PX 3 at ¶ 45. Defendants' telemarketer stated that if Adkins could provide a little more money, "UAD might be able to make this issue 'go away.'" Id. at ¶ 46. Despite claiming to be in uncharted waters, Defendants' telemarketer cited past experience when counselling the Adkinses to "hold tight," stating "after 15-18 months, most creditors are willing to take pennies on the dollar. Citibank, especially, was often willing to walk away for nothing." Id. at ¶47. Mr. Adkins refused to provide additional money. Shortly thereafter, Jason Adkins was sued by a creditor for non-payment; Erika Adkins was sued for the same reason a month later. PX 2 ¶ 59 (Ex. 11) (complaint) (Erika Adkins Dec.); PX 3 ¶ 50 (Ex. 7) (complaint) (Jason Adkins Dec.).

Regardless of what happens to their credit-card debt, consumers suffer serious harm by following Defendants' instructions to stop paying their credit card bills.[55]  Consumers fall further behind on their bills, end up paying higher interest rates on existing debt, and have reduced credit scores and higher overall credit-card debt due to late fees.[56]

Consumers can also face lawsuits from creditors.[57]  When consumers are sued, Defendants send consumers generic, boilerplate pleadings that are not personalized to consumers' circumstances or jurisdiction, and instruct consumers to file these documents *pro se*. These filings contain false allegations, such as claims that there is a "billing error dispute."[58]  As a result, non-lawyer consumers using Defendants' documents often end up filing false statements with a court.[59]  In the end, these consumers are left deeper in debt, worse off financially, and some have even had to file for bankruptcy.[60]

### C. Defendants Instruct Consumers to Pay the Up-Front Fees Using Credit-Card Cash Advances

Since at least March 2014, Defendants have been urging consumers to pay the up-front fees by taking a cash advance on their credit cards, and instructing them to send the proceeds to

---

When the Adkinses contacted Defendants, Defendants again asked for money, repeatedly using the phrase "learning as we go." PX 3 ¶¶ 52-53. Eventually, Defendants provided the Adkinses with a document styled as an "Answer" and instructed them to file it *pro se*. Citing "verbiage from the FTC website," the Answer alleges that a creditor's failure to respond in a timely fashion to a "billing error dispute" notification cancelled the creditor's right to collect the unsecured debt, "even if the bill is correct." PX 2 at 63 (Ex. 13).

Jason Adkins filed the Answer, which the Court accepted despite its failure to "comply with the rules of the court." PX 3 at 62 (Ex. 10) (Journal Entry, Judge Eddy); *see also id.* at ¶ 58. The Adkinses declared bankruptcy shortly thereafter. PX 3 ¶ 59.

[55] *See, e.g.,* PX 2 & 3 (Decs. of Erika Adkins and Jason Adkins) (filed bankruptcy); PX 20 ¶¶ 20 & 49 (credit score reduced from 730 to 579), ¶ 43 (issuer canceled credit card and hired debt collector), ¶ 46 (issuer reduced credit limit) (Healey Dec.).

[56] *Id.*

[57] *See supra* note 54; *see also* PX 112 ¶¶ 38-42 & 49 (Exs. 7, 8 & 10) (Fraver Dec.).

[58] PX 2 at 63 (Ex. 13) (Erika Adkins Dec.); *see also supra* note 54.

[59] *See supra* note 54.

[60] *Id.*

Defendants by personal check, cashier's check, or money order.[61]  Alternatively, Defendants ask consumers to send a credit-card convenience check made payable to one of the Corporate Defendants.[62]  Defendants instruct consumers to send their payments by mail or courier to Post Office boxes and UPS stores in the Orlando, Florida area.[63]

By accepting cash advances, Defendants avoid having to maintain an active a credit-card-processing merchant account, which payment processors are required to monitor for fraud.[64]  As a result, consumers are deprived of their credit-card chargeback rights under federal law.[65]  Defendants also do not inform consumers that credit-card issuers often charge a fee for cash-advance transactions, and may charge a higher interest rate on this type of credit-card debt.[66]

## D.    Defendants' Abusive Telemarketing Practices

As noted above, Defendants initially contact potential victims by using robocalls. Indeed, two telephone numbers associated with Defendants have generated more than 7,500 robocall consumer complaints.[67]  Defendants have also called numbers on the National Do Not Call Registry; in fact, Defendants have never even paid the annual fee to access the National Do Not Call Registry.[68]

---

[61] *See, e.g.,* PX 15 (Gannon Dec.), PX 18 (Graham Dec.), PX 30 (Myre-Napieralski Dec.).

[62] *See, e.g.,* PX 110 ¶ 7 (Schuldt Dec.).  Convenience checks, also called credit-card checks, can be used to take a cash advance on a credit card.  Credit-card issuers often send consumers these checks along with routine correspondence, such as consumers' credit-card statements.

[63] *See, e.g.,* PX 19 ¶¶ 50, 64-67 (Grinnan Dec.); PX 38 ¶¶ 24 & 26 (Wiley Dec.); PX 44 ¶¶ 15-16 (Kleier Dec.); PX 48 ¶ 23 (Ex. 4) (Caplan Dec.).

[64] PX42 ¶ 89 (Wilhelm Dec.).

[65] *See* Truth in Lending Act, 15 U.S.C. § 1601, *et seq., and* Regulation Z, 12 CFR § 226, *et seq.*

[66] PX42 ¶ 35 (Wilhelm Dec.).

[67] *See* PX 46 ¶¶ 40 & 41 (Tyndall Dec.).

[68] PX 46 ¶ 56-57 (Tyndall Dec.).

### E.    Consumer Harm

Defendants have grossed well over $15.6 million since January 2013.[69]  During the same period, at least 2,800 consumers have paid Defendants through credit-card convenience checks, personal checks, ACH transfers, money orders, and cashier's checks, several of which are for more than $10,000.[70]  And consumers who pay these amounts, particularly for Defendants' debt-elimination services, often see their credit ruined in exchange for the exorbitant and illegal up-front fees Defendants collect.  For example, two consumers who submitted declarations in support of Plaintiffs' motion describe having paid Defendants $22,000 and $17,199 respectively, only to face collection actions.[71]

This consumer harm is exacerbated by the fact that Defendants typically do not refund consumers' up-front payments.[72]  In some instances, Defendants have intimidated consumers who hesitated or refused to pay the illegal up-front fee after verbally agreeing to do so.[73]

## III.   DEFENDANTS

Defendants are a common enterprise of thirteen companies controlled by a cohort of five individuals who own, operate, and manage the Corporate Defendants.  Defendants transact business through a maze of interrelated companies that share bank accounts,[74] office space,[75] and

---

[69] PX 45 ¶11 (George Dec.).  As detailed in footnote 2, this likely understates the total consumer harm.

[70] Between January 2013 and June 2015, at least 102 consumers paid Defendants more than $10,000.  *See* PX 45 ¶ 13 (George Dec.) (limiting analysis to where payor can definitively be identified).

[71] PX 31 (Pompati Dec.); PX 20 (Healey Dec.).

[72] *See, e.g.*, PX 2 & 3 (Jason and Erika Adkins Decs.); PX 7 (Brabson Dec.); PX 18 (Graham Dec.); PX 27 (Lohr Dec.).  Defendants promised at least one consumer a partial refund, but only if the consumer abandoned her complaint with the State of Florida.  *See* Maxwell Dec, ¶ 23, Ex. 6 (emails from Celina Young with UAD, sent to Hannah Maxwell).

[73] *See, e.g.*, PX 25 (Kubeny Dec.); PX 111 (White Dec.).

[74] PX 45 at 16 (George Dec.) (Att. C) (detailing payments from one consumer to two or more Corporate Defendants); *see also* PX 46 ¶ 97 (Tyndall Dec.) (checks payable to IVD Recovery deposited in Loyal Financial bank account), PX 94 (checks); PX 46 ¶ 98 (Tyndall Dec.) (UAD Secure Services checks deposited in LPS bank account); PX 99 (checks); PX 46 ¶ 99 (UAD Secure Services checks deposited in URB Management bank account); PX 95 (checks); PX 46 ¶ 100 (Tyndall Dec.) (URB Management checks deposited in Loyal Financial bank account), PX 96 (checks).

telephone numbers.[76] Defendants are financially integrated, sharing assets and liabilities. For example, major expenses like payroll,[77] rent,[78] and telephone service[79] that benefit the enterprise are often billed to one Corporate Defendant but paid by another Defendant.[80] Revenue, in the form of consumer payments, is commingled among the Corporate Defendants,[81] and often reaches the Individual Defendants only after it has been funneled through numerous Corporate Defendants.[82] In addition, two Relief Defendants have received funds or other assets that are traceable to the fraudulent scheme, and to which they appear to have no legitimate claim.[83] The table below groups Defendants by their status.

---

[75] As discussed in the declaration of Florida Investigator Jacquelyn Randolph, with the exception of Loyal Financial, IVD Recovery, and Life Management Services, the remaining Defendants listed residences and a UPS Store as their principal business addresses in filings with the Florida Secretary of State. *See* PX 47 ¶¶ 23-24 (Randolph Dec.); *see also* PX 44 ¶ 9 (Kleier Dec.). Corporate Defendants Loyal Financial and IVD Recovery, both of which have been administratively dissolved, had offices in the same building on Lake Underhill Road. *See* PX 47 ¶ 26 (Randolph Dec.). Corporate Defendant Life Management Services has its offices at 12001 Science Drive, Suites 125 & 180, Orlando, FL 32826. *See* PX 47 ¶¶ 46-55 (Randolph Dec.); PX 102.

[76] Consumers who have dealt with Corporate Defendants LPS, KWP, and YCC all report having received telephone calls from (361) 271-4848. *See, e.g.* PX 7 ¶ 41 (Brabson Dec.); PX 34 ¶ 7 (Schley Dec.); PX 111 ¶ 41 (White Dec.). Orlando Police Detective Gary Kleier and FTC Investigator Reeve Tyndall similarly report having received calls from that number during their dealings with Defendants. See PX 44 ¶ 14 (Kleier Dec.); PX 46 ¶ 10 (Tyndall Dec.).

[77] PX 98 (BB&T wire transfers); PX 103 (SunTrust wire transfers); PX 114 (payroll checks); PX 46 ¶¶ 90, 95 & 96 (Tyndall Dec.) (LPSofFlorida paid KWP Services' payroll in May of 2015; LPSOFFLORIDA paid Life Management Services' payroll in July and August of 2015; and, KWP Services paid Life Management Services' payroll in July of 2015.).

[78] PX 46 ¶ 91 (Tyndall Dec.) (KWP Services paid Life Management Services' 12001 Science Drive rent from June 2014 - February 2016); PX 102 (copies of related checks).

[79] As discussed in greater detail at footnotes 118 and 131, *infra*, a Grasshopper Group account in URB Management's name lists telephone numbers that consumer declarations have tied to Corporate Defendants URB Management and UAD Secure Services, and has had a credit card in the name of KWP Services, LLC's manager, Karen Wahl, attached to the account, and a single FreedomVoice Systems account lists telephone numbers that consumer declarations and complaints have tied to KWP Services, LPS, YCC Solutions, and YFP Solutions. The same credit card held by Individual Defendant Harry Wahl, the manager of Corporate Defendant Life Management Services, is attached to the j2 Cloud Services accounts in the names of UAD Secure Services, LPS, and KWP Services. *See* PX 46 ¶¶ 81-84 (Tyndall Dec.). In addition, KWP Services paid URB Management's Grasshopper telephone bill from July 2014 - June 2015; Life Management Services paid the same URB Management Grasshopper telephone bill from September 2015 - January 2016. PX 86 at 3; PX 87 at 3; PX 88 at 3.

[80] Supra notes 77- 79.

[81] *See* PX 45 ¶ 25-39 (George Dec.) (detailing $8.8 million in transfers between Corporate Defendants).

[82] *See* PX 45 ¶¶ 40-50 and (Attach. D flow chart) (George Dec.) (tracing $1.6 million in consumer payments deposited in an LPS bank account to $890,000 in wire transfers to personal account of Individual Defendant Kevin Guice, including $755,000 via Corporate Defendant PW&F) .

[83] *See id.* (same funds tracked to check payments of $127,000 to Robert Guice and $84,000 to Timothy Woods from Kevin Guice's personal account).

15

## Table of Defendants by Category

| Primary Defendants | | Relief Defendants |
|---|---|---|
| Telemarketer Corporate<br><br>• Life Management Services of Orange County, LLC<br>• Loyal Financial & Credit Services, LLC<br><br>Individual<br><br>• Kevin W. Guice<br>• Chase P. Jackowski<br>• Linda N. McNealy<br>• Clarence H. Wahl, a/k/a Harry C. Wahl<br>• Karen M. Wahl | Shell Corporate<br><br>• IVD Recovery, LLC<br>• KWP Services, LLC<br>• KWP Services of Florida, LLC<br>• LPSofFLA LLC<br>• LPSofFlorida L.L.C.<br>• PW&F Consultants of Florida LLC<br>• UAD Secure Service of FL LLC<br>• UAD Secure Services LLC<br>• URB Management, LLC<br>• YCC Solutions LLC<br>• YFP Solutions LLC | • Robert Guice<br>• Timothy Woods |

## A.    The Corporate Defendants

Since January 2013, two Corporate Defendants, have held commercial telephone seller business licenses ("telemarketing licenses") issued by the Florida Department of Agriculture and Consumer Services ("FDACS"), housed the call centers, and employed the telemarketers who sell Defendants' bogus debt-relief services ("Telemarketer Corporate Defendants"). The other eleven Corporate Defendants have no known employees and appear to operate out of

Defendants' call center ("Shell Corporate Defendants").[84]  Defendants have opened more than two dozen bank accounts in the name of Shell Corporate Defendants,[85] and use these accounts to deposit consumers' up-front fees and pay business expenses.  In addition, the Shell Defendants facilitate the movement of money among the entities in the common enterprise and distribute the profits of the enterprise to the Individual and Relief Defendants.

### 1.    Telemarketer Corporate Defendants

Defendant **Life Management Services of Orange County, LLC ("Life Management Services")** is a Florida company with its principal place of business at 12001 Science Drive, Suites 125, 180 in Orlando, Florida.[86]  This company has been the hub of Defendants' scheme since 2014, when Defendants moved their call center to the Science Drive location.  **Individual Defendant Harry Wahl** was named as the company's manager in August 2014.[87]  Life Management Services has held a telemarketing license since April 2014, and renewed its license in April 2016.[88]  The company employs telemarketers pitching rate-reduction and debt-elimination services,[89] and a telephone number used by the company has been the subject of at least 6,500 consumer complaints.[90]  An FTC investigator later recorded calls from this number and captured portions of Defendants' deceptive rate-reduction pitch.[91]

---

[84] *See supra* notes 9 & 75.

[85] PX 45 at 13 (Att. C) (George Dec.).

[86] PX 47 ¶ 10 (Ex. 1) (Randolph Dec.).

[87] *Id.*

[88] PX 43 ¶¶ 57-59 (Compton Dec.).

[89] PX 43 (Exs. 19 & 28) (Compton Dec.); *see also* PX 47 ¶¶ 46-55 (Randolph Dec.) (during April 2016 undercover site visit to call center at 12001 Science Drive, investigator told that the hiring company does rate-reduction services; overheard telemarketer discussing debt-elimination).

[90] *See* PX 11 ¶¶ 3 & 11 (Dec. of Colin Cherry); PX 46 ¶ 40 (Tyndall Dec.).

[91] PX 46 ¶¶ 11-36 (Tyndall Dec.).

Defendant **Loyal Financial & Credit Services, LLC ("Loyal Financial")**,[92] is a former Florida company with its principal place of business at 11549 Lake Underhill Road, in Orlando, Florida.[93] Loyal Financial was formed in 2011 by **Individual Defendant Kevin Guice**, and was the predecessor to Life Management Services.[94] Until at least February 2014, Defendants' call center was located at 11549 Lake Underhill Road, and Loyal Financial employed telemarketers pitching rate-reduction and debt-elimination services.[95] In February 2013, FDACS sanctioned Loyal Financial and Mr. Guice for unlawful telemarketing practices.[96] Loyal Financial's telemarketing license expired in May 2014, less than two weeks after Life Management Service obtained its telemarketing license.[97] At or about the same time, 42 telemarketers left their employment with Loyal Financial and began working with Life Management Services at 12001 Science Drive.[98]

## 2.   Shell Corporate Defendants

Defendant **IVD Recovery, LLC ("IVD Recovery")** is a former Florida company with its principal place of business at 11561 Lake Underhill Road, Suite A, Orlando, Florida 32825.[99] While active, IVD Recovery and Loyal Financial were located in the same building,[100] and bank records show more than $1.8 million in transfers from IVD Recovery to Loyal Financial.[101] Bank records also demonstrate that **Individual Defendant Harry Wahl** controlled IVD Recovery.

---

[92] Loyal Financial also did business under the names FOC Credit and Reward Services.  PX 47 ¶ 11 (Ex. 2) (Randolph Dec.).
[93] *Id.*
[94] *Id.*
[95] PX 43 ¶¶ 16-28 (Exs. 1-4) & 34-40 (Compton Dec.).
[96] *Id.* at ¶¶ 29-33 (Ex. 5-7).
[97] *Id.* at ¶ 57.
[98] *Id.* at ¶¶ 54-56 (Ex. 27).
[99] PX 47 ¶ 12 (Ex. 3) (Randolph Dec.).
[100] *Id.* at ¶ 26.
[101] PX 45 ¶ 26 (George Dec.).

Mr. Wahl is listed as a co-signer on an IVD Recovery checking account at Bank of America, signed all issued checks,[102] and statements for the account were mailed to his home address.[103]

Defendant **KWP Services, LLC**, is a Florida company formed in 2014 by **Individual Defendant Karen Wahl**. **KWP Services of Florida LLC** is a Florida company formed in 2015 by **Individual Defendant Harry Wahl**.[104] KWP Services has issued payroll checks to Defendants' telemarketers and paid rent for the call center located at 12001 Science Drive.[105] KWP Services has received monies traceable to Defendants' scheme, and has accepted more than $2 million in transfers from Corporate Defendants LPS, UAD Secure Services, and PW&F.[106] KWP Services has issued payments to **Individual Defendants Linda McNealy** and **Kevin Guice**, and **Relief Defendants Timothy Woods** and **Robert Guice**.[107]

Defendant **LPSofFlorida L.L.C.** is a Florida company founded in 2015.[108] Defendant **LPSofFLA LLC** was a Florida company founded in 2014 and dissolved in September 2015.[109] Both entities were formed by **Individual Defendant Chase Jackowski**.[110] LPS has paid expenses of the common enterprise, including wires to Life Management Services for

---

[102] PX 47 ¶¶ 42 & 44 (Ex. 20) (Randolph Dec.).  Harry Wahl also registered the domain YourIVDRecovery.com with GoDaddy.com in 2013.  *See* PX 46 ¶ 86 (Tyndall Dec); PX 91.

[103] PX 47 ¶ 43 (Ex.21) (Randolph Dec.).

[104] Unless specifically noted, we refer to the two entities collectively as "KWP Services."

[105] PX 46 ¶ 91 (Tyndall Dec.); PX 102 (checks).

[106] PX45 ¶¶ 30-32 (George Dec.).

[107] *Id. at* ¶¶ 15-18.

[108] PX 47 ¶ 16 (Ex. 7) (Randolph Dec.).

[109] *Id.* at ¶ 15 (Ex.6). Unless specifically noted, we refer to the two entities collectively as "LPS."

[110] *Id.* at ¶¶ 15-16. (Ex. 6-7).

"payroll."[111] Plaintiffs have traced at least $1.6 million in consumer payments deposited in a single LPS bank account to distributions made to each Individual and Relief Defendant.[112]

Defendant **PW&F Consultants of Florida LLC** ("PW&F") is a former Florida company[113] that appears to have existed solely to facilitate money transfers among the Corporate Defendants and distribute funds to Individual and Relief Defendants.  PW&F has wired funds to KWP Services (more than $1 million) and Life Management Services ($43,000), and received wire transfers from UAD Secure Services (more than $600,000) and LPS (more than $2.2 million).[114]  Plaintiffs have traced money transfers involving LPS, KWP Services, and PW&F to distributions made to **Individual Defendants Kevin Guice, Linda McNealy, Harry Wahl, Karen Wahl**, and **Relief Defendants Timothy Woods** and **Robert Guice**.[115]

Defendant **URB Management, LLC,** is a former Florida company that has issued payroll checks to Defendants' telemarketers and paid other expenses of Defendants' enterprise.[116]  URB Management has received millions of dollars in consumer payments traceable to Defendants' fraud, and made direct payments to **Individual Defendant Kevin Guice** of almost $1.5 million.[117]  Even after its dissolution, URB Management remained listed as the subscriber on an

---

[111] PX 46 ¶ 98; *see also* PX 98 at 2-7.

[112] Between November 2014 and March 2015, an LPS bank account received more than $1.64 million from consumers. Direct payments from this account, and money flows from this account through PW&F, LPS and KWP Services, and the personal account of Kevin Guice show distributions to Kevin Guice ($679,000), Chase Jackowski ($155,576), Harry and Karen Wahl ($82,167), Linda McNealy ($41,750), Robert Guice ($127,000), and Timothy Woods ($84,000). *See* PX 45 ¶¶ 40-50 (George Dec.) (Attach. D money flow diagram).

[113] PX 47 ¶ 17 (Ex. 8) (Randolph Dec.).

[114] PX45 ¶¶ 25-39 (George Dec.).

[115] *See supra* note 112.

[116] PX 46 ¶ 90 (Tyndall Dec.); PX 114 (summarizing payments from Corporate Defendants to Defendants' telemarketer employees); PX 47 ¶ 20 (Ex. 11) (Randolph Dec.).

[117] PX 45 ¶ 15 (41 transfers, $1.498 million) (George Dec).

account for telephone numbers used in Defendants' enterprise.[118]  An FTC investigator recorded

an undercover call that he placed to one of the telephone numbers associated with this account,

during which the call-recipient acknowledged that her employer sells rate-reduction services and

has used the name "URB Management" and several other "merchant accounts."[119]

Defendants **UAD Secure Services LLC** and **UAD Secure Service of FL LLC** are

Florida companies organized in 2013 and 2014 respectively.[120]  UAD Secure Services has paid

expenses related to Defendants' scheme and is listed as the account holder for a Post Office box

where consumers' up-front payments are sent.[121]  UAD Secure Services is also linked to the

common enterprise through consumer declarations,[122] intercompany transfers,[123] and the

commingling of funds with Corporate Defendants, including Loyal Financial.[124]  UAD Secure

Services has additionally made direct payments to **Individual Defendant Kevin Guice** of more

---

[118] Grasshopper Group LLC has provided toll-free telephone service to the Life Management Defendants.  The Life Management Defendants' Grasshopper Group account is in URB Management's name, and since July 2014, Karen Wahl's credit card has been attached to the account.  *See* PX 84 at 1-2.  Telephone numbers on the account have included (866) 960-9368 and (866) 685-5195.  *See* PX 85 at 1-2.  Consumer declarations link these telephone numbers to URB Management and UAD Secure Services.  *See, e.g.*, PX 17 at 6 (Ex. 1) (Dec. of Dianne Goldsmith); PX 31 at 11 & 19 (Exs. 4 & 6) (Pompati Dec.).

[119] PX 46 ¶ 4-9 (Tyndall Dec.).

[120] PX 47 ¶¶ 18-19 (Exs. 9-10) (Randolph Dec.).  Unless specifically noted, we refer to the two entities collectively as "UAD Secure Services."

[121] PX 46 ¶¶ 63 & 94 (Tyndall Dec.) (UAD purchased $20,000 football tickets for Individual Defendant Kevin Guice); PX 98; PX 45 ¶¶ 15, 30, 34 & 39 (George Dec.) (UAD paid **Individual Defendant Kevin Guice** $555,000 in 11 separate transactions; UAD paid KWP Services $1,076,500 between June and November 2014; UAD paid PW&F $654,024 between August and November 2014; and, UAD paid Life Management Services $8,000 in April 2015).

[122] PX 2 (Erika Adkins Dec.); PX 3 (Jason Adkins Dec.); PX 15 (Gannon Dec.); PX 18 (Graham Dec.); PX 23 (Jorolemon Dec.); PX 28 (Maxwell Dec.); PX 31 (Pompati Dec.); PX 38 (Wiley Dec.).

[123] UAD Secure Services has transferred more than $1 million to KWP Services and more than $600,000 to PW&F.  PX 45 ¶ 25-39. (George Dec.).

[124] Consumers who had made payments to UAD Secure Services have also paid Loyal Financial, URB Management, LPS, and KWP Services.  PX 45 (Att. C) (George Dec.).

than $500,000[125] and, in September 2015, a UAD Secure Services account purchased football tickets for Kevin Guice at a cost of $20,000.[126]

Defendant **YCC Solutions LLC** ("YCC Solutions") is a Florida company founded in August 2015.[127] YCC Solutions has wired funds to Life Management Services, which in turn has paid expenses of the joint enterprise.[128] YCC Solutions additionally accepts consumer payments for debt-relief services,[129] and issues consumers invoices and New Client Packets that are nearly identical to those received by consumers who paid LPS, KWP Services, UAD Secure Services, and URB Management.[130] YCC Solutions' contact telephone number is one of five numbers listed on an account paid for by **Individual Defendant Karen Wahl**; the other telephone numbers are linked to YFP Solutions, LPS, and KWP Services.[131]

Defendant **YFP Solutions LLC** ("YFP Solutions") is a Florida company founded in August 2015 by **Individual Defendant Chase Jackowski**.[132] YFP Solutions accepts consumer payments for debt-relief services,[133] including consumer payments referring to "Lea Brownell" and "Angie Morales."[134] FDACS records show that telemarketers named Lea Brownell and Angivette Morales have been employed by Life Management Services since May 2014, and were

---

[125] PX 46 ¶ 15. (George Dec.).

[126] PX 98.

[127] PX 47 ¶ 21 (Ex. 12) (Randolph Dec.).

[128] PX 101 (January 2016 bank statement Life Management Services account showing incoming wire from YCC Solutions on January 19, and outgoing payments to j2 EFAX Services on the same day).

[129] PX 8 (Dec. of Mitchell Brown); PX 12 (Coombs Dec.); PX 111 (White Dec.).

[130] PX 48 ¶¶ 21, 23 (Exs. 2, 14) (Caplan Dec.).

[131] FreedomVoice Systems has provided toll-free telephone service to Defendants. Karen Wahl's credit card is on file for Defendants' FreedomVoice account, which has five telephone numbers. *See* PX 92 at 2. Consumer declarations and complaints link four of the five numbers – (866) 351-0009, (888) 687-3305, (800) 372-0145, and (800) 857-2964 – to KWP Services, LPS, YCC Solutions, and YFP Solutions. *See, e.g.,* PX 34 at 7 (Ex. 1) (Schley Dec.); PX 37 at 5 (Ex. 1) (Wedemeyer Dec.); PX 111 ¶ 18 (White Dec.); PX 46 ¶ 49 (Tyndall Dec.).

[132] PX 47 ¶ 22 (Ex. 13) (Randolph Dec.).

[133] January 2016 consumer payments to YFP Solutions contain hand-written such as "rate reduction freedom C," and "cc reduction." PX 100.

[134] *Id.* at 3-5.

previously employed by Loyal Financial.[135]  Lea Brownell has received payroll checks from

Loyal Financial (signed by **Individual Defendant Kevin Guice**), URB Management, KWP

Services (signed by **Individual Defendant Harry Wahl**) and Life Management Services.[136]  Ms.

Brownell is linked by consumer declaration to Defendants' marketing of debt-elimination

services.[137]

### B.    Individual Defendants

Each Individual Defendant has owned, operated, or managed one or more of the

Corporate Defendants, and each shares proceeds from Defendants' debt-relief scheme.

Defendant **Kevin W. Guice** is the principal beneficiary of the enterprise, having received

more than $5 million in proceeds between January 2013 and May 2015.[138]  Mr. Guice was the

managing member of **Corporate Defendant Loyal Financial** until its dissolution in 2014, and

has been identified by a former employee as its owner.[139]  Mr. Guice has signed checks to

Defendants' telemarketers and opened bank accounts that have received several million dollars

in proceeds from Defendants' fraud.[140]  Mr. Guice continues to be involved in Defendants'

scheme,[141] and has received payments from **Corporate Defendants PW&F, KWP Services,**

**and LPS** long after Loyal Financial's dissolution.[142]  Mr. Guice has used these payments to fund

a lavish lifestyle that includes a yacht, a collection of luxury watches, and travel throughout the

---

[135] PX 43 ¶ 56 (Ex. 27) (Compton Dec.).
[136] PX 97.
[137] PX 4 ¶¶ 27-30 (Bishop Dec.), PX 111 ¶¶ 25-28 (White Dec.).
[138] PX 45 ¶ 15.  Mr. Guice has used some of these funds to issue payments to Relief Defendants Robert Guice and Timothy Woods.
[139] PX 47 ¶ 11 (Ex. 2) (Randolph Dec.); PX 43 ¶ 29 (Ex. 5) (Compton Dec.).
[140] PX 47 ¶¶ 27-28 (Ex. 14) (Randolph Dec).
[141] Kevin Guice provided funds to Chase Jackowski, who has opened at least 10 bank accounts in the name of LPS and YFP Solutions. PX 47 ¶ 45 (Ex. 22) (Randolph Dec.).
[142] PX 47 ¶ 28 (Randolph Dec.).

United States and abroad.[143]  Furthermore, Defendant Kevin Guice has been cited for employing unlicensed telemarketers and using unapproved scripts, and was arrested for violations related to unlicensed telemarketing.[144]

Defendant **Chase P. Jackowski** is the sole manager of Corporate Defendants **YFP Solutions**,[145] **LPSofFlorida L.L.C.,**[146] and **LPSofFLA LLC.**[147]  Mr. Jackowski has withdrawn at least $230,000 from LPS's bank accounts between August 2014 and May 2015.[148]

Defendant **Linda N. McNealy** was the sole manager of **Corporate Defendant Loyal Financial** from May 2013 onwards, and played an active role in overseeing the Loyal Financial call center at 11549 Lake Underhill Road.[149]  Since at least May 2014, Ms. McNealy has managed the **Life Management Services** call center located at 12001 Science Drive.[150]  Ms. McNealy has received at least $375,000 traceable to Defendants' scheme since 2013, including distributions from **Corporate Defendants Loyal Financial, URB Management, KWP Services, and Life Management Services.**[151]

---

[143] PX 47 ¶¶ 33-39 ( Randolph Dec.).  In June 2014, Kevin Guice's personal CFE Account wired $162,325 to a business selling new and used luxury yachts.  In February 2015, Kevin Guice made a $20,600 purchase at Hublot Boutique, a luxury watch brand.  PX 48 ¶ 34 (Ex. 9) (Caplan Dec.).

[144] On February 28, 2013, FDACS investigations into Loyal Financial and Kevin Guice revealed Loyal Financial was employing or affiliated with unlicensed salespersons, and that Kevin Guice and Loyal Financial failed to provide revised scripts or other sales documents to the FDACS as required.  Loyal Financial and Kevin Guice were cited for these telemarketing violations, and as part of the Settlement Agreement with the FDACS, Kevin Guice specifically agreed that both he and his representatives, agents, and employees would abide by Florida's Telemarketing Act in the future.  At the same time, Kevin Guice was managing another telemarketing business named Community Economic Council ("CEC").  CEC was operating in an adjacent suite to Loyal.  That same day, Kevin Guice was arrested for violations related to unlicensed telemarketing activity.  PX 43 ¶¶ 29-33 (Ex. 5) (Compton Dec.)

[145] PX 47 ¶ 22 (Ex. 13) (Randolph Dec.).

[146] PX 47 ¶ 16 (Ex. 7) (Randolph Dec.).

[147] PX 47 ¶ 15 (Ex. 6) (Randolph Dec.).

[148] PX 45 ¶ 21 (George Dec.).

[149] PX 43 ¶ 38 & 95 (Ex. 12) (Compton Dec.); PX 47 ¶ 11 (Ex. 2) (Randolph Dec.).

[150] This is further illustrated by Ms. McNealy's $3,500 a week salary (far higher than other telemarketers), and by publicly available Facebook posts showing Ms. McNealy to be in regular contact with employees, providing advice, encouragement, and assistance.  PX 45 ¶ 16; PX 48 ¶ 34 (Ex. 10) (Caplan Dec.).

[151] PX 45 ¶ 16. (George Dec.).

Defendant **Clarence H. ("Harry") Wahl**[152] is the Registered Agent and sole manager of

Corporate Defendants **Life Management Services** and **KWP Services of Florida LLC**,[153] and

was a signatory on a bank account opened by **IVD Recovery** on January 31, 2013.[154] Mr. Wahl

issues payroll checks to Defendants' telemarketers,[155] handles consumer complaints, and has

claimed ownership of KWP Services.[156] Mr. Wahl has been previously sanctioned for unlawful

telemarketing in connection with the activities of another entity.[157]

Defendant **Karen M. Wahl**[158] is the sole listed manager of **KWP Services, LLC**,[159] and

the signatory on KWP Services bank accounts that have been used to pay expenses related to

Defendants' scheme.[160] Ms. Wahl's credit card is on file for two telephone accounts used by the

joint enterprise.[161] In April 2015, Ms. Wahl filed a telemarketing license application on behalf of

---

[152] Mr. Wahl is identified in some corporate filings and bank records as Harry Wahl or Harry C. Wahl, but his Florida driver's license and Life Management Services' FDACS filings identify him as Clarence H. Wahl.

[153] PX 47 ¶¶ 10 & 14 (Exs. 1 & 5) (Randolph Dec.).

[154] PX 47 ¶ 42 (Ex. 20) (Randolph Dec.).

[155] *See, e.g.,* PX 97 at 3-4 (payroll checks from KWP Services and Life Management Services signed by Harry Wahl).

[156] In August of 2015, Mr. Wahl responded to a call from an Orlando Police Department Economic Crimes Detective, Gary Kleier, who was investigating a consumer complaint related to KWP Services. During conversations with Detective Kleier, Harry Wahl implied that he owned KWP Services, and assured Detective Kleier that he would rectify any issues with the business, including obtaining a refund for the complaining consumer. PX 44 ¶¶ 11-12 (Ex. 3) (Kleier Dec.).

[157] In September of 2009, another of Harry Wahl's telemarketing businesses, H&K Financial Marketing, LLC d/b/a H&K Marketing (collectively referred to as "H&K"), was the subject of an investigation conducted by the FDACS. At the conclusion of this investigation, it was determined that Harry Wahl and H&K were in violation of Florida Statutes for employing or being affiliated with unlicensed telemarketing activity. Harry Wahl settled these allegations with the FDACS by paying a $9,000 fine and an agreement that both he and his representatives, agents, and employees would abide by Florida's Telemarketing Act in the future. PX 43 ¶ 106 (Ex. 62).

[158] Ms. Wahl has been married to Individual Defendant Harry Wahl since 2002. PX 48 ¶ 36 (Ex. 11).

[159] PX 47 ¶ 13 (Ex. 4) (Randolph Dec.).

[160] PX 46 ¶¶ 91-96 (Exs. 102, 98 & 103) (Tyndall Dec.) (KWP Services paid Life Management Services' 12001 Science Drive rent from June 2014 - February 2016; KWP Services paid URB Management's Grasshopper telephone bill from July 2014 - June 2015; and, KWP Services paid Life Management Services' payroll in July of 2015.).

[161] The first is in the name of Corporate Defendant URB Management (and is also linked to UAD Secure Services), and the second includes numbers that have been linked to Corporate Defendants KWP, LPS, YFP Solutions, and YCC Solutions. *See supra* notes 118 & 131.

KWP Services that lists the company's physical address as 12001 Science Drive, Suite 125.[162] The application also included scripts that are identical to those previously submitted by **Corporate Defendant Loyal Financial** (April 2012) and **Life Management Services** (March 2014).[163]

### C.    Relief Defendants

Since 2013, relief Defendant **Robert Guice**[164] has received at least $666,000 traceable to Defendants' scheme - $340,000 from three Corporate Defendants[165] and $326,000 from a single personal account belonging to **Individual Defendant Kevin Guice**.[166]  Plaintiffs have found no evidence suggesting that Robert Guice did any legitimate work for the Corporate or Individual Defendants.[167]  In addition to the funds he has received from Defendants, Robert Guice may have access to other funds traceable to Defendants' enterprise in in his personal account(s), via Kevin Guice, or through some other corporate entity.

Since 2013, relief Defendant **Timothy Woods**[168] has received at least $821,250 traceable to Defendants' scheme - $597,250 from three Corporate Defendants,[169] and $224,000 from a single personal account belonging to **Individual Defendant Kevin Guice**.[170]  Plaintiffs have found no evidence suggesting that Timothy Woods did any legitimate work for the Corporate or

---

[162] PX 43 ¶ 60 (Compton Dec.).

[163] PX 43 ¶¶ 16-25 (Exs. 2, 19, 28, 31) (Compton Dec.).  Life Management Services submitted the same scripts in its March 2016 renewal application. *Id.*

[164]  Robert Guice shares a last name with two Individual Defendants – Kevin Guice and Linda McNealy, whose 2011 marriage license lists her maiden name as Guice.  The same license identifies Robert Guice as having performed Ms. McNealy's marriage ceremony.  PX 48 ¶ 36 (Ex. 13) (Caplan Dec.).

[165] Loyal Financial, KWP Services, and URB Management.  PX 45 ¶ 18 (George Dec.).

[166] PX 47 ¶ 29 (Randolph Dec.).

[167] PX 47 ¶ 31(Ex. 15) (Randolph Dec.); PX 46 ¶ 107 (Tyndall Dec).

[168] Individual Defendant Kevin Guice is married to Shannon Woods Guice, formerly known as Shannon Louise Woods.  *See* PX 48 ¶ 36 (Ex. 12) (Caplan Dec.).

[169] Loyal Financial, KWP Services, and URB Management.  PX 45 ¶ 17 (George Dec.).

[170]PX 47 ¶ 30 (Ex. 16) (Randolph Dec.).

Individual Defendants.[171]  In addition to the funds he has received from Defendants, Timothy Woods may have access to other funds traceable to Defendants' enterprise in in his personal account(s), via Kevin Guice, or through some other corporate entity.

## IV.   THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER

To put an immediate stop to Defendants' ongoing deceptive practices and to preserve the possibility of effective final relief, Plaintiffs request that the Court issue an *ex parte* TRO with provisions for asset and document preservation, the appointment of a receiver, expedited discovery, immediate access to Corporate Defendants' business premises and records, and an order to show cause why a preliminary injunction should not issue.  As shown below, the Court has the authority to enter the relief sought, the evidence demonstrates that Plaintiffs are likely to succeed on the merits, and the equities weigh in favor of the requested relief.

### A.   Section 13(b) of the FTC Act Authorizes the Court to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction."  The practice of defrauding consumers by misrepresenting or omitting material facts in violation of Section 5(a) of the FTC Act presents a "proper case" for injunctive relief under Section 13(b).[172]  Once the Commission invokes a federal court's equitable powers, the full breadth of the court's authority is available, including the power to enter a TRO, a preliminary injunction, and whatever additional preliminary relief is necessary to preserve the possibility of providing effective final relief.[173]  Such ancillary relief may include an asset freeze to preserve assets for

---

[171] PX 47 ¶ 32 (Randolph Dec.); PX 46 ¶ 108 (Tyndall Dec.).

[172] *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996).

[173] *Id.; FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984).

eventual restitution to victimized consumers as well as the appointment of a receiver.[174]

In determining whether to grant preliminary injunctive relief under Section 13(b) of the FTC Act, courts in the Eleventh Circuit consider two factors: (1) the likelihood of success on the merits, and (2) whether the public equities outweigh any private equities.[175] This approach differs from the traditional four-pronged preliminary injunction standard. Unlike private litigants, Plaintiffs do not need to prove irreparable injury, which is presumed in a statutory enforcement action.[176] The FDUTPA requires even less. Under FDUTPA, the State of Florida's sole burden is to show a clear legal right to the relief requested. Section 501.207(1)(b) of FDUTPA expressly authorizes the State of Florida to seek injunctive relief without showing irreparable harm, lack of an adequate legal remedy or public interest.[177]

As explained below, the materials submitted in support of this motion establish that Plaintiffs have a strong likelihood of success in establishing that Defendants' conduct violates Section 5(a) FTC Act,[178] Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),[179] and multiple provisions of the Telemarketing Sales Rule ("TSR").[180] The record further demonstrates that the equities favor the requested relief.

---

[174] *U.S. Oil & Gas Corp.*, 748 F.2d at 1432-34. The court's expansive equitable powers also are available under the TSR. *See* 15 U.S.C. § 6105(b). Courts may enter any relief necessary to redress injury to consumers caused by TSR violations, including "rescission or reformation of contracts [and] the refund of money or return of property." 15 U.S.C. §§ 57b(a)(1) & (b).

[175] *FTC v. Univ. Health*, 938 F.2d 1206, 1217 (11th Cir. 1991).

[176] *Id.* at 1218.

[177] *Millennium Commc'ns & Fulfillment, Inc. v. Florida*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000).

[178] 15 U.S.C. § 45(a) (prohibiting deceptive acts or practices in or affecting commerce).

[179] Chapter 501, Part II, Florida Statutes (2015) (prohibiting unfair or deceptive acts or practices in the conduct of any trade or commerce).

[180] 16 C.F.R. Part 310 (2015).

### B.    Plaintiffs Have Shown a Likelihood of Success on the Merits

#### 1.    Plaintiffs Have Demonstrated a Likelihood of Success in Establishing that Defendants' Deceptive Practices Have Violated the FTC Act (Counts One and Two) and the FDUTPA (Count Eleven)

Section 5(a) of the FTC act provides: "[U]nfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."[181] An act or practice is deceptive under Section 5(a) if it involves a representation or omission that is material and would likely mislead consumers acting reasonably under the circumstances.[182] Similarly, under the FDUPTA, liability may be established if there is a representation or omission that is likely to mislead a consumer acting reasonably under the circumstances and which "offends established public policy."[183] "A misrepresentation is material if it is likely to affect a consumer's decision to buy a product or service."[184]

The FTC is not required to prove an intent to deceive to establish Section 5 liability. Moreover, the value of the product or service sold is "irrelevant" to the Section 5 analysis;[185] at

---

[181] FDUTPA likewise declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 501.204(1), Florida Statutes (2015). In construing this Section, the Florida Legislature has declared that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2015." § 501.204(2), Fla. Stat. (2015); *see also FTC. v. Info. Mgmt. Forum, Inc.*, 2013 U.S. Dist. LEXIS 91242, at *5 (M.D. Fla. June 28, 2013) ("Conduct that constitutes a 'deceptive act or practice' or an 'unfair act or practice' under the FTC Act is violation of FDUTPA.").

[182] *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *see also FTC v. Inbound Call Experts*, 14-81395-CIV-MARRA, 2014 U.S. Dist. LEXIS 182857, at *6-7 (S.D. Fla. Dec. 22, 2014).

[183] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003); *see also Republic of the Congo v. Air Capital Grp., LLC* 614 F. App'x 460, 470 (11th Cir. 2015) (listing examples of practices found to violate the FDUTPA).

[184] *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014).

[185] *Inbound Call Experts*, 2014 U.S. Dist. LEXIS 182857, at *7.

issue is whether "the seller's misrepresentations tainted the customer's purchasing decisions."[186]

### a. Defendants Misrepresent the Results They Will Achieve for Consumers

Count One alleges that Defendants have made numerous false and misleading representations while selling debt-relief services in violation of Section 5 of the FTC Act. Count Eleven alleges that the same conduct violates the FDUPTA.

While pitching their purported rate-reduction services, Defendants represent that they will substantially and permanently lower consumers' credit-card interest rates[187] and will save them thousands of dollars in a short time.[188] Defendants also guarantee that they will enable consumers to pay off their debt much faster, typically three to five times faster.[189] These claims are false because consumers who pay Defendants' up-front fee for rate-reduction services almost never obtain substantially lower interest rates that are permanent, or save the thousands of dollars in interest payments they were promised.[190] Consequently, consumers who purchase Defendants' services are not able to pay off their credit-card debts three to five times faster.

Defendants also make false statements about their debt-elimination services. Defendants claim that they can eliminate consumers' credit-card debt within 18 months by using a government fund paid for by credit-card companies.[191] In truth, no such government fund actually exists, consumers rarely have their debt eliminated, and in most cases, consumers are

---

[186] *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1235 (11th Cir. 2014); *see also Partners in Health Care Ass'n*, 2015 U.S. Dist. LEXIS 71027, at *20-21 (S.D. Fla. May 31, 2016) ("Worthlessness . . . is not an element of a claim for deceptive practices"). Relatedly, the existence of some satisfied customers is not a defense to Section 5 liability. *See FTC v. Wilcox*, 926 F. Supp. 1091, 1099 (S.D. Fla. 1995) (citing *FTC v. Amy Travel Service*, 875 F.2d 564, 572 (7th Cir. 1989)); *cf. Tashman*, 318 F.3d at 1278 (evidence of some satisfied customers was insufficient to overcome evidence that reasonable consumers were likely to be misled and were in fact misled, district court's finding to the contrary was clearly erroneous).

[187] *See, e.g.,* PX 19 ¶¶ 20-22 (Dec. of Patricia Grinnan); PX 51 at 14; PX 52; PX 5 ¶¶ 5-6 (Blakely Dec.); PX 36 ¶ 8 (Thomas Dec.); PX 22 ¶ 8 (James Dec.); PX 112 ¶¶ 6-7 (Fraver Dec.).

[188] PX 28 ¶ 6 (Maxwell Dec.) PX 22 ¶ 8 (James Dec.).

[189] PX 19 (Ex. 1) (Dec. of Patricia Grinnan, p. 46); PX 12 ¶ 6 (Dec. of Reed Coombs).

[190] PX 42 ¶¶ 59-87 (detailing consumer examples).

[191] *Supra* note 5.

left worse off financially and with severely damaged credit.[192]  Consumers who have purchased

Defendants' debt-elimination services have reported paying higher interest rates on existing debt,

higher credit-card debt due to the accrual of late fees, and reduced credit scores.[193]  At least two

consumers were sued by creditors and were forced to declare bankruptcy.[194]

Defendants' misrepresentations are material to a consumer's decision to purchase debt-

relief services because they relate directly to the effectiveness of those services.  Consumers

would not have paid thousands of dollars unless they believed that Defendants would deliver the

promised services.  Based on this evidence, Plaintiffs have demonstrated an overwhelming

likelihood of success on the merits of Counts One and Eleven.

### b.  Defendants Fail To Disclose the True Cost of Their Debt-Relief Services

Count Two alleges that Defendants violated Section 5 of the FTC Act by deceptively

failing to disclose the full cost of their debt-relief services.  Specifically, Defendants fail to

disclose that one of their rate-reduction tactics – transferring consumers' existing credit-card

balance to a new promotional-rate card – may result in the consumer paying a variety of bank

fees, such as balance-transfer fees, which can total three-to-five percent of the transferred

balance.[195]  When pushing consumers to take a credit-card cash advance to pay their up-front

fees, Defendants also fail to inform consumers that issuers often charge a fee for cash-advance

transactions, and may also charge a higher interest rate on this type of credit-card debt.[196]

Defendants' omissions relate directly to the price of their debt-relief services and are

---

[192] *Supra* notes 6-7.

[193] *Supra* notes 54-55.

[194] *Supra* note 57.

[195] PX 42 ¶ 29 (Wilhelm Dec.).

[196] *Id.* at ¶ 35.

therefore presumed material as a matter of law.[197]  As such, Plaintiffs have demonstrated a

likelihood of succeeding on the merits of Count Two of the Complaint.

**2.     Plaintiffs Have Demonstrated a Likelihood of Success in Proving that Defendants have Violated the TSR (Counts Three Through Ten)**

The TSR applies to Defendants because they are "sellers" or "telemarketers" of "debt

relief services" who engage in "telemarketing," as those terms are defined in the TSR.[198]

Defendants and/or Defendants' agents initiate telephone calls to customers, making them

"telemarketers," and they offer to provide, or arrange for others to provide, services that alter the

terms of a debt between a person and one or more unsecured creditors, thereby providing "debt

relief services."[199]  These services are provided in exchange for consideration, making

Defendants "sellers" under the TSR.[200]

**a.     Defendants Misrepresent the Performance, Nature or Essential Characteristics of Their Debt-Relief Services (Counts Three and Four)**

Under the TSR, Defendants are specifically prohibited from misrepresenting any material

aspect of any debt-relief service.[201]  As noted above, Defendants make numerous materially false

representations while pitching their rate-reduction and debt-elimination services.[202]  These

misrepresentations violate the TSR.

In addition, the TSR prohibits misrepresenting a seller or telemarketer's affiliation with

any person or government entity.[203]  During their telemarketing calls, however, Defendants claim

---

[197] *In re Removatron Int'l Corp.*, 111 F.T.C. 206, 309 (1988), *aff'd* 884 F.2d 1489 (1st Cir 1989); *see also FTC v. Windward Mktg.*, 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *28 (N.D. Ga. Sept. 30, 1997).
[198] 16 C.F.R. § 310.2.
[199] 16 C.F.R. § 310.2(cc), (m).
[200] 16 C.F.R. § 310.2(aa).
[201] 16 C.F.R. § 10.3(a)(2)(iii).
[202] *See supra* Section IV(B)(1).
[203] 16 C.F.R. § 310.3(a)(2)(vii).

that they are representatives of, or affiliated with, consumers' banks, credit-card issuers, or credit-card associations.[204]  Defendants have no affiliation with these entities; accordingly, their claims are misrepresentations that violate the TSR.[205]

### b. Defendants Fail To Disclose Material Aspects of their Debt-Relief Services (Counts Five and Six)

Defendants' telemarketing calls also contain material omissions that violate the TSR. Under the TSR, Defendants are prohibited from omitting material aspects of their debt-relief services, including the total cost of the debt-relief services, and the likely effect of their debt-elimination services on consumers' financial health.[206]  During their calls, Defendants' telemarketers fail to disclose that: (1) their services may require consumers to pay a variety of additional fees, including balance-transfer fees and cash-advance fees; and (2) their debt-elimination services will likely have a negative effect on consumers' creditworthiness, and may result in consumers being sued or increasing their total credit-card debt.[207]  Defendants' failure to make these important mandatory disclosures violates the TSR.[208]

### c. Defendants Unlawfully Charge an Advance Fee for Their Debt-Relief Services (Counts Seven)

Defendants also have violated specific TSR provisions that make it illegal to collect an up-front fee for debt-relief services.  The TSR prohibits Defendants from requesting or collecting fees from a consumer for any debt-relief service before (a) Defendants have renegotiated, settled, reduced or otherwise altered the terms of at least one debt, and (b) the consumer has made at

---

[204] *See supra* Section II(A)(2).

[205] 16 C.F.R. § 310.3(a)(2)(vii).  In addition to violating the TSR, these misrepresentations of affiliation also violate the FTC Act and the FDUPTA, and are included in Counts One and Eleven.

[206] 16 C.F.R. § 310.3(a)(2)(i), (x).

[207] *See supra* Section IV(B)(1).

[208] 16 C.F.R. § 310.3(a)(2)(i), (x).

least one payment under the new terms obtained by Defendants.[209]  Nonetheless, Defendants

request an up-front fee ranging from $500 to $5,000 for their rate-reduction services and $2,500

to $20,000 for their debt-elimination services.[210]  Defendants' collection of their up-front fees

violates the TSR.[211]

### d.  Defendants Violated the Do Not Call and Robocall Provisions of the TSR (Counts Eight, Nine, and Ten)

Defendants have initiated, or caused a telemarketer to initiate, numerous unsolicited

telemarketing calls: (1) to telephone numbers on the National Do Not Call Registry;[212] and/or (2)

that deliver prerecorded messages (i.e., robocalls).[213]  These calls violate the TSR.[214]  In addition,

Defendants placed their numerous telemarketing calls without paying the annual fee to access the

National Do Not Call Registry.  Defendants' failure to pay the annual fee also violates the

TSR.[215]

### C.    The Equities Heavily Favor the Requested Relief

In balancing the equities, "public equities must receive far greater weight."[216]  The

equities test "works on a sliding scale so that the greater the plaintiff's success on the merits, the

less harm she must show in relation to the harm defendant will suffer if the preliminary

---

[209] 16 C.F.R. § 310.4(a)(5)(i).

[210] *See supra* Section IV(A)(3) *and* Section IV(B)(1).

[211] 16 C.F.R. § 310.4(a)(5)(i).  One consumer, who had paid more than $17,000 in advance fees for rate-reduction and debt-elimination services, later asked Defendants why they had collected those fees from him when the TSR expressly prohibits the practice.  Defendants told the consumer that the TSR did not apply to them because they are regulated by the FDACS.  *See* PX 20 ¶ 50 (Healey Dec).

[212] 16 C.F.R. § 310.4(b)(1)(iii)(B).

[213] 16 C.F.R. § 310.4(b)(1)(v)(A).

[214] 16 C.F.R. § 310.4(b)(1)(iii)(B); 16 C.F.R. § 310.4(b)(1)(v)(A).

[215] 16 C.F.R. § 310.8.

[216] *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-1029 (7th Cir. 1988).  *See also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities along would not suffice to justify denial of a preliminary injunction.").

injunction is granted."[217]  Here, Plaintiffs have shown a strong likelihood of prevailing on every

count in the complaint.  The public equities in this matter include protecting consumers who

could be victimized by Defendants' ongoing scheme, and preserving the assets of Defendants

and Relief Defendants to redress consumers who have already lost money by paying for

Defendants' bogus services.[218]

Defendants have continued their deceptive practices in the face of consumer complaints

forwarded by FDACS,[219] inquiries from law enforcement,[220] and actions from state authorities.[221]

For example:

- In February 2013, FDACS cited Kevin Guice and Loyal Financial for employing
  unlicensed telemarketers and using unsanctioned scripts while selling rate-reduction and
  debt-elimination services.  Kevin Guice and Loyal Financial executed a settlement
  agreement, paid a $5,000 fine, and agreed to comply with Florida's Telemarketing Act.[222]

- In November 2014, the Mississippi Public Service Commission issued an administrative
  complaint against URB Management concerning unauthorized telemarketing in the state
  of Mississippi.  The company signed a settlement agreement, paid a $2,000 fine, and
  agreed to cease selling their products to Mississippi residents without first complying
  with Mississippi law and making a number of disclosures.[223]

- In February 2016, the Oregon Department of Justice executed an Assurance of Voluntary
  Compliance with LPS and Chase Jackowski relating to unauthorized telemarketing in the
  state of Oregon.  The company issued a refund to an Oregon consumer who had

---

[217] *FTC v. Lifewatch Inc.*, 15-cv-5781, 2016 U.S. Dist. LEXIS 45057, at *54-55 (N.D. Ill. Mar. 31, 2016) (quoting *Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993)).

[218] *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (in balancing equities, "the public interest should receive greater weight" than any private interest); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029.

[219] PX 43 ¶¶ 78, 79, 69, 66, 43, 66, 69, 78, 79, 84 (Compton Dec.) (detailing consumer complaints against Corporate Defendants and attempts by FDACS to resolve them).

[220] In 2015, Defendants were contacted by the Orlando Police Department and the Minnesota Attorney General regarding  complaints from senior citizens who were having difficulty obtaining refunds after becoming wise to Defendants' scam.  PX 44 (Dec. Detective Gary Kleier, Orlando Police Department); PX 9 at ¶¶ 9-12 (Dec. of Sharon Burke).

[221] *See supra* note 10.

[222] Recovered scripts and deal sheets demonstrate that Loyal Financial had been selling debt-elimination services. *See* PX 43 ¶ 29-34 (Exs. 5-8) (Compton Dec.) ("The investigation further revealed Loyal was utilizing Lead Sales forms, Debt Elimination forms, and Enrollment forms . . .").  In May 2013, FDACS initially refused to renew Loyal Financial's telemarketing license due to past unlicensed activity.  *Id.*

[223] PX 108 & 109.

purchased Defendants' rate-reduction services, assented to a $7,500 fine, and agreed to abide by Oregon telemarketing laws.[224]

Given the Defendants' track record of unlawful business practices, there is a strong likelihood that Defendants will continue defrauding consumers absent strong injunctive relief from this Court. The public's interest in immediately halting this unlawful conduct far outweighs any remote interest Defendants may have in continuing to operate their fraudulent, unlawful business.[225] This Court has granted similar injunctive relief in numerous FTC enforcement actions, many of which involved rate-reduction scams like the one at issue here.[226]

## V.    THE TRO AND PRELIMINARY INJUNCTION SHOULD EXTEND TO ALL DEFENDANTS

### A.    Corporate Defendants are Jointly and Severally Liable as a Common Enterprise

Corporate Defendants are jointly and severally liable for violations of the FTC Act when, considering the "pattern and framework of the whole enterprise," there is evidence of a common enterprise between them.[227] When examining whether a common enterprise exists among corporate defendants, courts look to a variety of factors including (1) common control; (2) the sharing of office space and officers; (3) commingling of corporate funds; and (4) failing to

---

[224] PX 106 & 107.

[225] *See World Wide Factors,* 882 F.2d at 347 (affirming the district court's finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment").

[226] *See, e.g., FTC v. All Us Mktg., LLC,* No. 6:15-CV-1016-ORL-28GJK (M.D. Fla. June 22, 2015); *Innovative Wealth Builders, Inc.,* No. 8:13-cv-123-T-33EAJ (M.D. Fla. Jan 14, 2013); *FTC v. WV Universal Mgmt.,* LLC, No. 6:12-cv-01618-ACC-KRS (M.D. Fla. Oct. 30, 2012); *FTC v. The Green Savers, LLC,* Case No. 6:12-cv-01588-JA-DAB (M.D. Fla. Oct. 22, 2012).

[227] *Delaware Watch Co., v. F.T.C.,* 332 F.2d 745, 746-47 (2d Cir. 1964).

maintain the separation between companies.[228]

The facts here demonstrate that Corporate Defendants operate as a classic common enterprise, sharing owners,[229] officers,[230] offices,[231] telephone numbers,[232] employees,[233] invoices, consumer New Client Packets, and other corporate documents sent to consumers,[234] scripts,[235] and expenses.[236] Corporate Defendants also commingle finances,[237] share payments from a single consumer,[238] and routinely make payments to and on behalf of one another.[239] Additionally, despite their legal distinctions, Corporate Defendants function as one interdependent unit with

---

[228] See Del. Watch Co., 332 F.2d at 746; accord F.T.C. v. J.K. Publ'ns., Inc., 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (finding common enterprise where corporate defendants were under common control; shared office space, employees, and officers; and conducted their businesses through a "maze of interrelated companies"); F.T.C. v. Wash. Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012); F.T.C. v. Direct Benefits Group, LLC, 6:11-cv-1186-Orl-28TBS, 2013 WL 3771322, at *18 (M.D. Fla. July 18, 2013).

[229] PX 43 ¶ 29 (Ex. 5) (Compton Dec.); PX 43 ¶¶ 38 & 97 (Exs. 12 & 53) (Compton Dec.); PX 47 ¶ 44 (Ex. 22) (Randolph Dec.); PX 43 ¶ 100 (Exs. 56 & 58) (Compton Dec.).

[230] PX 47 ¶¶ 9-22 (Randolph Dec.); PX 43 ¶¶ 38 & 97 (Exs. 12 & 53) (Compton Dec.).

[231] PX 43 ¶ 60 (Ex. 30) (Compton Dec.) (12001 Science Drive Suite 125 was linked to both Life Management Services and KWP Services); PX 47 ¶¶ 16 & 22 (Exs. 7 & 13) (4865 Darwood Drive Orlando, Florida 32812 was linked to YFP Solutions, LPSOFFLORIDA, and Chase Jackowski); PX 48 ¶ 29 (Ex. 1) (Caplan Dec.).

[232] PX 48 ¶ 28 (Ex. 1) (Caplan Dec.); PX 43 ¶¶ 44, 73, 75, 79, & 86 (Exs. 2, 16, 19, 28, 31, 36, 39, 40, 42, & 47) (Compton Dec.).

[233] PX 43 ¶ 56 (Ex. 27) (Compton Dec.); PX 48 ¶ 20 (Ex. 1) (Caplan Dec.).

[234] PX 48 ¶¶ 22-23 (Exs. 3-4) (Caplan Dec.).

[235] PX 43 ¶¶ 19-25 (Exs. 2, 19, 28, & 31) (Compton Dec.) (Loyal, KWP Services, and Life Management Services filed identical telemarketing sales scripts with the FDACS on numerous occasions, even including the same typos, and misplaced Defendant business names).

[236] See supra notes 77-79.

[237] Randolph Dec ¶ 29 (Defendant Kevin Guice received deposits from URB Management, UAD Secure Services LLC, LPSofFLA, LPSOFFLORIDA, PW&F Consultants of Florida, KWP Services, Loyal Financial, Michael Yager, Harry Wahl, and Karen Wahl).

[238] PX 46 ¶¶ 97-100 (Exs. 94, 99, 95 & 96) (Tyndall Dec.) (Examples of Corporate Defendants sharing consumer payments include the following, since January 2013: Life Management Services deposited at least 11 consumer checks issued to IVD Recovery and Loyal Financial into their own account; Life Management Services deposited at least 2 consumer checks issued to UAD Secure Services into a LPSOFFLA bank account; Life Management Services deposited at least 3 consumer checks issued to UAD Secure Services into a URB Management account; and, Life Management Services deposited at least 6 consumer checks issued to URB Management into a Loyal Financial bank account.).

[239] See supra notes 77-79.

the single purpose of defrauding consumers.[240] Accordingly, each of the Corporate Defendants

should be held jointly and severally liable for the entire amount of consumer injury caused by

Defendants' unlawful acts.[241] The TRO should therefore extend to all Corporate Defendants.

### B.     The Individual Defendants Are Personally Liable and Subject to Monetary and Injunctive Relief

To obtain injunctive and monetary relief against individuals for consumer harm from a

company's conduct, Plaintiffs must show that the individual defendants (1) participated directly

in the unlawful acts or practices or had authority to control them; and (2) had some knowledge of

these acts or practices.[242] Having signing authority on corporate accounts evidences control.[243]

Authority to control may also be evidenced by "active involvement in business affairs and the

making of corporate policy, including assuming the duties of a corporate officer."[244] Plaintiffs

may satisfy the knowledge prong by showing actual knowledge of the misrepresentations,

reckless indifference to the truth or falsity of the representations, or awareness of a high

probability of fraud coupled with an intentional avoidance of the truth.[245]

---

[240] PX 47 ¶ 26 (Randolph Dec.); PX 47 ¶¶ 9-26 (Randolph Dec.); PX 44 ¶¶ 9-10 & 15-16 (Exs. 2 & 6) (Kleier Dec.); PX 5 (Blakely Dec.) (consumer was initially called by CMA or Credit Management Assistance, received an invoice from URB Management, received a contract from IVD Recovery, and paid the Defendants' fee to IVD Recovery); PX 155 (Franklin Dec.) (consumer was called by Card Management Associates, was emailed by IVD Recovery, received an invoice from FOCU Credit, and paid Defendants' fee to FOCU); PX 22 (James Dec.) (consumer was called by American Credit Assistance, received emails and an invoice from URB Management, but later received a Welcome Letter from ACA); PX 36 (Thomas Dec.) (consumer received an invoice from URB Management, and a New Client Packet and Welcome Letter from UAD Secure Services, consumer paid Defendants' fee to URB Management, and received a partial refund check remitted by Jessica Hernandez, a known Life Management Services employee); PX 48 (Ex. 1) (Caplan Dec.).

[241] See FTC v. HES Merch. Servs., 2014 U.S. Dist. LEXIS 17292, at *16-17 (M.D. Fla. Nov. 18, 2014).

[242] See Gem Merch. Corp., 87 F.3d at 470; FTC v. Amy Travel Serv., 875 F.2d at 573.

[243] See Transnet Wireless, 506 F. Supp. 2d at 1270 ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.") (citations omitted).

[244] FTC v. Wilcox, 926 F. Supp. at 1104  (quoting Amy Travel, 875 F.2d at 573); see also FTC v. Windward Mktg., Ltd., 1997 WL 33642380, a *5 (N.D. Ga. Sept. 30, 1997) (holding that defendant did not have to be an officer or even an employee to control corporate activities noting that courts  consider "the control that a person actually exercises over given activities.").

[245] FTC v. Transnet Wireless Corp., 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007); Amy Travel Service, 875 F.2d at 574.

In this case, Individual Defendants participated in, controlled, and had knowledge of the enterprise's actions.  Each Individual Defendant has been a manager of at least one of the limited liability companies involved in Defendants' enterprise.[246]  Defendants Kevin Guice, Chase Jackowski, Harry Wahl, and Karen Wahl are also signatories on bank accounts into which millions of dollars of scam proceeds have been transferred.[247]  Linda McNealy has managed both call center locations, demonstrating her active involvement in Defendants' affairs.[248]  Individual Defendants have also received large sums of money from the common enterprise,[249] which further indicates their management roles in the companies, and that they have either direct knowledge of the fraud, or least constructive knowledge of the illegal activity.  Accordingly, each Individual Defendant is properly subject to injunctive and monetary relief.

### C.      Relief Defendants Should Disgorge Ill-Gotten Funds

A court may grant equitable relief against a relief defendant if the relief defendant (1) received ill-gotten funds; and (2) does not have a legitimate claim to those funds.[250]  A court may order disgorgement of such proceeds under the doctrines of constructive trust or unjust enrichment.[251]

---

[246] PX 47 ¶¶ 9-22 (Exs. 1-13) (Randolph Dec.).

[247] *See generally* PX 45 (George Dec.).

[248] PX 43 ¶¶ 38, 41& 95 (Ex. 12) (Compton Dec.); PX 48 ¶ 34 (Ex. 10) (Caplan Dec.).

[249] *See supra* Section III(B).

[250] *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 192 (4th Cir. 2002) (federal courts may order equitable relief against a person not accused of wrongdoing in a securities enforcement action where that person received ill-gotten funds and did not have a legitimate claim to those funds); *see also FTC v. Holiday Enters.,* 2008 U.S. Dist. LEXIS 35858, at 31-33 (N.D. Ga. Feb. 5, 2008) (applying rationale in an FTC matter); *FTC v. Transnet Wireless Corp.,* 506 F. Supp. 2d at 1273 (same).

[251] *See FTC v. Network Servs. Depot, Inc.,* 617 F.3d 127, 1142 (9th Cir. 2010) (finding the district court properly imposed a constructive trust on defendants' funds in part because the funds were tainted in that they were traceable to the defendants' statutory violation); *SEC v. Antar,* 831 F. Supp. 380, 402 (D.N.J. 1993) (court found the nominal defendants liable as constructive trustees and subject to the doctrine of unjust enrichment); *see also Rollins v. Metro. Life Ins. Col,* 863 F.2d 1346, 1354 (7th Cir. 1988) ("[A] constructive trust may be invoked even where the unjustly enriched person is completely blameless."); *Transnet Wireless,* 506 F. Supp. 2d at 1273 (relief defendant ordered to pay $1.6 million for money obtained through fraud where defendants failed to provide any services to payor).

Each Relief Defendant has received funds derived from the fraudulent activity described above. Between January 2013 and May 2015, Robert Guice received at least $666,000 from Corporate Defendants and Individual Defendant Kevin Guice.[252] During the same period, Timothy Woods received at least $821,250 from Corporate Defendants and Individual Defendant Kevin Guice.[253]

Plaintiffs have found no evidence to suggest that Relief Defendants have a legitimate claim to those funds. Relief Defendants are not officers, managers or employees of the corporate defendants, and there is no evidence that either Robert Guice or Timothy Woods has provided any good or service of value to Defendants. As such, under either the doctrine of unjust enrichment or constructive trust, the Court is authorized to impose an asset freeze against Timothy Woods and Robert Guice to preserve the Court's ability to order disgorgement of consumer funds they unjustly received from Defendants' fraudulent scheme.

## VI.   AN EX PARTE TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF

In addition to an injunction halting Defendants' illegal conduct, Plaintiffs seek restitution for the consumer victims of Defendants' scheme. To preserve the possibility of such relief, an *ex parte* TRO is necessary to prevent Defendants from dissipating assets and destroying evidence. Plaintiffs respectfully request a TRO to: (a) immediately freeze Defendants and Relief Defendants' assets; (b) appoint a temporary receiver over Corporate Defendants; and (c) grant Plaintiffs immediate access to Corporate Defendants' business premises, business records, and other relevant information. If such relief is not provided or if Defendants are given advanced notice of this action, Defendants are likely to dissipate assets or destroy evidence. Indeed bank

---

[252] *Supra* notes 165 & 166.
[253] *Supra* notes 169-170.

records show that Defendants have already withdrawn more than \$2.5 million in cash from the enterprise.[254]  Courts in this district have frozen defendants' assets, appointed receivers, and granted the FTC immediate access to defendants' business premises in numerous FTC enforcement actions, many of which involved rate-reduction scams like the one at issue here.[255]

### A.     An Asset Freeze Is Necessary

Plaintiffs seek restitution for the victims of Defendants' scheme.  To preserve the possibility of such relief, Plaintiffs ask the Court to freeze Defendants' and Relief Defendants' assets and to order an immediate accounting to prevent concealment or dissipation of assets pending a final resolution.  Courts in this Circuit have repeatedly ordered asset freezes to preserve the possibility of consumer redress.[256]  An asset freeze should be imposed where (1) there is a likelihood of success on the merits and (2) the defendants will dissipate assets absent an injunction.[257]  Asset freezes should extend to individual defendants when the movant shows a likelihood of success in establishing individual liability.[258]  Here, an asset freeze will preserve the status quo, ensuring funds that have not already been dissipated are available for consumer redress.

The evidence demonstrates that Defendants have defrauded consumers of more than \$15 million in just two and a half years.[259]  Individual Defendants and Relief Defendants have received large distributions from the enterprise.  Kevin Guice in particular has used these ill-

---

[254] *See* Declaration and Certification of FTC Counsel Pursuant to Fed. R. Civ. P. 65(b) in Support of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order and Motion to Temporarily Seal File (describing need for *ex parte* relief and citing cases in which defendants who learned of impending FTC action withdrew funds, destroyed vital documents, and fled the jurisdiction).

[255] *See supra* note 226.

[256] *See FTC v. Gem Merch. Corp.*, 87 F.3d at 469-70; *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d at 1434.

[257] *See World Travel Vacation Brokers*, 861 F.2d at 1031; *see also FTC v. Home Assure, LLC*, 2009 U.S. Dist. LEXIS 32055, at *8-11 (M.D. Fla. Apr. 16, 2009).

[258] *See Home Assure,* 2009 U.S. Dist. LEXIS 32055 at *5-6.

[259] *Supra note 2.*

gotten gains to fund a lavish lifestyle.[260]  In June 2014 alone, Kevin Guice spent $380,000 on

hotels, rental cars, luxury shopping, and on a yacht.[261]  In addition, Individual Defendants have

withdrawn more than $2.5 million in cash from the enterprise.[262]  As previously discussed,

Defendants have also created a maze of corporate entities to hide their ill-gotten gains,[263] and

have responded to consumer complaints or government action by shifting banking

responsibilities to a newly created corporate entity.[264]  Without an asset freeze, there is a serious

risk that there will be no funds left for consumer redress.  As such, an asset freeze is necessary to

protect the funds from Defendants' illegal activities, prevent Defendants' continued misuse of

consumers' money, and preserve the Court's ability to provide effective relief for consumers.

### B.    Appointing a Receiver Will Prevent Further Mismanagement and Assist the Court's Ability to Provide Effective Final Relief

Appointing a receiver for the Corporate Defendants is also critical, and Plaintiffs seek

this relief pursuant to the Court's equitable powers under Section 13(b) of the FTC Act.[265]  Such

an appointment is appropriate when, as here, Defendants have defrauded the public and have

mismanaged funds that could be used for consumer redress.[266]

As noted above, Defendants' business is permeated with fraud.  Defendants have caused

more than $15 million in consumer harm in just two and a half years, and have continued their

deceptive practices in the face of consumer complaints and law enforcement actions.  The Court

---

[260] PX 48 ¶ 34 (Ex. 9) (Caplan Dec.); PX 47 ¶¶ 33-34 (Randolph Dec.).

[261] PX 47 ¶¶ 33-34 (Randolph Dec.).

[262] On 84 occasions, withdrawals from corporate accounts exceeded $10,000 in single day. *Supra* note 13.

[263] *Supra* note 240.

[264] *See supra* note 11.

[265] *See U.S. Oil & Gas*, 748 F.2d at 1432.

[266] *See FTC v. Millennium Telecard, Inc.*, 2001 U.S. Dis. LEXIS 74951, at *35 (D.N.J. July 11, 2011) ("In determining whether a Court-appointed Receiver is necessary, the 'prima facie showing of fraud and mismanagement is enough to call into play the equitable powers of the court.'" (quoting *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981)).

should not permit Defendants to continue controlling Corporate Defendants' affairs "for the benefit of those shown to have been defrauded,"[267] especially given the amount of money Defendants have already withdrawn from the enterprise.  Appointment of a receiver will preserve remaining Defendant funds, and a receiver can marshal additional resources to identify consumer victims for partial redress.  Moreover, without a receiver, there is substantial risk that Defendants will hide assets, compromising the Court's ability to provide effective final relief.[268]

A receiver can also prevent the destruction of documents and dissipation of assets, assist the Court in assessing the extent of Defendants' fraud and understanding Defendants' current and past activity, and provide information to consumers ensnared in Defendants' debt-elimination scheme.

### C.    Immediate Access and Limited Expedited Discovery

To locate wrongfully obtained assets, Plaintiffs request that this Court permit expedited discovery and allow Plaintiffs and the temporary receiver immediate access to Corporate Defendants' business premises and records.  Immediate access to the business premises will allow the receiver and Plaintiffs to secure relevant records and prevent destruction of relevant evidence.  Moreover, immediate access and expedited discovery are necessary to ensure that Plaintiffs, the temporary receiver, and the Court are fully informed of (1) the scope and scale of Defendants' business operations, financial status, and role in the scheme; (2) the range and extent of Defendants' unlawful conduct; (3) the identity of injured consumers; (4) total consumer harm; and (5) the location, nature, and extent of Defendants' and Relief Defendants' assets.  District

---

[267] *First Fin. Group of Texas*, 645 F.2d at 438 ("It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.") (quotation omitted)).

[268] *Id.* at 438.

courts are authorized to depart from normal discovery procedure and fashion a discovery schedule that meets the needs of the particular case,[269] and courts in this district have granted the FTC and court-appointed receivers immediate access in similar cases.[270]

In addition, the proposed TRO requires that Defendants and Relief Defendants' produce certain financial records and information on short notice, and requires financial institutions served with the order to disclose whether they are holding any of Defendants' and Relief Defendants' assets. These expedited discovery provisions will assist in implementing the asset freeze and preventing dissipation of assets.

### D.     The TRO Should Be Issued *Ex Parte*

Federal Rule of Civil Procedure 65(b) permits the Court to enter an *ex parte* order upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given to defendants.[271] As discussed above, Defendants' business operations are permeated with fraud and deception. Courts in this district have on numerous occasions entered *ex parte* temporary restraining orders in similar FTC enforcement actions.[272]

As set forth in the FTC's Certification of Support of *Ex Parte* Motion for Temporary Restraining Order Pursuant to Rule 65(b), defendants involved in similar frauds have dissipated assets and destroyed documents after receiving advanced notice of federal action. Here, Defendants have already withdrawn more than $7 million from corporate accounts and have continued their scheme despite law enforcement actions, regulatory citations, and numerous consumer complaints. It is thus highly likely that Defendants will conceal or dissipate assets

---

[269] Fed. R. Civ. P. 1, 26(d), 34(b).

[270] *See supra* note 226.

[271] *See AT&T Broadband v. Tech Commc'ns Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004) (holding that *ex parte* relief is appropriate where either the defendants or person involved in similar actions have concealed assets or destroyed documents in the past).

[272] *See supra* note 226.

and/or destroy evidence if given prior notice of the filing of this action. Such a result would cause immediate and irreparable harm, as it would impair this Court' ability to secure relief for consumers. Accordingly, it is in the interest of justice to provide the requested *ex parte* relief to prevent such harm, maintain the status quo, and preserve this Court's ability to award full and effective final relief.

## VII. CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant this motion for an *ex parte* TRO with an asset freeze, appointment of a temporary receiver, and other equitable relief.