UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, and OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS, | **Case No.** 6:16-cv-982-Orl-41TBS |
| Plaintiffs, | E-Filed May 1, 2017 |
| vs. |  |
| LIFE MANAGEMENT SERVICES OF ORANGE COUNTY, LLC, a Florida limited liability company, *et al.*, |  |
| Defendants. |  |

**DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW AGAINST
INDIVIDUAL DEFENDANT KEVIN W. GUICE**

DAVID C. SHONKA
Acting General Counsel

Tejasvi M. Srimushnam
Tel:  (202) 326-2959
E-mail:  tsrimushnam@ftc.gov

Joshua A. Doan
Tel:  (202) 326-3187
E-mail:  jdoan@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580
Fax:  (202) 326-3395

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PAMELA JO BONDI
Attorney General, State of Florida

Jennifer Hinton Knutton
Assistant Attorney General, FL Bar # 92771
Jennifer.Knutton@myfloridalegal.com

Denise Beamer
Assistant Attorney General, FL Bar #69369
Denise.Beamer@myfloridalegal.com

Office of the Attorney General
Consumer Protection Division
135 W. Central Blvd., Suite 670
Orlando, Florida 32801
Tel:  (407) 316-4840 Fax: (407) 245-0365

Attorneys for Plaintiff
OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................2

    A. Overview of Defendants .............................................................2

    B. Defendants' Illegal Telemarketing Campaign ...............................4

    C. Rate-Reduction Pitch and Misrepresentations ...............................5

        1. Defendants Used Fake Names and Made False Affiliation Claims ............................................................6

        2. What Defendants Told Consumers About Their Rate-Reduction Services ...................................................7

        3. Defendants Did Not, and Could Not, Deliver the Promised Services ......................................................8

        4. Deceptive Omission from the Rate-Reduction Pitch ........................9

    D. Defendants' Debt-Elimination Pitch and Misrepresentations.......................9

        1. Debt Elimination – Pitching a Lucrative Upsell ...............................9

        2. Defendants' Unfulfilled Debt-Elimination Promises........................13

    E. Defendants' Use of the Shell Defendants and Mail Drops to Collect Up-Front Fees ...........................................................14

    F. Prior Lawsuits and Regulatory-Enforcement Actions ...................16

    G. Defendant Kevin Guice Controlled the Corporate Defendants and Was Aware of Their Deceptive Practices .......................................17

    H. Corporate Defendants Operated as a Common Enterprise ............................19

III. ARGUMENT...................................................................................21

    A. The Undisputed Facts Prove that Defendants' Acts and Practices Violated Section 5 of the FTC Act, the Telemarketing Sales Rule and the Florida Deceptive and Unfair Trade Practices Act.....................................................21

1.    Elements of a Claim Under Section 5 and the FDUTPA..................21

2.    Defendants' Misrepresentations Violate Section 5 of the
      FTC Act (Count One) and the FDUTPA (Count Eleven).................23

3.    Defendants Failed to Disclose the True Cost of their
      Debt-Relief Services, Violating Section 5 of the FTC Act
      (Count Two)....................................................................................25

4.    Defendants Violated the TSR (Counts Three Through Ten).............25

      a.    Defendants Misrepresented Material Aspects of Their
            Debt-Relief Services (Counts Three and Four) ..........................26

      b.    Defendants Failed To Disclose Material Aspects of Their
            Debt-Relief Services (Counts Five and Six)...............................27

      c.    Defendants Unlawfully Charged an Advance Fee for
            Their Debt-Relief Services (Count Seven) ..................................27

      d.    Defendants Violated the Do Not Call and Robocall
            Provisions of the TSR (Counts Eight, Nine, and Ten) ...............27

B.    Corporate Defendants are Liable as a Common Enterprise..........................28

C.    Defendant Kevin Guice is Liable for the Corporate Defendants'
      Practices .................................................................................................29

      1.    Defendant Kevin Guice Controlled and Participated in the
            Deceptive Practices of the Corporate Defendants ...........................29

      2.    Defendant Kevin Guice Knew or Should Have Known
            about the Deceptive Corporate Practices ..........................................30

      3.    The Court Should Draw Adverse Inferences Against Defendant
            Kevin Guice From His Repeated Fifth Amendment Invocations......31

D.    This Court Should Order Injunctive and Monetary Relief ...........................31

      1.    Permanent Injunctive Relief Is Equitable and Necessary to
            Protect Consumers ..........................................................................33

      2.    The Monetary Relief Proposed Is Equitable and Necessary..............34

IV.     CONCLUSION .......................................................................................................35

# **TABLE OF AUTHORITIES**

## **Cases**

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ................................................................. 31

*Delaware Watch Co.*, *v. FTC*, 332 F.2d 745 (2d Cir. 1964) ........................................ 28

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298 (11th Cir. 2009) ........... 31

*FTC v. Actions Research Group, Inc.*, No. 6:07-cv-0027-ACC-UAM (DE 30)
(M.D. Fla. 2008) ....................................................................................................... 34

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ................................. passim

*FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005) ........................ 25, 30

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ..................................... 25

*F.T.C. v. Direct Benefits Group, LLC*, 6:11-cv-1186-Orl-28TBS, 2013 U.S. Dist.
LEXIS 100593 (M.D. Fla. July 18, 2013). .................................................................. 28

*FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202 (D. Mass. 2009) ................ 35

*FTC v. Febre*, 128 F.3d 530 (8th Cir. 1997) .......................................................... 33, 35

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .............................. 22

*FTC v. Global Mktg. Group*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) ................... 32, 34

*FTC v. Group One Networks, Inc.*, No. 8:09-cv-00352-RAL-MAP (DE 147)
(M.D. Fla. 2010) ....................................................................................................... 34

*FTC v. HES Merch. Servs.*, 6:12-cv-1818-Orl-22KRS, 2014 U.S. Dist. LEXIS 171292
(M.D. Fla. Nov. 18, 2014) ......................................................................................... 29

*FTC v. Home Assure, LLC,* No. 8:09-cv-00547-SDM-TBM (DE 273) (M.D. Fla. 2010) ........... 34

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982)…………………………………..33

*FTC v. J.K. Publ'ns., Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ............................. 28

*FTC v. NPB Adver., Inc.*, Case No. 8:14-cv-1155, 2016 U.S. Dist. LEXIS 151840
(M.D. Fla. Nov. 2, 2016) ........................................................................................... 22

*FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) .......................... 22

*FTC v. RCA Credit Servs.*, 727 F. Supp. 2d 1320 (M.D. Fla. 2010) ............................................ 22

*FTC v. SlimAmerica*, 77 F. Supp. 2d 1263 (S.D. Fla 1999) ...................................................... 34

*FTC v. Sterling Drug Inc.*, 317 F.2d 669 (2d Cir. 1963) ......................................................... 23

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)................................................................... 21

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007)....................... 22, 30, 32

*FTC v. US Sales Corp.*, 785 F. Supp. 737 (M.D. Ill. 1992)........................................................ 34

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) ............................................................... 29

*FTC v. Windward Mktg.*, Case No: 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114
 (N.D. Ga. Sept. 30, 1997) ................................................................................................ 25, 29

*In re Cliffdale Assoc. Inc.,* 103 F.T.C. 110 (1984) .................................................................. 22

*In re Removatron Int'l Corp.*, 111 F.T.C. 206 (1988) ............................................................ 25

*KC Leisure, Inc., v. Haber*, 972 So. 2d 1069 (Fla. 5th DCA 2008) ....................................... 21, 29

*Millennium Commc'ns & Fulfillment, Inc. & Advanced Mktg. and Research, v. Office of the Attorney Gen.*, 761 So. 2d 1256 (Fla. 3d DCA 2000).................................................... 21, 22

*Office of the Attorney Gen.* v. *Wyndham Intern., Inc.*, 869 So. 2d 592 (Fla. 1st DCA 2004)......21

*PNR v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773 (Fla. 2003)................................................. 21

*Storer Communications, Inc. v. State, Dept. of Legal Affairs*, 591 So. 2d 238 (Fla. 4th DCA 1991) ................................................................................................................................... 21

*Sw. Sunsites, Inc., v. FTC,* 785 F.2d 1431 (9th Cir. 1986) ....................................................... 21

## **Statutes**

15 U.S.C. §§ 41, *et seq*........................................................................................................... 35

15 U.S.C. § 53(b) ................................................................................................................... 33

Florida Statutes § 501.204(2) (2016)...................................................................................... 21

Florida Statutes § 501.207 (2016)........................................................................................... 33

**Regulations**

16 C.F.R. § 310 ................................................................................................................ 26-28

**Rules**

Fed. R. Civ. P. 56…….………………………………………………………………………1

**DISPOSTIVE MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW AGAINST
INDIVIDUAL DEFENDANT KEVIN W. GUICE**

## I.      INTRODUCTION

Plaintiffs' case against Defendant Kevin Guice is ripe for Summary Judgment under

Federal Rule of Civil Procedure 56.  The undisputed facts establish that Defendant Guice,

through thirteen companies he owned or controlled, sold fraudulent debt-relief services to more

than 10,000 people throughout the United States, causing more than $23 million in consumer

harm.  Mr. Guice has chosen to invoke the Fifth Amendment, rather than respond to the

allegations against him.

The undisputed evidence demonstrates that between January 2013 and June 9, 2016,

Defendants bombarded consumers with illegal robocalls and deceptively pitched a service that

they claimed would provide a permanent and substantial reduction in consumers' credit-card

interest rates ("rate-reduction services").  Defendants collected illegal up-front fees ranging from

$500 to $5,000 for these services, but did not deliver the promised results.

Unfortunately, Defendants' scam went even further.  The undisputed evidence establishes

that Defendants also marketed a credit-card debt-elimination program that resulted in far more

serious consumer harm ("debt-elimination services").  Here, Defendants promised consumers

that in exchange for another illegal up-front fee, which ranged from $2,000 to $26,000,

Defendants would use a government fund to substantially eliminate consumers' credit-card debt.

In reality, no such government fund exists, and consumers who paid Defendants were left deeper

in debt and with severely damaged credit.

Plaintiffs have built a voluminous record to support the allegations in the Complaint, including more than forty sworn consumer declarations; testimony of former employees and business associates identifying Mr. Guice as the mastermind of Defendants' scheme; bank records proving more than $8 million in payments to Mr. Guice; and internal documents demonstrating Mr. Guice's knowledge of consumer complaints and his day-to-day involvement in the enterprise.  Throughout this litigation, Mr. Guice has refused to answer any questions about his role in Defendants' telemarketing scheme.[1]  The Court is entitled to, and should, draw adverse inferences against Mr. Guice based on his repeated invocations of the Fifth Amendment.

In sum, the overwhelming and undisputed evidence itself, along with the adverse inferences, establishes that Mr. Guice and his companies deceptively marketed debt-relief services that harmed more than 10,000 people.  Accordingly, no genuine issue of material fact exists, and Plaintiffs are entitled to judgment as a matter of law against Defendant Guice on all counts of the Complaint.[2]

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    <u>Overview of Defendants</u>

Defendant Guice began working in the telemarketing industry in 2003 and first organized a company to sell rate-reduction services in 2008.[3]  Mr. Guice organized Corporate Defendant Loyal Financial & Credit Services, LLC ("Loyal Financial") in November 2011, and he applied

---

[1] This includes his Answer (Doc. 73), at an asset deposition (1st Guice Dep.), in response to Plaintiffs' requests for admission and interrogatories (PX 177-PX 180, PX 183), and during Plaintiffs' deposition (2nd Guice Dep.).

[2] Plaintiffs and the other Defendants and Relief Defendants in this case have reached proposed settlement agreements, and the Court has granted a stay as to these parties until August 1, 2017 (Doc. 162).

[3] 2nd Guice Dep. at 15:5-7; PX 181 ¶¶ 27-31 (2nd Compton Decl.); 2nd Guice Dep. at 40:2-23; PX 185; 2nd Guice Dep. at 43:10-24.

for a telemarketing license in the company's name in April 2012.[4]  Loyal Financial's tax returns

identify Mr. Guice as the company's majority owner, and he was the only signer on the

company's bank account, which he used to issue paychecks to Defendants' employees.[5]  Like

other companies that Mr. Guice had organized, Loyal Financial sold rate-reduction services to

consumers.  In 2013, Loyal Financial also began selling debt-elimination services.[6]

Corporate Defendant Life Management Services of Orange County, LLC ("Life

Management Services") was organized in February 2014 at Kevin Guice's direction.[7]  The other

eleven Corporate Defendants are shell companies (the "Shell Defendants") that were also

organized at Mr. Guice's direction.[8]  Mr. Guice used Wayne Norris and Individual Defendant

Clarence ("Harry") Wahl to set up the Shell Defendants.[9]  During the relevant period, the Shell

Defendants opened more than two dozen bank accounts, and Kevin Guice effectively controlled

---

[4] Under Florida law, a commercial telephone seller's license (*i.e.*, a telemarketing license) is issued by the Florida Department of Agriculture and Consumer Services ("DOACS").  PX 43 ¶ 7 (Compton Decl.).

[5] Receiver's Initial Report (Doc. 109) at 14; 2nd Guice Dep. at 55:16-19; PX 121; PX 157 at 1; 2nd Guice Dep. at 56:10-57:5.  Defendant Guice filed telemarketing scripts with DOACS that contains misrepresentations related to Loyal Financial's debt-relief services.  PX 43 ¶¶ 16-25, 35 (Ex. 2).

[6] Andrews Dep. at 23:23-24; Brownell Dep. at 61:10-20; Hampton Dep. at 111:14-17; 2nd Guice Dep. at 49:8-16.

[7] *See* 1st Norris Dep. at 225:19-227:13; 2nd Guice Dep. at 84:7-9.

[8] 2nd Guice Dep. at 67:13-24; *id*. at 69:3-10; *id*. at 70:16-13; *id*. at 101:18-102:3; *id*. at 103:10-12; *id*. at 104:3-6; *id*. at 105:8-11; *id*. at 106:6-12; *id*. at 107:3-9.

[9] 1st Norris Dep. at 229:10-18; 2nd Guice Dep. at 107:18-108:10.  Mr. Norris recruited friends and acquaintances for this task, including Individual Defendant Chase Jackowski, who organized Shell Defendants LPSofFLA LLC, LPSofFlorida L.L.C., and YFP Solutions, LLC; Victoria Miller, who organized Shell Defendant PW&F Consultants of Florida LLC; Michael Yager, Jr., who organized Shell Defendants UAD Secure Service of FL LLC, and UAD Secure Services, LLC; Matthew Roberts, who organized Shell Defendant URB Management, LLC; and Christine Jones, who organized Shell Defendant YCC Solutions LLC.  1st Norris Dep. at 36:4-14; *id*.at 174:8-175:5; *id*. at 231:5-16; PX 47 ¶¶ 15-22 (Randolph Decl.).  Harry Wahl formed Shell Defendant KWP Services of Florida, LLC.  PX 47 ¶ 14 (Randolph Decl.).  Mr. Wahl's wife, Individual Defendant Karen Wahl, formed KWP Services, LLC, and Ms. Wahl's longtime friend, Inez Vest, formed IVD Recovery, LLC.  PX 47 ¶¶ 12-13 (Randolph Decl.); K. Wahl Dep. at 6:21-24; *id*. at 66:2-21.

all of these accounts.[10]  When asked about receiving money from the Corporate Defendants, Mr.

Guice repeatedly invoked the Fifth Amendment.[11]

      **B.**    **<u>Defendants' Illegal Telemarketing Campaign</u>**

      Defendants used an outside dialer or lead generator to place telephone calls to consumers

throughout the United States[12] that played a prerecorded message ("robocalls").[13]  The

prerecorded message told consumers that the call was "urgent" because their "eligibility for

lowering [their] interest rate to as little as 1 percent expires shortly," and that the call was their

"final notice."[14]  The message told consumers to "press one" to speak with a live operator.[15]  An

FTC investigator received two robocalls in November 2015 that led to conversations with an

employee of the Defendants.[16]

---

[10] *See* PX 115 – PX 154 (bank signature cards); 1st Norris Dep. at 256:6-257:8; *id*. at 265:2-266:17; 2nd Jackowski Dep. at 15:23-17:2; *id*. at 30:6-21.

[11] 2nd Guice Dep. at 68:10-15; *id*. at 72:2-20; *id*. at 111:5-7; *id*. at 112:11-13; *id*. at 113:7-24; *id*. at 114:19-21; *id*. at 116:3-16; *id*. at 117:18-20; *id*. at 118:2-22.

[12] Kunz Dep. at 14:5-23; Stickles Dep. at 54:5-8.

[13] *See* Stickles Dep. at 54:9-55:1; PX 1 ¶¶ 3-5 (Anderson Decl.); PX 4 ¶¶ 5-7 (Bishop Decl.); PX 7 ¶ 5 (E. J. Brabson Decl.); PX 10 ¶¶ 6-7 (B. Cherry Decl.); PX 11 ¶¶ 4-5 (C. Cherry Decl.); PX 12 ¶¶ 5-6 (Coombs Decl.); PX 15 ¶¶ 3-4 (Gannon Decl.); PX 16 ¶¶ 5- 6 (Gascon Decl.); PX 23 ¶¶ 3-4 (Jorolemon Decl.); PX 29 ¶¶ 6, 8 (Mussallem Decl.); PX 32 ¶¶ 4-5 (Decl. of Joseph Railey); PX 33 ¶¶ 5-7 (Schallon Decl.); PX 34 ¶¶ 3-4 (Schley Decl.); PX 35 ¶¶ 5-6 (Scholzen Decl.); PX 36 ¶ 3 (Thomas Decl.); PX 37 ¶¶ 5-7 (Wedemeyer Decl.); PX 111 ¶ 5 (White Decl.); PX 155 ¶ 4 (Franklin Decl.).

[14] PX 51 at 4; PX 52 at 4.

[15] *Id*.

[16] *See* PX 46 ¶¶ 14 & 26 (Tyndall Decl.);  PX 51 at 4; PX 52 at 4; Deese Dep. at 54:1-65:8 (invoking Fifth Amendment privilege against self-incrimination as to whether she was the "Melissa" in PX 51 and PX 52); Andrews Dep. at 135:18-136:7; *id*. at 136:25-137:17 (identifying Melissa Deese as "Melissa").

Many consumers who were contacted by Defendants had previously listed their telephone numbers on the FTC's National Do Not Call Registry ("DNC Registry").[17]  Those consumers also had no prior business relationship with Defendants, and they had not given Defendants written permission to contact them.[18]  Indeed, the FTC has received at least 8,500 DNC consumer complaints regarding telephone numbers linked to the Defendants.[19]

It is no surprise that Defendants contacted consumers whose telephone numbers were listed on the DNC Registry, because Defendants never paid the fee required to access the Registry.[20]

### C.    Rate-Reduction Pitch and Misrepresentations

Between January 2013 and June 9, 2016, Defendants sold rate-reduction services to approximately 7,500 consumers, grossing more than $11.4 million.[21]  These consumers paid fees ranging from $500 to $5,000.[22]

---

[17] *See* PX 1 ¶ 11 (Anderson Decl.); PX 2 ¶ 3 (E. Adkins Decl.); PX 4 ¶ 3 (Bishop Decl.); PX 7 ¶ 3 (E.J. Brabson Decl.); PX 8 ¶ 3 (Brown Decl.); PX 10 ¶ 4 (B. Cherry Decl.); PX 12 ¶ 3 (Coombs Decl.); PX 15 ¶ 2 (Gannon Decl.); PX 16 ¶ 3 (Gascon Decl.); PX 18 ¶ 2 (Graham Decl.); PX 20 ¶ 3 (Healey Decl.); PX 21 ¶ 3 (Henderson Decl.); PX 22 ¶ 3 (James Decl.); PX 23 ¶ 2 (Jorolemon Decl.); PX 24 ¶ 3 (Knauss Decl.); PX 25 ¶ 4 (Kubeny Decl.); PX 27 ¶ 2 (Lohr Decl.); PX 28 ¶ 3 (Maxwell Decl.); PX 29 ¶ 4 (Mussallem Decl.); PX 30 ¶ 2 (Myre-Napieralski Decl.);  PX 32 ¶ 10 (Railey Decl.); PX 33 ¶ 3 (Schallon Decl.); PX 35 ¶ 3 (Scholzen Decl.); PX 37 ¶ 3 (Wedemeyer Decl.); PX 38 ¶ 3 (Wiley Decl.); PX 111 ¶ 3 (White Decl.).

[18] *See id.*

[19] *See* PX 46, ¶¶ 40 & 41 (Tyndall Decl.) (listing do not call complaints against phone numbers (248) 215-0437 and (361) 271-4848)); *id.* at ¶¶ 1-10 (linking (248) 215-0437 to Defendants); *id.* at ¶¶ 25- 36 (linking (361) 271-4848 to Defendants).  The FTC also received nearly 300 fraud complaints from consumers regarding the Corporate Defendants.  PX 46 ¶¶ 43-50 (Tyndall Decl.).

[20] PX 46 ¶¶ 56-57 (Tyndall Decl.).

[21] PX 175 ¶ 12 (2nd George Decl.).

[22] *See* Stickles Dep. at 280:22-24.

1.    **Defendants Used Fake Names and Made False Affiliation Claims**

Consumers who "pressed one" after receiving Defendants' robocalls were routed to a

salesperson at Defendants' call center.[23]  Defendants' salespersons routinely told consumers that

they worked for American Credit Assistance, or "ACA," Bank Card Services, or "BCS," and

Credit Assistance Program, or "CAP," rather than for Loyal Financial or Life Management

Services.[24]  Building on this ruse, Defendants falsely told consumers that they were a "licensed

enrollment center" for companies such as MasterCard and Visa.[25]  Defendants also claimed to

have a direct relationship with the consumers' credit-card issuer, such as Citibank.[26]  Defendants,

however, had no relationship with these entities.[27]

These misrepresentations were captured during calls Defendants placed to the FTC's

undercover investigator, and they are also contained in call scripts recovered from Defendants'

call center.[28]

---

[23] PX 51 at 4-6; PX 52 at 4-6; Deese Dep. at 54:1-65:8 (invoking Fifth Amendment privilege against self-incrimination as to whether she was the "Melissa" in PX 51 and PX 52); Andrews Dep. at 135:18-136:7; *id.* at 136:25-137:17 (identifying Melissa Deese as "Melissa").

[24] *See* Doc. 41-2 ¶ 9 and Ex. 1 (2nd Caplan Decl.) (describing call scripts found at Life Management Services' call center); PX 46 ¶¶ 15 & 29 (Tyndall Decl.); PX 51 at 8; PX 52 at 7; 2nd Guice Dep. at 58:7-22; *id.* at 91:23-92:23; PX 172 (forwarding to Mr. Guice an investigative demand addressed to "Bank Card Services" from the North Carolina Attorney General's Office).

[25] PX 46 ¶¶ 16 & 29 (Tyndall Decl.); PX 51 at 8-9; PX 52 at 7; Doc. 41-1, Attach. D (2nd Tyndall Decl.) (rebuttal scripts).

[26] PX 46 ¶¶ 16 & 31 (Tyndall Decl.); PX 51 at 9; PX 52 at 8.

[27] *See* PX 40 ¶¶ 4-5 (Decl. of John Brady (MasterCard)); PX 41 ¶¶ 7-11 (Decl. of Martin Elliott (Visa)); PX 39 ¶¶ 27-32 (Decl. of Gail Kilmer (Citibank)).

[28] PX 51 at 9 & 22; PX 52 at 7-9; Doc. 41-1 ¶ 15 & Attach. D (2nd Tyndall Decl.); Doc. 41-2 ¶ 9 & Ex. 1 (2nd Caplan Decl.).  Those call scripts differ markedly from the rate-reduction scripts that Loyal Financial and Life Management Services filed with DOACS.  Andrews Dep. at 138:20-25; 2nd Guice Dep. at 57:23-60:18; *id.* at 91:6-94:11.

Mr. Guice repeatedly invoked the Fifth Amendment when confronted with the fake

company names and false-affiliation claims that Defendants used in their rate-reduction pitch.[29]

### 2.     What Defendants Told Consumers About Their Rate-Reduction Services

Defendants guaranteed to consumers that their rate-reduction program would

substantially and permanently reduce consumers' credit-card interest rates.[30]  Defendants also

promised consumers that their rate-reduction services would save consumers thousands of

dollars in a short period of time, allowing them to pay off their credit-card debt much

faster, typically three-to-five times faster.[31]

Defendants' representation about being able to obtain permanent interest-rate reductions

was also captured in a recording of a call placed to the FTC's undercover investigator.[32]

Mr. Guice repeatedly invoked the Fifth Amendment when confronted with the deceptive

statements his salespersons made about Defendants' alleged ability to substantially and

permanently lower consumers' credit-card interest rates and save them thousands of dollars.[33]

---

[29] 2nd Guice Dep. at 57:23-63:18; *id*.at 91:11-94:11.

[30] PX 2 ¶¶ 18-19 (E. Adkins Decl.); PX 5 ¶¶ 5, 17 (Blakely Decl.); PX 8 ¶ 13 (Brown Decl.); PX 10 ¶¶ 11-12 (B. Cherry Decl.); PX 12 ¶ 18 (Coombs Decl.); PX 13 ¶¶ 11-12 (DeMarco Decl.); PX 21 ¶¶ 20 (Henderson Decl.); PX 23 ¶¶ 16 (Jorolemon Decl.); PX 24 ¶¶ 11, 14 (Knauss Decl.); PX 34 ¶ 23 (Schley Decl.); PX 35 ¶ 15 (Scholzen Decl.); PX 37 ¶¶ 12-13 (Wedemeyer Decl.); PX 38 ¶ 10 (Wiley Decl.); PX 111 ¶ 10 (White Decl.); PX 155 ¶ 7 (Franklin Decl.); 2nd Guice Dep. at 60:19-23; *id*. at 94:12-16.

[31] PX 2 ¶¶ 11, 12, 18 (E. Adkins Decl.); PX 3 ¶ 5 (J. Adkins Decl.); PX 12 ¶ 6 (Coombs Decl.); PX 18 ¶ 25 (Graham Decl.); PX 20 ¶¶ 8-9 (Healey Decl.); PX 22 ¶ 8 (James Decl.); PX 23 ¶ 13 (Jorolemon Decl.); PX 33 ¶ 16 (Schallon Decl.); PX 34 ¶ 15 (Schley Decl.); 2nd Guice Dep. at 61:7-10; *id*. at 95:9-22.

[32] PX 51 at 15.

[33] 2nd Guice Dep. at 60:19-63:22; *id*. at 94:12-97:19.

### 3.   Defendants Did Not, and Could Not, Deliver the Promised Services

Defendants did not deliver on their promises.  Not a single consumer-declarant received a substantial and permanent reduction of their credit-card interest rates.[34]  Some consumers reported that although Defendants called their existing credit-card issuer and requested a lower rate, their issuer offered only a modest and temporary interest-rate reduction (if any reduction at all).[35]  Other consumers reported that Defendants obtained new credit cards for them with low introductory interest rates ("promotional rates").  But these "promotional rates" were again only temporary.[36]

The unrebutted testimony of expert witness Lisa Wilhelm, who has spent more than 35 years in the retail-banking industry as an executive and consultant, shows that these consumer experiences reflect industry practices.  First, credit-card issuers typically would not offer a substantial reduction to an existing cardholder's interest rate, but might instead offer to reduce the interest rate of a cardholder in good standing by one-to-three percent.[37]  Second, credit-card issuers were unlikely to offer fixed (*i.e.* permanent) interest rates to cardholders.[38]  Third, Defendants could not rely on "promotional rate" credit cards to fulfill their promises because such cards offered only temporary interest-rate savings and, in most cases, the rates on such

---

[34] *See* PX 1– PX 38; PX 110 – PX 112; PX 155 (consumer declarations).

[35] PX 8 ¶ 11 (Brown Decl.); PX 12 ¶ 25 (Coombs Decl.); PX 21 ¶ 18 (Henderson Decl.); PX 22 ¶ 10 (James Decl.); PX 23 ¶ 11 (Jorolemon Decl.); PX 34 ¶ 21 (Schley Decl.); PX 35 ¶ 12 (Scholzen Decl.).

[36] PX 5 ¶¶ 17, 39 (Blakely Decl.); PX 7 ¶ 21 (E. J. Brabson Decl.); PX 10 ¶ 32 (B. Cherry Decl.); PX 12 ¶ 26 (Coombs Decl.); PX 18 ¶ 23 (Graham Decl.); PX 33 ¶ 22 (Schallon Decl.); PX 34 ¶ 42 (Schley Decl.); PX 38 ¶ 20 (Wiley Decl.); PX 111 ¶ 22 (White Decl.).

[37] PX 42 (Wilhelm Decl.) ¶ 49.

[38] PX 42 (Wilhelm Decl.) ¶ 51.

cards increased substantially after the promotional term.[39]  Fourth, fees charged by credit-card issuers, such as cash-advance fees and balance-transfer fees, would eat into any insignificant or temporary interest-rate savings a consumer might receive, especially when combined with Defendants' high up-front fee.[40]

### 4.     Deceptive Omission from the Rate-Reduction Pitch

In addition to falling far short of the substantial and permanent savings promised by Defendants, temporarily lowering a consumer's credit-card interest rate through a balance transfer presents another problem for consumers: credit-card issuers generally charge a fee of three-to-five percent of the balance transferred from an existing credit card to a new credit card.[41] Defendants did not tell consumers that they may have to pay balance-transfer fees in addition to Defendants' fees.[42]

### D.     Defendants' Debt-Elimination Pitch and Misrepresentations

### 1.     Debt Elimination – Pitching a Lucrative Upsell

Defendants' debt-elimination program was a lucrative upsell to a recycled subset of the consumers who had already purchased rate-reduction services.[43]  Between January 2013 and

---

[39] PX 42 (Wilhelm Decl.) ¶¶ 29 & 52.

[40] PX 42 (Wilhelm Decl.) ¶¶ 36, 68, 84, 86.

[41] PX 42 (Wilhelm Decl.) ¶ 29; PX 12 ¶ 27 (Coombs Decl.); PX 17 ¶ 22 (Goldsmith Decl.); PX 21 ¶ 41 (Henderson Decl.); PX 24 ¶ 33 (Knauss Decl.); PX 25 ¶ 32 (Kubeny Decl.); PX 33 ¶ 21 (Schallon Decl.); PX 38 ¶ 21 (Wiley Decl.); PX 111 ¶ 24 (White Decl.); PX 155 ¶ 21 (Franklin Decl.).

[42] PX 8 ¶ 14 (Brown Decl.); PX 10 ¶ 15 (B. Cherry Decl.); PX 13 ¶¶ 11-12 (DeMarco Decl.); PX 16 ¶ 13 (Gascon Decl.); PX 17 ¶ 15 (Goldsmith Decl.); PX 21 ¶ 21 (Henderson Decl.); PX 23 ¶ 15 (Jorolemon Decl.); PX 25 ¶ 15 (Kubeny Decl.); PX 33 ¶ 17 (Schallon Decl.); PX 34 ¶ 24 (Schley Decl.); PX 35 ¶ 18 (Scholzen Decl.); PX 37 ¶ 17 (Wedemeyer Decl.); PX 38 ¶ 12 (Wiley Decl.); PX 111 ¶ 14 (White Decl.); PX 155 ¶ 7 (Franklin Decl.); 2nd Guice Dep. at 62:23-63:10; *id.* at 96:25-97:12; Stickles Dep. at 180:23-182:4.

[43] Brownell Dep. at 84:10-23.

June 9, 2016, Defendants received more than $11.6 million in fees from approximately 2,500 debt-elimination customers, who paid fees ranging from $2,000 to $26,000.[44]

Defendants developed customer leads for the debt-elimination program by reviewing information collected from their rate-reduction customers.  Defendants would then contact those consumers who had both "the debt parameter to be enrolled into the program" and sufficient available credit to pay the debt-elimination fee.[45]  Defendants did not have a script for their debt-elimination pitch.  Instead, their primary debt-elimination closer, Lea Brownell, gained her understanding about the program from Mr. Guice and his sister, Heather Cline.[46]  In some instances, Defendants tailored their debt-elimination pitch to senior citizens.[47]

Defendants deceived consumers into believing that their debt-elimination program would leverage someone else's money to pay off their credit-card debts, and that one or more branches of the government was involved.  Defendants told consumers that the debt-elimination program involved a "government fund," "fund," "lawsuit," or government findings that credit-card issuers

---

[44] PX 175 ¶ 15 (2nd George Decl.); Brownell Dep. at 59:4-7; 2nd Guice Dep. at 149:19-22.

[45] Brownell Dep. at 84:10-85:5; *id*. at 140:12-15 (noting that the debt-elimination fee "would come off of the credit card. It would be in the form of a balance transfer, direct deposit or ACH into their checking account, or even a cash advance.").

[46] Brownell Dep. at 136:17-137:6; *id*. at 212:16-23.  Ms. Brownell sometimes used her real name when dealing with consumers, and she sometimes told consumers that her name was Lea White or Lea Morency.  Brownell Dep. at 91:2-11.  The spelling of Ms. Brownell's first name varies in consumer complaints and declarations, but "Lea" is pronounced the same as "Lee" and "Leigh."

[47] PX 7 ¶ 25 (E.J. Brabson Decl.) ("Ms. White told me that she had a program to help senior citizens eliminate their debt."); PX 16 ¶ 25 (Gascon Decl.) ("The female representative said that I was eligible for her debt-elimination program because of my age.  I was 64 years old at the time."); PX 112 ¶ 5 (Fraver Decl.) (Florida consumer Ms. Fraver reports that she was told that the "United States government had a new program for senior citizens which would eliminate their credit card debt"); *see also* PX 30 ¶ 10 (Myre-Napieralski Decl.).

had charged their customers excessive interest.[48]  Mr. Guice pleaded the Fifth Amendment when

asked whether Defendants had told consumers that their debt-elimination program involved a

government fund.[49]

 Deposition testimony from Defendants' salespersons supports the sworn declarations

from consumers.  Clark Hampton, who provided debt-elimination fulfillment services at Life

Management Services, testified that he spoke with consumers who believed there was a

government fund that would be used to eliminate or settle their credit card debts.[50]  Mr. Hampton

explained, "when customers would say to me . . . well, what about this government fund that was

going to pay 100 percent of my settlement? I said, I'm sorry to give you the bad news, there is no

such fund."[51]

 Defendants' primary debt-elimination pitchwoman acknowledged at her deposition that

she told consumers that "throughout the last 10 to 15 years, credit card companies had been fined

---

[48] PX 2 ¶ 31 (E. Adkins Decl.) ("25 billion government fund paid for by credit-card companies because they were found to be engaging in predatory lending practices"); PX 3 ¶ 16 (J. Adkins Decl.) ("same"); PX 20 ¶ 16 (Healey Decl.); PX 30 ¶ 16 (Myre-Napieralski Decl.); PX 111 ¶ 27 (White Decl.); PX 7 ¶ 26 (E.J. Brabson Decl.) ("a large fund had been created because credit-card companies had been charging their customers too much interest"); PX 10 ¶ 37 (B. Cherry Decl.) ("credit card companies had been required to create a fund because of some sort of lawsuit against them"); PX 25 ¶ 38 (Kubeny Decl.) ("$10 billion fund had been created because the credit card companies had engaged in fraud and other deceptive practices"); PX 31 ¶ 8 (Pompati Decl.) ("Obama administration had set up a fund to bail out credit cardholders"); PX 110 ¶ 12 (Schuldt Decl.) ("she could access the fund to eliminate my credit-card debt"); PX 38 ¶ 24 (Wiley Decl.) ("multi-million-dollar or multi-billion-dollar fund had been created because credit card companies were charging their customers too much interest"); PX 4 ¶ 29 (Bishop Decl.) ("the government had found that credit card companies were charging too much interest to their customers"); PX 9 ¶ 8 (Burke Decl.) ("Federal Trade Commission ('FTC') had collected billions of dollars from lawsuits against credit-card companies, and that the FTC was giving that money to consumers to pay off their credit-card debts"); PX 16 ¶ 24 (Gascon Decl.) ("credit-card companies were charging too much interest"); PX 28 ¶ 5 (Maxwell Decl.) ("government program would pay off credit card debt for those who qualify under the Predatory Lending Act"); PX 36 ¶ 18 (Thomas Decl.) ("lawsuit that their company had recently won against many credit card companies").

[49] 2nd Guice Dep. at 74:4-78:8; *id.* at 135:11-149:14; *id.* at 61:24-62:6; *id.* at 96:3-8.

[50] Hampton Dep. at 141:2-142:2.

[51] Hampton Dep. at 149:23-150:3.

money."[52]  She said that Defendants then told consumers that they had a "staff of coordinators who utilize the laws and regulations to be able to have a portion of [the consumer's] debt legally discharged."[53]  She further acknowledged that the debt-elimination services Defendants provided had nothing to do with any fines against credit-card companies, and she conceded that the debt-elimination pitch could have misled consumers.[54]

Defendants knew that consumers would be going into default on their credit-card bills, but failed to inform consumers about the consequences of defaulting.[55]  Ms. Brownell, Defendants' debt-elimination closer, acknowledged that Defendants did not tell consumers that failing to make timely payments to creditors would likely adversely affect their creditworthiness.[56]  Defendants also failed to tell consumers that not paying their creditors in a timely manner might result in the consumer being subject to collections or being sued.[57]  Finally, Ms. Brownell acknowledged that Defendants did not tell consumers that not making timely

---

[52] Brownell Dep. at 209:18-20.

[53] Brownell Dep. at 210:3-6.

[54] Brownell Dep. at 210:24-211:16; *id.* at 212:6-15.

[55] Brownell Dep. at 147:6-12.

[56] Brownell Dep. at 147:13-16; *see also* PX 2 ¶ 33 (E. Adkins Decl.); PX 3 ¶ 18 (J. Adkins Decl.); PX 16 ¶ 29 (Gascon Decl.); PX 18 ¶ 37 (Graham Decl.); PX 20 ¶ 23 (Healey Decl.); PX 28 ¶ 11 (Maxwell Decl.); PX 110 ¶ 16 (Schuldt Decl.); PX 111¶ 34 (White Decl.); PX 112 ¶ 25 (Fraver Decl.).

[57] Brownell Dep. at 147:17-20; *see also* PX 2 ¶ 34 (E. Adkins Decl.); PX 3 ¶ 19 (J. Adkins Decl.); PX 16 ¶ 30 (Gascon Decl.); PX 20 ¶ 25 (Healey Decl.); PX 28 ¶ 11 (Maxwell Decl.); PX 110 ¶ 17 (Schuldt Decl.); PX 111 ¶ 35 (White Decl.); PX 112 ¶ 26 (Fraver Decl.).

payments to their creditors might increase the consumer's overall debt due to the accrual of fees and interest.[58]

Kara Andrews, who supervised debt-elimination fulfillment at Life Management Services, testified that she monitored Ms. Brownell's telephone calls with consumers "maybe every few months."[59]  Ms. Andrews also acknowledged that Ms. Brownell brought in lots of money for Defendants and never faced discipline in connection with her work pitching their debt-elimination program.[60]

## 2.   Defendants' Unfulfilled Debt-Elimination Promises

There was no fund, government or otherwise, that could be used to pay off the credit-card debts of consumers who purchased Defendants' debt-elimination services.[61]  Instead, Defendants instructed consumers to stop paying their credit-card bills after three-to-six months, placing them in past-due status.[62]  Approximately two-to-three months after enrolling in the debt-elimination program, consumers would receive a "New Client Packet."[63]  The packet included, among other

---

[58] Brownell Dep. at 147:21-25; *see also* PX 2 ¶ 35 (E. Adkins Decl.); PX 3 ¶ 20 (J. Adkins Decl.); PX 16 ¶ 31 (Gascon Decl.); PX 20 ¶ 26 (Healey Decl.); PX 28 ¶ 11 (Maxwell Decl.); PX 110 ¶ 18 (Schuldt Decl.); PX 111 ¶ 36 (White Decl.); PX 112 ¶ 27 (Fraver Decl.).

[59] Andrews Dep. at 207:2-13.

[60] Andrews Dep. at 209:25-210:2; *id*. at 120:4-9.

[61] *See, e.g.*, PX 42 ¶ 105 (Wilhelm Decl.); PX 39 (Decl. of Citibank's Gail Kilmer) ¶¶ 34-35; Hampton Dep. at 141:15-22; *id*. at 149:23-150:3; 2nd Guice Dep. 62:11-14; *id*. at 96:9-13.

[62] Brownell Dep. at 147:6-9; *id*. at 144:21-145:9; Hampton Dep. at 58:21-59:7.

[63] Hernandez Dep. at 29:5-18.

materials, a Limited Power of Attorney form, which granted Defendants the authority to negotiate with consumers' credit-card issuers.[64]

After receiving an executed Limited Power of Attorney form, Defendants would send consumers' credit-card issuers a cease-and-desist letter, asking that all statements and communications about the consumer's accounts be sent to Defendants.[65]  Defendants would then attempt to negotiate with the consumer's creditors to pay something less than what the consumer owed on his past-due accounts.

Even when those negotiations were successful, the consumer still had to pay off the settlement amounts that Defendants had negotiated with the consumer's creditors.[66]  Thus, the consumer paid Defendants thousands of dollars at the outset of the debt-elimination program, and was left to pay her creditors if Defendants performed any services.[67]  If negotiations were unsuccessful, a consumer was subject to being sued by creditors or debt collectors.

**E.      Defendants' Use of the Shell Defendants and Mail Drops to Collect Up-Front Fees**

Between January 2013 and June 2016, Defendants did not directly charge consumers' credit cards to collect their up-front fees.[68]  Instead, in many cases, Defendants asked consumers to take a cash advance on a credit card and deposit those funds into their personal bank accounts.

---

[64] Hampton Dep. at 58:6-9; *id*. at 101:15-102:7.  Clark Hampton, who joined Life Management Services' debt-elimination fulfillment staff in February 2015, testified that the other members were Danny Quintero, who used the name "Danny Romero" when speaking with consumers; Sylina Solomon, who used the name "Celina Young"; Frank Lewis; Trish; and Heather Cline, who is Kevin Guice's sister.  Hampton Dep. at 13:20-19:10.

[65] Andrews Dep. at 75:11-17; Hampton Dep. at 57:24-58:5.

[66] Hampton Dep. at 177:11-18.

[67] Hampton Dep. at 81:24-82:8.

[68] Andrews Dep. at 145:13-18; Brownell Dep. at 140:7-141:14; 2nd Guice Dep. at 149:23-150:1.

Defendants would then instruct the consumer to send a personal or cashier's check with the funds from the cash advance, or would use an automated clearing house ("ACH") transaction to remove the funds from the consumer's account.[69]  In other instances, Defendants asked consumers to pay using credit-card convenience checks.[70]  Defendants' practice of asking consumers to take a cash advance and then send them a check raised a "red flag" for industry expert Lisa Wilhelm, who observed that Defendants would only do that if they could no longer process traditional credit-card transactions or if they wanted to deprive consumers of their means of disputing a payment transaction.[71]

Shell Defendants opened various mail drops in the Orlando area.[72]  Consumers were asked to send both checks and paperwork related to Defendants' debt-elimination program to these mail drops, thereby obscuring the location of Defendants' call center.[73]

Defendants requested and collected their up-front fees as soon as they could.  For the rate-reduction program, Defendants collected their fee before a consumer had made her first

---

[69] Andrews Dep. at 143:13-145:18; 2nd Guice Dep. at 150:2-151:9; PX 2 ¶¶ 23-24 (E. Adkins Decl.); PX 3 ¶ 10 (J. Adkins Decl.); PX 4 ¶ 23 (Bishop Decl.); PX 5 ¶ 15 (Blakely Decl.); PX 7 ¶¶ 15-16 (E.J. Brabson Decl.); PX 8 ¶ 16 (Brown Decl.); PX 10 ¶ 25 (B. Cherry Decl.); PX 13 ¶ 16 (DeMarco Decl.); PX 16 ¶ 13 (Gascon Decl.); PX 18 ¶ 33 (Graham Decl.); PX 21 ¶ 36 (Henderson Decl.); PX 23 ¶ 30 (Jorolemon Decl.); PX 24 ¶ 19 (Knauss Decl.); PX 25 ¶ 29 (Kubeny Decl.); PX 26 ¶ 20 (Laxton Decl.); PX 33 ¶ 26 (Schallon Decl.); PX 37 ¶ 16 (Wedemeyer Decl.); PX 38 ¶¶ 18-19 (Wiley Decl.); PX 111 ¶ 19 (White Decl.); PX 155 ¶ 21 (Franklin Decl.).

[70] PX 110 ¶ 7 (Schuldt Decl.).

[71] PX 42 ¶ 88 (Wilhelm Decl.).

[72] PX 55 – PX 59; PX 48 ¶ 29 (Caplan Decl.).

[73] PX 2 ¶ 50 (Erika Adkins Decl.); PX 3 ¶ 35 (Jason Adkins Decl.); PX 7 ¶ 16 (Brabson Decl.); PX 10 ¶ 27 (Betty Cherry Decl.); PX 21 ¶ 34 (Henderson Decl.); PX 25 ¶ 58 (Kubeny Decl.); PX 33 ¶ 25 (Schallon Decl.); PX 34 ¶ 31 (Schley Decl.); PX 37 ¶ 30 (Wedemeyer Decl.); PX 38 ¶ 16 (Wiley Decl.); PX 110 ¶ 7 (Schuldt Decl.); PX 111 ¶¶ 18-19 (White Decl.).

payment on a credit card with a new lower interest rate.[74]  In the debt-elimination context, Ms. Brownell asked consumers to pay Defendants' fees when she made her pitch.  She did not wait until negotiations with a consumer's creditors had been completed—or had even started—before requesting payment.[75]

### F.    Prior Lawsuits and Regulatory-Enforcement Actions

Defendants were the subjects of lawsuits, regulatory actions, and law-enforcement inquiries before this Court entered its Temporary Restraining Order on June 8, 2016.  For example:

- In February 2013, DOACS cited Kevin Guice and Loyal Financial for employing unlicensed telemarketers and using forms that had not previously been provided to the Department.  That same day, DOACS arrested Kevin Guice for managing an unlicensed telemarketing business in a room adjacent to the room occupied by Loyal Financial.[76]

---

[74] See PX 2 ¶ 21 (E. Adkins Decl.); PX 3 ¶ 9 (J. Adkins Decl.); PX 4 ¶ 23 (Bishop Decl.); PX 5 ¶ 15 (Blakely Decl.); PX 7 ¶ 17 (E. J. Brabson Decl.); PX 8 ¶¶ 18, 20 (Brown Decl.); PX 10 ¶ 27 (B. Cherry Decl.); PX 15 ¶ 18 (Gannon Decl.); PX 16 ¶ 18 (Gascon Decl.); PX 18 ¶¶ 32-33 (Graham Decl.); PX 20 ¶ 11 (Healey Decl.); PX 21 ¶ 35 (Henderson Decl.); PX 22 ¶ 16 (James Decl.); PX 25 ¶ 29 (Kubeny Decl.); PX 26 ¶ 20 (Laxton Decl.); PX 31 ¶ 6 (Pompati Decl.); PX 36 ¶ 10 (Thomas Decl.); PX 38 ¶¶ 18-19 (Wiley Decl.); PX 110 ¶ 8 (Schuldt Decl.); PX 111 ¶ 19 (White Decl.); PX 155 ¶ 21(Franklin Decl.).

[75] Brownell Dep. at 153:24-154:17; Hampton Dep. 57:9-59:19; Andrews Dep. 141:3-142:7; PX 2 ¶ 37 (E. Adkins Decl.); PX 3 ¶ 22 (J. Adkins Decl.); PX 4 ¶ 37 (Bishop Decl.); PX 7 ¶ 33 (E. J. Brabson Decl.); PX 16 ¶ 35 (Gascon Decl.); PX 18 ¶ 50 (Graham Decl.); PX 20 ¶ 29 (Healey Decl.); PX 26 ¶ 41 (Laxton Decl.); PX 27 ¶ 10 (Lohr Decl.); PX 28 ¶ 15 (Maxwell Decl.); PX 30 ¶ 33 (Myre-Napieralski Decl.); PX 31 ¶ 10 (Pompati Decl.); PX 36 ¶ 21 (Thomas Decl.); PX 110 ¶ 20 (Schuldt Decl.); PX 111 ¶¶ 39 (White Decl.); PX 112 ¶¶ 17, 18 (Fraver Decl.).  One consumer, who had paid more than $17,000 in up-front fees for rate-reduction and debt-elimination services, later asked Defendants why they had collected those fees from him when the TSR expressly prohibits the practice. Defendants told the consumer that the TSR did not apply to them because they are regulated by DOACS.  See PX 20 ¶ 50 (Healey Decl.).

[76] PX 43 ¶¶ 29-32 (1st Compton Decl.); 2nd Guice Dep. at 48:15-49:24.  Mr. Guice was unable to renew Loyal Financial's telemarketing license following his arrest.  PX 43 ¶¶ 35 & 36 (Compton Decl.); 2nd Guice Dep. at 50:8-17.  Loyal Financial then amended its Articles of Organization and license application to identify Mr. Guice's sister, Individual Defendant Linda N. ("Nikki") McNealy, as the company's manager, and DOACS renewed the company's telemarketing license.  PX 47 ¶ 11 (Randolph Decl.); PX 43 ¶¶ 38, 39, 103 (Compton Decl.); 2nd Guice Dep. at 50:18-52:2; McNealy Dep. at 34:19-25.  But as Mr. Guice later made clear to his (and Loyal Financial's) accountant, Ms. McNealy was "just a manager" of the company, and he designated her as the company's sole manager in corporate and DOACS filings because he "needed to do that for licensing purposes . . . ."  PX 159; 2nd Guice Dep. at 52:9-53:7.

- In December 2013, Kevin Guice, Loyal Financial, and URB Management were sued in Ohio state court by a customer named Sona Childress.  Childress alleged that the defendants had fraudulently induced her to send them $13,000 while she was in a nursing home.  The defendants reached a settlement with Ms. Childress without responding to the Complaint.[77]

- In November 2014, the Mississippi Public Service Commission issued an administrative complaint against URB Management concerning unauthorized telemarketing in the state of Mississippi. The company signed a settlement agreement, paid a $2,000 fine, and agreed to cease selling their products to Mississippi residents without first complying with Mississippi law and making a number of disclosures.[78]

- In February 2016, the Oregon Department of Justice executed an Assurance of Voluntary Compliance with LPSofFLA LLC, LPSofFlorida L.L.C., and Chase Jackowski relating to unauthorized telemarketing in the state of Oregon.   The companies issued a refund to an Oregon consumer who had purchased Defendants' rate-reduction services, assented to a $7,500 fine, and agreed to abide by Oregon telemarketing laws.[79]

### G.    Defendant Kevin Guice Controlled the Corporate Defendants and Was Aware of Their Deceptive Practices

Corporate Defendants operated under the common control of Kevin Guice, who owned

Loyal Financial, and used Messrs. Norris and Wahl to create the other twelve Corporate

Defendants.[80]  Mr. Guice directed the affairs of Life Management Services on a regular basis.

Kara Andrews, who was a manager at Life Management Services, testified that Mr. Guice had

---

[77] PX 160 & 161; 2nd Guice Dep. at 79:20-83:20.  Life Management Services was organized while the Childress lawsuit against Mr. Guice and Loyal Financial was pending.  PX 47 ¶ 10 (Randolph Decl.); 2nd Guice Dep. at 83:21-84:13.  Wayne Norris testified that Mr. Guice asked him to organize Life Management Services because he "needed to get a license and everything set up."  He also testified that Mr. Guice needed a new company to be organized rather than just renewing Loyal Financial's telemarketing license "because there was an open court case." 1st Norris Dep. at 225:22-227:4.

[78] PX 108 & 109.

[79] PX 106 & 107.

[80] 1st Norris Dep. at 229:10-18; Receiver's Initial Report (Doc. 109) at 14; 2nd Guice Dep. at 55:16-19; PX 121; PX 157 at 1 (payroll check bearing Defendant Guice's signature); 2nd Guice Dep. at 56:10-57:5.

authority over the managers.[81]  Ms. Andrews oversaw debt-elimination fulfillment for Life

Management Services, and she testified that she would speak with Mr. Guice "frequently" about

issues regarding the debt-elimination program.[82]  Life Management Services' employees and

managers also consulted Mr. Guice about customer complaints, refund requests, and debt-

elimination fulfillment, sometimes by email.[83]  And Mr. Guice communicated with his sister,

Heather Cline, about the debt-elimination program.[84]

Corporate Defendants' distribution of the scheme's proceeds directly to Mr. Guice further

demonstrates his control.  As summarized in the chart below, Mr. Guice received $8,593,352.60

in payments from Corporate Defendants between January 2013 and June 8, 2016, despite having

been the owner of record for only one of the companies, Loyal Financial.[85]

| Name | Number of Transfers | Total |
|---|---|---|
| PW&F Consultants of Florida, LLC | 32 | $1,841,520.00 |
| Loyal Financial & Credit Services, LLC | 242 | 1,732,332.60 |
| URB Management, Inc. | 41 | 1,498,500.00 |
| LPSFLA, LLC and LPSOFFLORIDA L.L.C. | 37 | 1,276,000.00 |
| KWP Services, LLC | 35 | 999,000.00 |
| YCC Solutions, LLC | 17 | 587,000.00 |
| UAD Secure Services, LLC and UAD Secure Service of FL LLC | 11 | 555,000.00 |
| IVD Recovery, LLC | 2 | 80,000.00 |
| YFP Solutions, LLC | 2 | 24,000.00 |
| **Total** | **419** | **$8,593,352.60** |

Mr. Guice was aware of consumer complaints about Defendants' debt-relief programs.

Wayne Norris testified that Mr. Guice was consulted about complaints concerning Defendants

---

[81] Andrews Dep. at 10:15-11:16.

[82] Andrews Dep. at 100:12-101:20; *see also id.* at 161:3-6.

[83] 2nd Norris Dep. at 13:5-18; PX 164-173 (2014 and 2015 emails between Mr. Guice and "UAD Counseling" email address); 2nd Guice Dep. at 126:4-134:15.

[84] *See, e.g.,* PX 164 – PX 166; *see also* 2nd Guice Dep. 55:2-8; *id.* at 121:22-122:9; *id.* at 126:4-129:1.

[85] PX 182 ¶ 7 (4th George Decl.); PX 47 ¶¶ 10-22 (Randolph Decl.).

from attorneys, the state of Florida, and regulatory agencies around the country.[86]  Mr. Norris's

testimony is supported by Plaintiffs' Exhibit 172, a March 2015 email to Mr. Guice attaching

(a) a letter from the Pennsylvania Attorney General's Office regarding a consumer complaint

about LPSofFLA, (b) a letter from the North Carolina Attorney General's Office addressed to

Bank Card Services, and (c) letters from the Illinois Attorney General's Office regarding

consumer complaints about "KWP."

### H.      Corporate Defendants Operated as a Common Enterprise

The deposition testimony of Clark Hampton, who provided debt-elimination fulfillment

at Life Management Services, illustrates Corporate Defendants' interrelated nature.[87]  Mr.

Hampton testified that he kept at his desk two documents titled "Debt Elimination Contact Info"

which listed addresses, telephone numbers, fax numbers, and email addresses for: UAD

Counseling, UAD Secure Services, LPSofFLA, KWP, YCC, and YFP.  Mr. Hampton also

testified that he understood that Life Management Services owned these other companies.[88]  And

Mr. Hampton testified that Life Management Services' debt-elimination clients thought that they

---

[86] 2nd Norris. Dep. at 13:5-18.

[87] Mr. Hampton started working for Life Management Services in February 2015, but the oldest debt-elimination file that he worked on was for a consumer who had enrolled in the program in February 2013, one year before Life Management Services was organized, and fourteen months before the company received a commercial telephone seller's license.  Hampton Dep. at 109:2-6; PX 47 ¶ 10 (Randolph Decl.); PX 43 ¶ 57 (Compton Decl.).  Loyal Financial, however, was operating in 2013 and was selling debt-elimination services under the supervision of Mr. Guice.  Andrews Dep. 23:23-24; PX 43 ¶¶ 29-31 (Compton Decl.).

[88] *See* Hampton Dep. at 45:13-52:10 & Exhibits 5&6 (PX 186 & PX 187); *accord* Doc. 41-2 ¶¶ 13-14 (2nd Caplan Decl.) (describing materials referencing Corporate Defendants other than Life Management Services found at Life Management Services' call center on June 9, 2016).

were dealing with these Shell Defendants when they were, in fact, dealing with Life

Management Services.[89]

Other record evidence demonstrates that Corporate Defendants functioned as one

interdependent unit.  For example, Corporate Defendants shared employees.  Shortly after

receiving its telemarketing license, Life Management Services informed DOACS that effective

May 13, 2014, 42 salespersons who had been working for Loyal Financial were now working for

Life Management Services.[90]

Corporate Defendants also shared office space.  Ten of the eleven Shell Defendants

identified a residence or a private mailbox as their principal place of business in filings with the

Florida Department of State.  Two Corporate Defendants, Loyal Financial and IVD Recovery,

had addresses in the same corporate center on Lake Underhill Road, before Loyal Financial's

salespersons moved to Life Management Services' offices on Science Drive.[91]

Corporate Defendants were also financially integrated, sharing assets and liabilities.  For

example, Chase Jackowski, who owned LPSofFLA, LPSofFlorida, and YFP Solutions, testified

that he wired funds to Life Management Services for payroll.[92]  KWP Services issued checks to

pay the rent for the offices occupied by Life Management Services.[93]  Revenue, in the form of

---

[89] Hampton Dep. at 49:16-20.

[90] PX 43 ¶¶ 55-56 (Compton Decl.).

[91] PX 47 ¶¶ 11-26 (Randolph Decl.).  Randi Stickles, who worked for Loyal Financial and Life Management Services, testified that she thought the company moved from Lake Underhill Road to Science Drive because Mr. Guice and other managers "just wanted a bigger, nicer office."  Stickles Dep. at 89:1-8.

[92] 2nd Jackowski Dep. at 30:6-21.  Mr. Jackowski also delivered cash to Life Management Services' call center. 2nd Jackowski Dep. at 13:6-15:8.

[93] PX 46 ¶ 91 (Tyndall Decl.); PX 102 (copies of rent checks).

consumer payments, was commingled among Corporate Defendants,[94] and often reached the

Individual Defendants only after it had been funneled through numerous bank accounts.[95]

Kevin Guice pleaded the Fifth Amendment when asked whether Corporate Defendants

operated as a common enterprise and about the role he played in that common enterprise.[96]

## III.    ARGUMENT

### A.    The Undisputed Facts Prove that Defendants' Acts and Practices Violated Section 5 of the FTC Act, the Telemarketing Sales Rule and the Florida Deceptive and Unfair Trade Practices Act

#### 1.    Elements of a Claim Under Section 5 and the FDUTPA

To establish a violation of Section 5(a) of the FTC Act,[97] Plaintiffs must show that

"(1) there was a representation; (2) that the representation was likely to mislead customers acting

reasonably under the circumstances, and (3) the representation was material."[98]  The same

standard and accompanying analysis applies to the FDUTPA.[99]

---

[94] *See* PX 45 ¶ 25-39 (George Decl.) (detailing $8.8 million in transfers between Corporate Defendants).

[95] *See* PX 45 ¶¶ 40-50 and Attach. D (George Decl.) (tracing $1.6 million in consumer payments deposited in an LPS bank account to $890,000 in wire transfers to Mr. Kevin Guice, including $755,000 via Corporate Defendant PW&F Consultants of Florida LLC)  .

[96] 2nd Guice Dep. at 153:7-22.

[97] Section 5(a) of the FTC Act provides: "[U]nfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

[98] *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted).

[99] *See* § 501.204(2), Fla. Stat. (2016). When determining whether conduct violates the FDUTPA, "great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts . . . ." *KC Leisure, Inc., v. Haber*, 972 So. 2d 1069, 1072-73 (Fla. 5th DCA 2008) (finding that the legislature declined to define specific elements for an action under the FDUTPA and instead directed Florida courts to follow interpretations of the FTC Act and federal courts); *Millennium Commc'ns & Fulfillment, Inc. & Advanced Mktg. and Research, v. Office of the Attorney Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) ("Since the FDUTPA is the state counterpart to the Federal Trade Commission Act, in deciding whether an act or practice may be deemed deceptive, we must give due consideration and great weight to the interpretations made by the Federal Trade Commission and the federal courts.").  *See also Tashman*, 318 F.3d at 1277; *PNR v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003); *Office of the Attorney Gen*. v. *Wyndham Intern., Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *FTC v. Amy Travel*

"In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created."[100]  In addressing the materiality of a deceptive practice, "only deceptions that are likely to cause injury to a reasonable relying consumer" are material.[101]  "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material."[102]  Defendants also violate the FTC Act if they omit a material fact, even if there are no affirmative representations.[103]

Plaintiffs are not required to show reliance by each victim.[104]  Rather, "[a] presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product."[105]  And Plaintiffs need not prove that the representations at issue were made with intent to defraud or deceive.[106]  "Instead, the 'cardinal factor' in determining whether

---

*Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989); *Storer Communications, Inc. v. State, Dept. of Legal Affairs*, 591 So. 2d 238, 240 (Fla. 4th DCA 1991); *In re Cliffdale Assoc. Inc.*, 103 F.T.C. 110, 164-166 (1984) (adopting FTC Policy Statement on Deception).

[100] *FTC v. RCA Credit Servs.*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) (citations omitted).

[101] *Sw. Sunsites, Inc.*, *v. FTC*, 785 F.2d 1431, 1435 (9th Cir. 1986); *Millennium*, 761 So. 2d at 1263.

[102] *RCA Credit Servs.*, 727 F. Supp. 2d at 1329.

[103] *FTC v. NPB Adver., Inc.*, Case No. 8:14-cv-1155, 2016 U.S. Dist. LEXIS 151840, at *15 (M.D. Fla. Nov. 2, 2016).

[104] *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007).

[105] *FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016).

[106] *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005).

an act or practice is deceptive under Section 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer."[107]

Finally, for purposes of determining liability under Section 5, it is irrelevant whether the product or service sold provided value to the consumer because the "existence of some satisfied customers does not constitute a defense under the FTCA."[108]

### 2. Defendants' Misrepresentations Violate Section 5 of the FTC Act (Count One) and the FDUTPA (Count Eleven)

Unrebutted evidence establishes that Defendants made five false and misleading representations while selling their debt-relief services, any one of which by itself would be sufficient to prevail on Counts One and Eleven of the Complaint. Defendants (1) claimed to be affiliated with consumers' banks or credit-card companies, (2) guaranteed that their rate-reduction services would permanently and substantially reduce consumers' credit-card interest rates, (3) saving them thousands of dollars in a short time, (4) enabling them consumers to pay off their debt much faster, typically three-to-five times faster,[109] and Defendants (5) led their debt-elimination customers to believe that they could substantially eliminate consumers' credit-card debt within 18 months by using a government fund paid for by credit-card companies.[110]

The undisputed evidence shows that each of these representations was false. *First*, Defendants were not affiliated with any entity in the financial-services industry. *Second*, the sworn declarations of more than forty consumers establish that consumers never obtained

---

[107] *Id*. (quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)).

[108] *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).

[109] *See supra* §II(C).

[110] *See supra* § II(D).

permanent, substantially lower interest rates. *Third*, those declarants also state that they did not save thousands of dollars in interest payments, or pay off their credit-card debt three-to-five times faster. *Fourth*, the unrebutted testimony of industry expert Lisa Wilhelm establishes that Defendants *could not* achieve the results they promised consumers.[111] And *fifth*, no government fund and no money from any fine or lawsuit against any credit-card issuer existed to pay off a consumer's credit-card debt.[112]

Defendants' misrepresentations were widely disseminated. The unrebutted testimony of more than forty consumers details their experiences with Defendants.[113] The record also contains the transcripts of two telephone calls wherein Defendants made several misrepresentations about the rate-reduction program to an undercover FTC investigator.[114] Further, call scripts recovered from Life Management Services' own call center contain the same misrepresentations that the FTC's investigator heard.[115]

Defendants' misrepresentations were clearly material; more than 10,000 consumers collectively paid in excess of $23 million for Defendants' debt-relief services.[116] Consumers would not have paid Defendants unless the consumers believed that Defendants would deliver

---

[111] *See supra* § II(C).

[112] *See supra* § II(D).

[113] *See supra* § II(C) – (D).

[114] *See supra* § II(C).

[115] *Id.*

[116] *See supra* § II(C)-(D).

the promised services.[117]  Furthermore, since Defendants' misrepresentations go to the core

characteristics of the offered services, they are presumed material as a matter of law.[118]

In sum, the undisputed facts demonstrate that Defendants' representations regarding their

debt-relief services were false, that they were likely to and did mislead consumers acting

reasonably, and that the representations were material to consumers' purchase decisions.

Accordingly, summary judgment should be entered as to Counts One and Eleven.

### 3.   Defendants Failed to Disclose the True Cost of their Debt-Relief Services, Violating Section 5 of the FTC Act (Count Two)

Plaintiffs' undisputed evidence demonstrates that, while pitching their rate-reduction

services, Defendants failed to disclose that their preferred fulfillment methodology—transferring

consumers' existing credit-card balance to a new promotional-rate card—could result in the

consumer paying a variety of bank fees, such as balance-transfer fees, which could total three-to-

five percent of the transferred balance.[119]  These fees relate to the price of Defendants' rate-

reduction services and are therefore material as a matter of law.[120]  Accordingly, the Court

should grant summary judgment on Count Two.

### 4.   Defendants Violated the TSR (Counts Three Through Ten)

The Telemarketing Sales Rule ("TSR") applies to Defendants because they were "sellers"

or "telemarketers" of "debt relief services" who engaged in "telemarketing," as those terms are

---

[117] *See, e.g., FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005) (no reasonable consumer would pay hundreds of dollars to obtain a stored value card).

[118] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

[119] *See supra* § II(C)(4).

[120] *In re Removatron Int'l Corp.*, 111 F.T.C. 206, 309 (1988), *aff'd* 884 F.2d 1489 (1st Cir 1989); *see also FTC v. Windward Mktg.*, Case No: 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *28 (N.D. Ga. Sept. 30, 1997).

defined in the TSR.[121]  Defendants or their agents initiated telephone calls to customers, making

them "telemarketers."[122]  Defendants also offered to provide, or arranged for others to provide,

services that alter the terms of a debt between a person and one or more unsecured creditors,

thereby providing "debt relief services."[123]  These services were provided in exchange for

consideration, making Defendants "sellers" under the TSR.[124]

### a. Defendants Misrepresented Material Aspects of Their Debt-Relief Services (Counts Three and Four)

The TSR prohibits Defendants from misrepresenting any material aspect of any debt-

relief service.[125]  As noted in Section II(C)-(D) above, Defendants made several materially false

representations while pitching their debt-relief services.  In addition, the TSR expressly prohibits

misrepresenting a seller or telemarketer's affiliation with any person or government entity.[126]

During their telemarketing calls, however, Defendants claimed that they were representatives of,

or affiliated with, consumers' banks, credit-card issuers, or credit-card associations.  Defendants

had no affiliation with these entities.[127]  Accordingly, the Court should grant summary judgment

as to Counts Three and Four.

---

[121] 16 C.F.R. § 310.2.

[122] *See supra* § II(B).

[123] 16 C.F.R. § 310.2(o).

[124] 16 C.F.R. § 310.2(dd).

[125] 16 C.F.R. § 310.3(a)(2)(x).

[126] 16 C.F.R. § 310.3(a)(2)(vii).

[127] *See supra* § II(C)(1).

### b. Defendants Failed To Disclose Material Aspects of Their Debt-Relief Services (Counts Five and Six)

The TSR prohibits Defendants from omitting material aspects of their debt-relief services, including their total cost and likely effect on consumers' financial health.[128]  As noted in Section II(C)(4) above, Defendants failed to disclose that: (1) their services may require consumers to pay a variety of additional fees, including balance-transfer fees; and (2) their debt-elimination services would likely have a negative effect on consumers' creditworthiness, might result in consumers being sued, and might increase consumers'  total credit-card debt. Therefore, summary judgment should be granted as to Counts Five and Six.

### c. Defendants Unlawfully Charged an Advance Fee for Their Debt-Relief Services (Count Seven)

The TSR prohibits Defendants from requesting or collecting fees from a consumer for any debt-relief service before (a) Defendants hde renegotiated, settled, reduced or otherwise altered the terms of at least one debt, and (b) the consumer had made at least one payment under the new terms obtained by Defendants.[129]  The undisputed evidence demonstrates that Defendants collected fees ranging from $500 to $26,000 for their debt-relief services prior to meeting the conditions described above.[130]  Accordingly, the Court should grant summary judgment on Count Seven.

### d. Defendants Violated the Do Not Call and Robocall Provisions of the TSR (Counts Eight, Nine, and Ten)

Defendants have initiated, or caused others to initiate, numerous telemarketing calls:

---

[128] 16 C.F.R. § 310.3(a)(2)(i), (x).

[129] 16 C.F.R. § 310.4(a)(5)(i).

[130] *See supra* § II(C)-(D).

(1) to telephone numbers on the DNC Registry; and/or (2) that deliver prerecorded messages (*i.e.*, robocalls) without prior written consent or an established business relationship.[131]  These calls violated the TSR.[132]  In addition, Defendants placed their numerous telemarketing calls without paying the annual fee to access the DNC Registry.[133]  Defendants' failure to pay the annual fee also violated the TSR.[134]  Accordingly, the Court should grant summary judgments on Counts Eight, Nine, and Ten.

### B. Corporate Defendants are Liable as a Common Enterprise

Corporate Defendants are jointly and severally liable for violations of the FTC Act when, considering the "pattern and framework of the whole enterprise," there is evidence of a common enterprise between them.[135]  When examining whether a common enterprise exists among corporate defendants, courts look to a variety of factors including (1) common control; (2) the sharing of office space and officers; (3) commingling of corporate funds; and (4) failing to maintain the separation between companies.[136]

For the reasons discussed in Section II(H) above, Corporate Defendants operated as a common enterprise.  Accordingly, each Corporate Defendant should be held jointly and severally

---

[131] *See supra* § II(B).

[132] 16 C.F.R. § 310.4(b)(1)(iii)(B); 16 C.F.R. § 310.4(b)(1)(v)(A).

[133] *See supra* § II(B).

[134] 16 C.F.R. § 310.8.

[135] *Delaware Watch Co.*, *v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964).

[136] *See Del. Watch Co.*, 332 F.2d at 746; *accord FTC v. J.K. Publ'ns., Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (finding common enterprise where corporate defendants were under common control; shared office space, employees, and officers; and conducted their businesses through a "maze of interrelated companies"); *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012); *FTC v. Direct Benefits Group, LLC*, 6:11-cv-1186-Orl-28TBS, 2013 U.S. Dist. LEXIS 100593, at *52-58 (M.D. Fla. July 18, 2013).

liable for the entire amount of consumer injury caused by their unlawful acts.[137]

### C.   Defendant Kevin Guice is Liable for the Corporate Defendants' Practices

An individual defendant can be held liable for corporate misconduct if the individual

"participated directly in the [unlawful] practices or acts or had authority to control them [and]

had some knowledge of the practices."[138]

### 1.   Defendant Kevin Guice Controlled and Participated in the Deceptive Practices of the Corporate Defendants

Authority to control may be demonstrated by making corporate policy and active

involvement in business affairs.[139] Additionally, "[a]n individual's status as a corporate officer

gives rise to a presumption of ability to control a small, closely-held corporation."[140]

The undisputed evidence demonstrates that Mr. Guice organized every Corporate

Defendant, either directly or through a proxy.  Mr. Guice held executive positions with Loyal

Financial and controlled the finances of the overall enterprise.  Additionally, deposition

testimony from Defendants' employees establishes that Mr. Guice created company policy and

provided approval for the Defendants' business practices.[141]  The record also demonstrates Mr.

---

[137] *See FTC v. HES Merch. Servs.*, 6:12-cv-1818-Orl-22KRS, 2014 U.S. Dist. LEXIS 171292, at *16-17 (M.D. Fla. Nov. 18, 2014).

[138] *See Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (quoting *Amy Travel*, 875 F.2d at 573).  Subsequent to the Gem Merchandising Corporation case, *id.*, the Florida Fifth District Court of Appeals has held that plaintiffs are only required to establish the knowledge component, *i.e.*, that the "defendant had or should have had knowledge or awareness of the misrepresentations," when seeking monetary restitution from an individual.  *KC Leisure*, 972 So. 2d at 1073-74. Here, Plaintiffs are seeking such relief and therefore address the knowledge requirement as well.

[139]*FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995) (quoting *Amy Travel*, 875 F.2d at 573); *see also FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17144, at *15 (holding that defendant did not have to be an officer or even an employee to control corporate activities noting that courts consider "the control that a person actually exercises over given activities.").

[140] *Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17144, at *39.

[141] *See supra* §§ II(D)(1), II(G), II(H).

29

Guice's involvement in the day-to-day operations of the enterprise.  Mr. Guice signed employee

paychecks, monitored consumer complaints, and personally authorized refunds.  The record also

establishes that Mr. Guice oversaw his employees, at first directly, and later through his

managers.[142]  These facts demonstrate that Mr. Guice had the authority to control, and

participated in, the acts and practice of the Corporate Defendants, and should be held liable for

injunctive relief.

### 2.    Defendant Kevin Guice Knew or Should Have Known about the Deceptive Corporate Practices

To obtain monetary relief, Plaintiffs must show that the individual had "actual knowledge

of material misrepresentations, reckless indifference to the truth or falsity of such

misrepresentations, or an awareness of a high probability of fraud along with an intentional

avoidance of the truth."[143]  Plaintiffs need not show a subjective intent to defraud.[144]

Furthermore, the degree of an individual's participation in business affairs is probative as to

knowledge.[145]

Mr. Guice's day-to-day involvement in the enterprise demonstrates his actual or

constructive knowledge of Corporate Defendants' violative practices.  Undisputed email

evidence and deposition testimony demonstrates that Mr. Guice was aware of consumer

---

[142] *Id.*

[143] *Bay Area Bus. Council Inc.*, 423 F.3d at 636 (quoting *Amy Travel*, 875 F.2d at 573); *Transnet Wireless*, 506 F. Supp. 2d at 1270 (same).

[144] *Amy Travel*, 875 F.2d at 573-574.

[145] *Id.*

complaints about, and state investigations into, Corporate Defendants' business practices.[146]

Most importantly, however, the very structure of the enterprise, which Mr. Guice designed,

demonstrates that he knew that Corporate Defendants were defrauding consumers.  Mr. Guice

created the Shell Defendants so that consumers would be ignorant about who they were paying,

and directed those Shell Defendants to open post office boxes so that consumers would not know

where his enterprise resided.  Mr. Guice's enterprise did not directly charge consumer's credit

cards, and instead asked consumers to take a cash advance on their credit cards and then send

checks, or permit an ACH withdrawal from their checking accounts, methods that make it more

difficult for consumers to obtain refunds.

These undisputed facts demonstrate that Mr. Guice had actual or constructive knowledge

of Corporate Defendants' deceptive practices and should therefore be held liable for monetary

relief.

### 3. The Court Should Draw Adverse Inferences Against Defendant Kevin Guice From His Repeated Fifth Amendment Invocations

In civil cases, unlike criminal cases, the Court may draw adverse inferences from a

party's invocation of the Fifth Amendment.[147]  The Eleventh Circuit explained this policy in

*Coquina Investments v. TD Bank, N.A.*: "When a party remains silent in the face of an

accusation, his silence is indicative of the reliability of the adverse inference drawn against him

---

[146] *See supra* § II(H).

[147] *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a civil cause.") (citations omitted); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1301 (11th Cir. 2009) ("In a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment.") (citations omitted).

if it would have been natural under the circumstances to object to the accusation in question."[148] Further, while some cases suggest that adverse inferences may not be used as the *sole* basis to support a judgment against a defendant, a court is permitted to draw such inferences when the responses are considered in conjunction with other supporting evidence.[149]

Here, Mr. Guice is accused of controlling a telemarketing operation that defrauded more than 10,000 consumers to the tune of $23 million.[150]  Plaintiffs have also alleged that Mr. Guice is the principal beneficiary of the scheme, and that he has received at least $8.5 million between January 2013 and June 2016.[151]  Against such allegations and the mountain of evidence amassed, Mr. Guice has pleaded the Fifth Amendment to every question about Corporate Defendants' scheme and his role in it.  Moreover, as noted above in Section II, overwhelming, uncontroverted evidence substantiates the negative inferences drawn from Mr. Guice's refusal to answer questions about his role in the scheme.  The Court should therefore draw adverse inferences from Mr. Guice's Fifth Amendment invocations, and add them to the weight of Plaintiffs' evidence. These adverse inferences buttress Plaintiffs' undisputed evidence, establishing that Mr. Guice participated in, had authority to control, and had knowledge of Corporate Defendants' unlawful

---

[148] 760 F.3d 1300, 1310 (11th Cir. 2014) (citations omitted).

[149] *See, e.g. FTC v. Global Mktg. Group*, 594 F. Supp. 2d 1281, 1289 (M.D. Fla. 2008) (court applied adverse inferences from the individual defendant's Fifth Amendment invocations, when supported by "independent record evidence", to find that the defendant "had authority over and knowledge of" corporate defendants' conduct and granted summary judgment ); *Transnet Wireless*, 506 F. Supp. 2d at 1272-73 (using "the record evidence and the adverse inferences" to conclude that the individual defendants were personally liable for corporate defendants' violative conduct and granted summary judgment).

[150] *See supra* § II(C)-(D).

[151] *See supra* § II(G).

conduct. Accordingly, the court should find Defendant Guice liable for Counts One through Eleven.

### D.    This Court Should Order Injunctive and Monetary Relief

It is well established that Section 13(b) authorizes courts to grant a permanent injunction.[152]  The statute also gives authority "to grant any ancillary relief necessary to accomplish complete justice," including rescission of contracts and restitution.[153]  Similarly, under the FDUTPA, the Florida Attorney General may bring "[a]n action to enjoin any person who has violated . . . [or] is otherwise likely to violate, this part,"[154] and obtain actual damages[155] and equitable or other appropriate relief.[156]

Plaintiffs have submitted a proposed Final Judgment and Order for Permanent Injunction and Monetary Relief against Kevin Guice ("Final Order") with this motion.

### 1.    Permanent Injunctive Relief Is Equitable and Necessary to Protect Consumers

Sections I and II of the proposed Final Order would permanently ban Mr. Guice from telemarketing, and prohibit him from advertising, marketing, or selling any debt-relief product or service.  Mr. Guice's control over Defendants' egregious telemarketing scheme demonstrates

---

[152] 15 U.S.C. § 53(b).

[153] *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997); *Amy Travel*, 875 F.2d at 571-572.

[154] § 501.207(1)(b), Fla. Stat. (2016).

[155] § 501.207(1)(c), Fla. Stat. (2016).

[156] Florida Statutes § 501.207(3) FDUTPA also authorizes courts to "… make appropriate orders, including, but not limited to, . . . reimburse consumers … found to have been damaged; to order any defendant to divest herself or himself of any interest in any enterprise, including real estate; to impose reasonable restrictions upon the future activities of any defendant to impede her or him from engaging in or establishing the same type of endeavor; to order the dissolution or reorganization of any enterprise; or to grant legal, equitable, or other appropriate relief."

that he cannot be trusted to lawfully participate in the telemarketing or debt-relief industry.  Mr. Guice deceptively sold debt-relief products to consumers since at least 2013, despite consumer complaints, inquiries from law enforcement, and actions from state authorities.[157]  Mr. Guice continued telemarketing these services even after being warned that they were illegal.[158]  To ensure effective injunctive relief, Courts have imposed bans where, as here, defendants have engaged in particularly egregious conduct and demonstrated a likelihood of future violations.[159]

Section III of the proposed Final Order would enjoin Mr. Guice from making any false or misleading statements in connection with the sale of any good or service.  Section IV of the proposed Final Order would preclude Mr. Guice from obtaining a cash advance on a consumer's credit card or submitting a consumer's billing information without first having obtained written consent.  The proposed Final Order would also enjoin Mr. Guice from using customer information obtained in connection with Defendants' deceptive practices.  Finally, the proposed Final Order contains reporting and monitoring provisions that are standard in FTC fraud cases and that aid the FTC in monitoring defendants' compliance with court orders.[160]

## 2.    The Monetary Relief Proposed Is Equitable and Necessary

---

[157] *See supra* § II(A), II(F), II(G).

[158] *See supra* § II(F), II(G).

[159] *Global Mktg. Group*, 594 F. Supp. 2d at 1290 (permanent ban on telemarketing).  *See also FTC v. Group One Networks, Inc.*, No. 8:09-cv-00352-RAL-MAP (DE 147) (M.D. Fla. 2010) (permanent ban on telemarketing and on requesting or receiving advance fees for loans or credit). *FTC v. Home Assure, LLC*, No. 8:09-cv-00547-SDM-TBM (DE 273) (M.D. Fla. 2010) (permanent ban on marketing or selling loan modification and foreclosure relief services); *FTC v. Actions Research Group, Inc.*, No. 6:07-cv-0027-ACC-UAM (DE 30) (M.D. Fla. 2008) (permanent ban on sale of customer phone records).

[160] *See, e.g., FTC v. SlimAmerica*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999); *FTC v. US Sales Corp.*, 785 F. Supp. 737, 753-54 (M.D. Ill. 1992); *see also, e.g., Home Assure, LLC*, No. 8:09-cv-00547-SDM-TBM (DE 273) (stipulated final order).

Mr. Guice should be held liable for the full amount of consumer injury caused by Defendants' scheme. The Court has equitable authority under the FTC Act to order monetary relief.[161] The Eleventh Circuit has determined that the appropriate measure of monetary relief is the total consumer injury.

The undisputed facts establish that Defendants' scheme caused $23,099,878.02 in consumer injury.[162] Once Plaintiffs show that their calculation of restitution reasonably approximates the total of consumers' net losses, the burden shifts to the defendant to show that the figures are inaccurate.[163] And to the extent there is any uncertainty regarding the amount of consumer losses, the "risk of uncertainty should fall on the wrongdoers whose illegal conducted created the uncertainty."[164] In this case, there is no dispute that a monetary judgment of $23,099,878.02 should be entered.

## IV.   CONCLUSION

For the reasons stated above, the Court should grant summary judgment against Defendant Kevin Guice on each of the eleven counts in the Complaint, and enter the proposed Final Order.

---

[161] 15 U.S.C. §§ 41, *et seq*.

[162] PX 175 ¶¶ 12, 15 (2nd George Decl.).

[163] *Febre*, 128 F.3d at 535; *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 214 (D. Mass. 2009).

[164] *Febre*, 128 F.3d at 535 (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2017, a true and correct copy of the Plaintiffs'

Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law Against

Individual Defendant Kevin W. Guice, Plaintiffs' Exhibits Numbered 159 through 200, and a

Proposed Final Order were filed with the Court's CM/ECF electronic filing system.  I further

certify that due to the large file size of the attachments, I will mail the foregoing documents

and the notice of electronic filing by first-class mail to the parties of record on the Service List

below:

Matthew Leibert, Esq.
200 S. Orange Ave., Suite 2000
Orlando, FL 32801
Email: leibert@urbanthier.com
**Counsel for Individual Defendant Kevin Guice and Relief Defendants Robert Guice and Timothy Woods**

Mario Ceballos, Esq.
The Ceballos Law Firm, P.A.
638 Broadway Avenue, Orlando, Florida 32803-4540
Email: mceballos@ceballos-law.com
**Counsel for Defendants Chase Jackowski, LPSofFLA LLC, LPSofFlorida L.L.C., YFP Solutions LLC**

David P. Hill, Esquire
Law Offices of David P. Hill, P.A.
214 Annie Street, Orlando, Florida 32806-1208
Email: dphillpa@cfl.rr.com
**Counsel for Individual Defendant Linda McNealy**

Elias R. Hilal, Esquire
Williams Hilal Wigand Grande, PLLC
633 Southeast Third Avenue, Suite 301
Fort Lauderdale, Florida 33301
Email: elias@whwlegal.com
**Counsel for Individual Defendants Clarence ("Harry") Wahl and Karen Wahl**

Harry Wahl, Registered Agent for **Life Management Services of Orange County, LLC**
c/o Elias R. Hilal, Esq., Counsel for Mr. Wahl
Email: elias@whwlegal.com

Linda McNealy, Registered Agent for **Loyal Financial & Credit Services, LLC**
c/o David P. Hill, Esquire, Counsel for Ms. McNealy
Email: dphillpa@cfl.rr.com

Inez Vest, Registered Agent for **IVD Recovery, LLC**
Email: zeni0325@gmail.com

Karen Wahl, Registered Agent for **KWP Services, LLC**
c/o Elias R. Hilal, Esq., Counsel for Ms. Wahl
Email: elias@whwlegal.com

Harry Wahl, Registered Agent for **KWP Services of Florida LLC**
c/o Elias R. Hilal, Esq., Counsel for Mr. Wahl
Email: elias@whwlegal.com

Victoria Miller, Registered Agent for **PW&F Consultants of Florida LLC**
Email: miller.tori82@gmail.com

Michael Yager, Jr., Registered Agent for **UAD Secure Service of FL LLC**
Email: myagerjr@yahoo.com

Michael Yager, Jr., Registered Agent for **UAD Secure Services LLC**
Email: myagerjr@yahoo.com

Matthew Roberts, Registered Agent for **URB Management, LLC**
Email: msroberts@me.com

Christine Jones, Registered Agent for **YCC Solutions LLC**
c/o Heiko G. Moenckmeier, Esquire, Counsel to Ms. Jones
The Law Firm of Heiko G. Moenckmeier
836 Highland Avenue, Orlando, Florida 32803-3941
Email: heikogeorge@gmail.com

Mark Bernet, Esquire
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, Florida 33602-5250
Email: mark.bernet@akerman.com
**Receiver**

Respectfully Submitted,


/s/ Jennifer Hinton Knutton
Jennifer Hinton Knutton

OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
DEPARTMENT OF LEGAL AFFAIRS

Dated:  May 1, 2017                         Respectfully submitted,

                                            DAVID C. SHONKA
                                            Acting General Counsel


                                            /s/ Tejasvi Srimushnam
                                            Tejasvi M. Srimushnam
                                            Tel: (202) 326-2959
                                            E-mail:  tsrimushnam@ftc.gov

                                            Joshua A. Doan
                                            Tel: (202) 326-3187
                                            E-mail:  jdoan@ftc.gov

                                            Attorneys for Plaintiff
                                            Federal Trade Commission
                                            600 Pennsylvania Ave., NW,
                                            Mail Stop H-286
                                            Washington, DC 20580
                                            Fax: (202) 326-3395

                                            /s/ Jennifer Hinton Knutton
                                            Jennifer Hinton Knutton
                                            Assistant Attorney General
                                            Florida Bar # 92771
                                            Jennifer.Knutton@myfloridalegal.com

                                            Denise Beamer
                                            Assistant Attorney General
                                            Florida Bar #69369
                                            Denise.Beamer@myfloridalegal.com

                                            Office of the Attorney General
                                            Consumer Protection Division
                                            135 W. Central Blvd., Suite 670
                                            Orlando, Florida 32801
                                            Telephone: (407) 316-4840
                                            Facsimile: (407) 245-0365

                                            Attorneys for Plaintiff
                                            OFFICE OF THE ATTORNEY GENERAL
                                            STATE OF FLORIDA
                                            DEPARTMENT OF LEGAL AFFAIRS