# In the Matter of:

# FTC v. Life Management Services, et al.

*November 17, 2016*
*Melissa M. Deese*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 6:16-cv-00982-CEM-GJK   Document 165   Filed 05/03/17   Page 2 of 12 PageID 3008

FTC v. Life Management Services, et al.  Deese  11/17/2016

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF FLORIDA
 3                    ORLANDO DIVISION
 4
 5  FEDERAL TRADE COMMISSION and   )
 6  OFFICE OF THE ATTORNEY GENERAL,)
 7  STATE OF FLORIDA,              )
 8         Plaintiffs,             )
 9  vs.                            )  CASE NO.
10  LIFE MANAGEMENT SERVICES OF    )  6:16-cv-982-Orl-41TBS
11  ORANGE COUNTY, LLC, et al.,    )
12         Defendants.             )
13  _____)
14
15
16                     - - - - -
17       The deposition of MELISSA M. DEESE was
18  taken on Thursday, November 17, 2016, commencing at
19  9:37 a.m., at the offices of Akerman LLP, 420 South
20  Orange Avenue, Suite 1200, Orlando, Florida, before
21  Lorraine Yerdonek, Court Reporter and Notary Public.
22                     - - - - -
```

## Page 2

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF FEDERAL TRADE COMMISSION:
 4      JOSHUA A. DOAN, ESQ.
 5      TEJASVI M. SRIMUSHNAM, ESQ.
 6      Federal Trade Commission
 7      600 Pennsylvania Avenue, Northwest
 8      Washington, D.C. 20580
 9      202-326-3187
10      jdoan@ftc.gov
11      tsrimushnam@ftc.gov
12
13  ON BEHALF OF THE PLAINTIFF OFFICE OF THE ATTORNEY
14  GENERAL, STATE OF FLORIDA
15      DENISE KIM BEAMER
16      Assistant Attorney General
17      ANNA CAPLAN
18      Investigating Specialist I
19      Office of the Attorney General State of Florida
20      135 West Central Boulevard, Suite 670
21      Orlando, Florida 32801
22      407-316-4840
23      denisebeamer@myfloridalegal.com
24      nannacaplan@myfloridalegal.com
```

## Page 3

```
 1           A P P E A R A N C E S (Cont'd.)
 2
 3  ON BEHALF OF THE DEFENDANT KEVIN GUICE AND THE
 4  RELIEF DEFENDANTS ROBERT GUICE AND TIMOTHY WOODS:
 5      AMY B. TALISMAN, ESQ. (Via Telephone)
 6      Cove & Associates, P.A.
 7      225 South 21st Avenue
 8      Hollywood, Florida 33020
 9      (954) 921-1121
10      abt@covelaw.com
11
12  RECEIVER FOR THE CORPORATE DEFENDANTS:
13      MARK J. BERNET, ESQ.
14      Akerman, LLP
15      401 East Jackson Street, Suite 1700
16      Tampa, Florida 33602
17      813-223-7333
18      mark.bernet@akerman.com
```

## Page 4

```
 1                    I N D E X
 2  WITNESS                                      PAGE
 3  MELISSA M. DEESE                              5
 4
 5
 6                   E X H I B I T S
 7  DEESE              DESCRIPTION              PAGE
 8  Exhibit 1   Document titled "Individual Search  18
 9              Results"
10  Exhibit 2   Floor plan                          29
11  Exhibit 3   Document titled "Fronting"          31
12  Exhibit 4   Document titled "Fronter Script"    46
13  Exhibit 5   Document titled "Fronter Script"    47
14  Exhibit 6   Document headed "Rebutals" [sic]    48
15  Exhibit 7   Transcript, November 12, 2016       54
16  Exhibit 8   Transcript, November 19, 2015       60
17  Exhibit 9   Photograph of Mohammad             118
```

Case 6:16-cv-00982-CEM-GJK   Document 165   Filed 05/03/17   Page 3 of 12 PageID 3009

FTC v. Life Management Services, et al.   Deese   11/17/2016

Page 5

PROCEEDINGS
----
Whereupon--
        MELISSA M. DEESE,
called as a witness, having been first duly sworn,
was examined and testified as follows:
        THE WITNESS: I do.
            EXAMINATION
BY MR. DOAN:
    Q  Good morning, Ms. Deese. Again, my name is Josh Doan. I represent the Federal Trade Commission in a case brought against Life Management Services of Orange County and some other defendants.
        To my right is Tej Srimushnam, who also represents the FTC. Next to him is Denise Beamer from the Office of the Florida Attorney General. Next to her is Anna Caplan, an investigator with the Florida Attorney General's Office. And I know you met Mr. Bernet, the court-appointed receiver for the corporate defendants in the case.
        I see that you have brought counsel with you today. Is that correct?
    A  Yes.
    Q  And that's Mr. Agranoff?
    A  Yes.

Page 6

    MR. DOAN: Mr. Agranoff, do you have anything you want to add?
    MR. AGRANOFF: No. I just want to announce my appearance is for today's deposition purposes only. We have not been presented to continue beyond today as of this time. So at the termination of this deposition, any written communication to my client may be directed to her until further notice.
        Additionally, if I could just put on record and make sure that we're clear for my client, that yesterday I was present representing Brandun Anderson. You have signed a conflict waiver. We've discussed what conflicts are.
        Are you comfortable with who representing you knowing that I represented Brandun yesterday?
    THE WITNESS: Yes.
    MR. AGRANOFF: Okay.
    MR. DOAN: Great. Thank you.
BY MR. DOAN:
    Q  Could you please state your full name for the record?

Page 7

    A  Melissa Deese.
    Q  And what is your middle name?
    A  Mae.
    Q  M-A-E?
    A  That is correct.
    Q  And your maiden name is Ward?
    A  Yes.
    Q  Okay. You are originally from Massachusetts?
    A  Yes.
    Q  Whereabouts?
    A  Milford.
    Q  Milford?
    A  (Nods head affirmatively.)
    Q  Okay. How long did you live there?
    A  Until I was about 16.
    Q  Okay. So you went to high school in Milford, Massachusetts?
    A  Yes.
    Q  And where else?
    A  That's it.
    Q  That's it, okay.
        And when you lived in Massachusetts, you had relatives down in the Orlando area?
    A  Uh-huh (yes).

Page 8

    Q  And you would come visit them at April?
    A  Yes.
    Q  Okay. And you would come to Disney World sometimes?
    A  Yes.
    Q  Okay. So when you left Milford at the age of 16, where did you move?
    A  We left there and went to Wisconsin.
    Q  Okay.
    A  We were in Wisconsin, I want to say, for only about three months. My mom traveled with her job, so we moved very often after that.
    Q  Okay. What year was it when you moved to Wisconsin?
    A  It was 2012 -- or 2002. And we left in 2003.
    Q  And let me back up, because I jumped right into asking you questions as soon as you told me your name. Usually I like to go over some ground rules with a deponent.
        Have you ever testified at a deposition before?
    A  No.
    Q  Have you ever testified in court?
    A  No.

2 (Pages 5 to 8)

17

1 A I want to say it was 2000 -- 2004.
2 Q Okay. And at that time you were living
3 with your mother?
4 A Correct.
5 Q Okay. What type of work did your mother
6 do that she kept moving around?
7 A She was a surgical technologist, and she
8 traveled around the state -- or country to do so.
9 Q Your husband's name is Steve?
10 A Steven, yes.
11 Q Do people call him Steve?
12 A Yeah.
13 Q And when did you meet him?
14 A Oh, gosh. Eight or nine years ago.
15 Q Okay. Is he your age?
16 A He's a little older.
17 Q Okay. How old is he?
18 A Thirty-five. Thirty-six. He just had a
19 birthday. Thirty-six.
20 Q Okay. Where did he go to high school?
21 A I think Boone.
22 Q Where is that?
23 A In Orlando.
24 Q Is he Facebook friends with Chase
25 Jackowski?

18

1 A I don't know.
2 Q Do you use Facebook?
3 A I do.
4 Q Okay. Do you know Chase Jackowski?
5 A No, I do not.
6 Q How many children do you have?
7 A Three.
8 Q Three. How old are they?
9 A Thirteen, eleven and five.
10 Q Okay. You've held a telemarketing license
11 issued by the state of Florida?
12 A Yes.
13 Q When did you first get a telemarketing
14 license?
15 A About three years ago, I would assume.
16 Q What company were you working for at the
17 time you got a telemarketing license?
18 A Life Management Service.
19 Q Of Orange County?
20 A Yes.
21 Q Okay. All right.
22     MR. DOAN: Can we mark this as Exhibit 1,
23 please.
24     (Exhibit 1 was marked for identification.)
25     (Exhibit No. 1 was marked for identification.)

19

1 BY MR. DOAN:
2 Q Okay, Ms. Deese. You've been handed
3 what's been marked Deese Exhibit 1. I can represent
4 to you that this is a document -- it's called
5 "Individual Search Results," from a database
6 maintained by the Florida Department of Agriculture
7 and Consumer Services. Are you familiar with that
8 agency?
9 A Yes.
10 Q Okay. And so you know that they license
11 telemarketers, both individuals and companies that
12 conduct telemarketing within the state of Florida?
13 A Yes.
14 Q And so you can see there are two entries
15 here for you, and they are Life Management of Orange
16 County, LLC and Higher Goals Marketing, LLC. Do you
17 see that there?
18 A Yes.
19 Q Okay. And so for a start date for Life
20 Management Services of Orange County, it lists
21 July 21st, 2014. Do you see that there?
22 A Oh, yeah.
23 Q Okay. And does that seem like a fair
24 representation of when you started at Life
25 Management Services of Orange County?

20

1 A Yes.
2 Q Okay. So when you said maybe three years
3 ago, it could have been July 2014?
4 A Correct.
5 Q Okay. You don't have any reason to think,
6 as you sit here today, that you started working
7 there before that?
8 A No.
9 Q Who hired you to work at Life Management
10 Services of Orange County?
11 A John.
12 Q John Kunz?
13 A Yes.
14 Q That's K-U-N-Z? Is that right?
15 A Yes.
16 Q How did you find out about the job at Life
17 Management Services?
18 A I was referred by a friend.
19 Q And who was that friend?
20 A Wayne Norris.
21 Q Okay. How did you know Wayne?
22 A My husband knew him.
23 Q Okay. Were they friends from high school
24 or ...
25 A I believe so.

5 (Pages 17 to 20)

21

1  Q  Okay. Had you personally met Wayne before
2  he referred you there?
3  A  One time, yes.
4  Q  Okay. When was that?
5  A  It's -- I mean, I don't know exactly -- or
6  exactly when it was, but it was at a car race down
7  Bradenton, and it was just in passing.
8  Q  Is your husband into car racing?
9  A  Yes.
10 Q  Okay. Was he racing or was Wayne racing,
11 or were they both spectating?
12 A  I believe they were both just watching.
13 Q  Okay. Okay. So Wayne Norris referred
14 you, John interviewed you. And how long after your
15 interview did you start working at Life Management
16 Services?
17 A  Probably the following Monday.
18 Q  Okay. And what positions did you hold at
19 Life Management Services of Orange County?
20 A  I choose to take the Fifth on that.
21 Q  Okay.
22    MR. BERNET: I think there's going to be a
23    waiver issue, but that's fine.
24 BY MR. DOAN:
25 Q  And so one thing I had hoped to clarify,

22

1  just because you've now started invoking your Fifth
2  Amendment privilege against self-incrimination, is
3  that it's only appropriate to invoke the Fifth
4  Amendment when you are concerned with your own
5  potential criminal liability. Do you understand
6  that?
7  A  Yes, I do.
8  Q  Okay. Thus you cannot invoke the Fifth
9  Amendment to protect somebody else. Do you
10 understand that?
11 A  Yep.
12 Q  Okay. Now, were you in Life Management
13 Services of Orange County's offices on June 9th,
14 2016, when Mr. Bernet and some of the rest of us
15 arrived at the premises?
16 A  Yes.
17 Q  Okay. And did Mr. Bernet interview you on
18 June 9th?
19 A  That same day?
20 Q  Yes, that same day.
21 A  No.
22 Q  Okay. And, in fact, you came back the day
23 after, on June 10th, Friday, correct?
24 A  Correct.
25 Q  Okay. And before you went to the offices,

23

1  you went to Dunkin' Donuts, as I see you did today;
2  is that right?
3  A  That's correct.
4  Q  And you saw Reeve Tyndall, an investigator
5  from the Federal Trade Commission, in Dunkin'
6  Donuts, right?
7  A  If that's their name, yes.
8  Q  Okay. You recall seeing an investigator
9  from the FTC?
10 A  Yes.
11 Q  And you approached the FTC investigator?
12 A  I did.
13 Q  And you asked him if he was the person
14 from the LI room from yesterday?
15 A  Correct.
16 Q  Okay. In fact, Mr. Srimushnam and I were
17 there too; is that right?
18 A  I don't recall.
19 Q  Okay. I guess we're not as memorable as
20 Mr. Tyndall, but I won't take any offense at that.
21    And then after you went to Dunkin' Donuts,
22 you went to Life Management Services of Orange
23 County's offices, right?
24 A  Correct.
25 Q  And those offices were at 12001 Science

24

1  Drive?
2  A  Correct.
3  Q  Suites 125 and 180?
4  A  Yes.
5  Q  Okay. And you entered through the 180
6  side?
7  A  In the back.
8  Q  By Nikki McNealy's desk?
9  A  Yes.
10 Q  Okay. And at some point on June 10th you
11 then conducted an interview with Mr. Bernet,
12 correct?
13 A  I wouldn't call it an interview.
14 Q  Okay. You spoke with Mr. Bernet? Would
15 you -- do you at least agree to that?
16 A  Yes.
17 Q  Mr. Bernet asked you some questions?
18 A  Yes.
19 Q  You answered Mr. Bernet's questions?
20 A  To the best of my knowledge, yes.
21 Q  Okay. And Ms. Caplan, who's sitting here,
22 was there as well, right?
23 A  I believe so.
24 Q  Okay. And you showed Mr. Bernet and
25 Ms. Caplan where your desk was at the Science Drive

6 (Pages 21 to 24)

Page 49

1. 551 nationwide lenders, sent out the automated
2. message, so when you pressed 1, you were transferred
3. over to the first representative in the
4. qualifications department available to speak to
5. you." Do you see that there, Ms. Deese?
6. A   Yes.
7. Q   Okay. And so that's something that you
8. told consumers on the phone when you worked at Life
9. Management Services at Orange County, correct?
10. A   I take the Fifth.
11. Q   Okay. If you go down to the fourth
12. paragraph on the first page of Deese Exhibit 6,
13. which has a handwritten numeral "3" next to it, even
14. though it's the fourth paragraph, it says, "How much
15. is this going to cost?" Do you see that, Ms. Deese?
16. A   Yes.
17. Q   Okay. And then it says, "As long as you
18. come back in excellent standings with one of your
19. lenders and do qualify, there is absolutely no
20. out-of-pocket expense." And "absolutely no
21. out-of-pocket expense" is underlined. Do you see
22. that there, Ms. Deese?
23. A   Yes.
24. Q   And that too is something that you would
25. tell consumers over the phone when you worked at

Page 50

1. Life Management Services of Orange County, correct?
2. A   I take the Fifth.
3. Q   Okay. If you turn to page 2 of Deese
4. Exhibit 6, please. The first paragraph, which has a
5. handwritten numeral "4" next to it. "Who are you,"
6. it says. And the rebuttal is, "We are Credit
7. Assistance Program," parentheses, "(CAP)," close
8. parentheses. Do you see that there, Ms. Deese?
9. A   Yes.
10. Q   And that's something you told consumers
11. when you worked at Life Management Services of
12. Orange County, correct?
13. A   I take the Fifth.
14. Q   Okay. And it continues, after a
15. semi-colon, "we work directly with the corporate
16. office of Visa, MasterCard, American Express and
17. Discover, which are the merchants of the 551
18. nationwide lenders, like Chase, Bank of America,
19. Capital 1, etc." Do you see that there, Ms. Deese?
20. A   Yes.
21. Q   Okay. And that too is something that you
22. told consumers over the phone when you worked at
23. Life Management Services of Orange County, correct?
24. A   I take the Fifth.
25. Q   Okay. The next paragraph down, page 2 of

Page 51

1. Deese Exhibit 6 says, "Refuse To Give Card Over The
2. Phone." And then the rebuttal is, "I completely
3. understand. I'm a card holder myself. Are you
4. familiar with the Consumer Protection Act?" Do you
5. see that there, Ms. Deese?
6. A   Yes.
7. Q   What do you know about the Consumer
8. Protection Act?
9. A   I don't know anything about it.
10. Q   Okay. But you would talk to consumers
11. about the Consumer Protection Act when you worked at
12. Life Management Services of Orange County, correct?
13. A   I take the Fifth.
14. Q   Okay. And Deese Exhibit 6 was a document
15. that you had at your desk at Science Drive, correct?
16. A   I've already taken the Fifth on that
17. question.
18. Q   Okay. All right. It's 10:29. We've been
19. going about an hour. Do you want to take a short
20. break?
21. A   I'm fine as long as you guys are.
22. Q   Okay, then we will keep going. I
23. anticipate what we're about to move into is going to
24. take 20-plus minutes at least. Does that change
25. your thinking, or do you want to keep going?

Page 52

1. A   No, I'm okay.
2. MS. TALISMAN:  Josh, it's Amy. Are you
3. hearing anything from my phone?
4. MR. SRIMUSHNAM:  No.
5. MR. DOAN:  Teg says no. I haven't been
6. paying attention, so, yeah, I'll take that as a
7. no. Thank you, though.
8. MS. TALISMAN:  All right.
9. BY MR. DOAN:
10. Q   All right. So I'm going to move my
11. computer a little closer to the phone and to you and
12. Mr. Agranoff, and I'm going to play something for
13. you. And I'm going to hope that you can hear it.
14. Got it up to 11. All right.
15. (Audio recording plays.)
16. BY MR. DOAN:
17. Q   I'm going to fast-forward this a little
18. bit so we don't have to listen to hold music, okay?
19. A   Uh-huh (yes).
20. (Audio recording plays.)
21. BY MR. DOAN:
22. Q   All right, Ms. Deese. I have played for
23. you, as you heard Mr. Tyndall say, a recording of a
24. call that you received on November 12th, 2015 from a
25. telephone number 248-215-0437. You heard the

13 (Pages 49 to 52)

53

1 representative say that her name was Melissa, that
2 she was from Massachusetts and that she used to come
3 down to Orlando during April breaks as a child. Do
4 you recognize the voice of Melissa that you heard in
5 the recording I just played for you?
6     A   I take the Fifth.
7     Q   Okay. I'll play for you another short
8 recording.
9         MR. AGRANOFF: Counsel, if I may ask a
10 quick question.
11        MR. DOAN: Sure.
12        MR. AGRANOFF: What state was the caller
13 recording the call in?
14        MR. DOAN: The District of Columbia.
15        MR. AGRANOFF: Is that a one-party or
16 two-party recording state?
17        MR. DOAN: Well, I'm not hear to answer
18 legal questions. You can research that
19 yourself, Counsel.
20        MR. AGRANOFF: I'll just -- I'm not sure
21 how far the objection will go, but I will --
22 I'll object to her being questioned on anything
23 that could potentially have been illegally
24 recorded by the department, agency, state or
25 federal government.

54

1         MR. DOAN: Okay.
2 BY MR. DOAN:
3     Q   Short recording.
4         (Audio recording plays.)
5 BY MR. DOAN:
6     Q   All right. That was a call that
7 Mr. Tyndall recorded on November 13th, 2015 from the
8 telephone number 361-271-4848. Do you recognize the
9 voice of the person who called Mr. Tyndall?
10    A   I take the Fifth.
11 (Exhibit No. 7 was marked for identification.)
12 BY MR. DOAN:
13    Q   Okay. I'm going to hand you what's been
14 marked Deese Exhibit 7.
15        MR. AGRANOFF: Thank you.
16 BY MR. DOAN:
17    Q   All right, Ms. Deese. Deese Exhibit 7,
18 I'll represent to you, is a transcript prepared for
19 the Federal Trade Commission of the recording that
20 you just heard from November 12th, 2015. So the
21 first two recordings that I just played for you.
22        It says on here, "Telephone conversation
23 with Melissa, 2482150437, Call No. 1." You can see
24 it also is marked down at the bottom of the page
25 "PX 51." Do you see that, Ms. Deese?

55

1     A   Yes.
2     Q   Okay. This was an exhibit, Plaintiffs'
3 Exhibit 51, in support of our memorandum -- sorry,
4 Plaintiffs' Exhibit 51 to Plaintiffs' Memorandum in
5 Support of Their Motion for a Temporary Restraining
6 Order in the case of Life Management Services of
7 Orange County and the other defendants.
8         Could you turn to page 8 of the
9 transcript, please, Ms. Deese?
10    A   Okay.
11    Q   All right. And so you'll see at the
12 bottom of that page, line 24, Melissa says, "The
13 name of our company is the Credit Assistance
14 Program. We're a licensed enrollment center for
15 Visa, MasterCard, American Express and Discover."
16 Do you see that there?
17    A   Yes.
18    Q   Okay. That is a statement that you made
19 to Mr. Tyndall on November 12, 2015, isn't it?
20    A   I take the Fifth.
21    Q   Okay. Moving down, on page 9, we just
22 finished at the top of page 9, Mr. Tyndall says, on
23 line 2, "So do you work directly with my bank?"
24        Melissa replies, "Yes, sir."
25        Mr. Tyndall says, "Okay."

56

1         Melissa says, "We have a business
2 relationship with your bank. We work with the
3 merchant, which would be Visa, that logo on your
4 card." Do you see that there, Ms. Deese?
5     A   Yes.
6     Q   Okay. That's a statement that you made to
7 Mr. Tyndall on November 12, 2015, isn't it?
8         MR. AGRANOFF: Objection; misstates --
9 misstates testimony. She never mentioned that
10 it was her.
11 BY MR. DOAN:
12    Q   Go ahead and answer the question,
13 Ms. Deese.
14    A   I take the Fifth.
15    Q   Okay. Page 14 of the transcript, which is
16 PX 51 in Deese Exhibit 7, line 11. Do you see that
17 there, Ms. Deese?
18    A   Yes.
19    Q   Okay. "The next step would be to contact
20 Citibank with you on the line and negotiate a
21 substantially lower rate." That's a statement that
22 you made to Mr. Tyndall on November 12, 2015, isn't
23 it, Ms. Deese?
24    A   I take the Fifth.
25    Q   Okay. Page 15 of Deese Exhibit 7,

14 (Pages 53 to 56)

57

1  Plaintiffs' Exhibit 51, line 4, you'll see Melissa
2  says to Mr. Tyndall, "Right. And the rate that we
3  get you is a fixed rate, so it's for the whole life
4  of the account." Do you see that there, Ms. Deese?
5     A   Yep.
6     Q   That's a statement that you made to
7  Mr. Tyndall on November 12, 2015, isn't it?
8     A   I take the Fifth.
9     Q   Okay. Continuing on that page, starting
10 at line 8, you'll see that Melissa says to
11 Mr. Tyndall, "It's not just a 12- or 18-month
12 promotional rate. It's forever as long as you
13 continue making your payments on time." Do you see
14 that, Ms. Deese?
15    A   Yes.
16    Q   Okay. That's a statement that you made to
17 Mr. Tyndall on November 12, 2015, isn't it?
18    A   I take the Fifth.
19    Q   All right. Let's go to page 20 of Deese
20 Exhibit 7, Plaintiffs' Exhibit 51, line 13. Are you
21 there, Ms. Deese?
22    A   Yep.
23    Q   Okay, thank you. You'll see that Melissa
24 says to Mr. Tyndall, "But as a child, I was actually
25 from Massachusetts, so we would come down here to

58

1  visit family members every April vacation." Do you
2  see that there, Ms. Deese?
3     A   Yes, I do.
4     Q   That's a statement that you made to
5  Mr. Tyndall on November 12, 2015, isn't it?
6     A   I take the Fifth.
7     Q   Okay. Page 22 of Deese Exhibit 7,
8  Plaintiffs' Exhibit 51, line 15. Are you there,
9  Ms. Deese?
10    A   Uh-huh (yes).
11    Q   Thank you. Melissa says to Mr. Tyndall,
12 in response to a question about whether there's a
13 customer service number, in case Melissa doesn't
14 call him back the next day at 10:30, Melissa says,
15 "I don't have one because all of my calls get
16 transferred to me, transferred to me by Visa,
17 MasterCard, American Express and Discover." Do you
18 see that there, Ms. Deese?
19    A   Yes, I do.
20    Q   Okay. That's a statement that you made to
21 Mr. Tyndall on November 12, 2015, isn't it?
22    A   I take the Fifth.
23    Q   Okay. Would you like to take a break,
24 Ms. Deese, or would you like to keep going?
25    A   I'm fine.

59

1     Q   Okay.
2         MR. AGRANOFF: I'm going to at least ask
3  Melissa to stand up and stretch.
4         MR. DOAN: Madam Court Reporter, would you
5  like to have a break, or are you okay?
6         THE COURT REPORTER: We could take a
7  minute.
8         MR. DOAN: Okay. Why don't we take a
9  two-minute break. We'll go off the record for
10 two minutes, Amy, and anybody else on the
11 phone.
12        MS. TALISMAN: Okay. Thank you.
13        MR. DOAN: Thanks.
14           (Recess taken.)
15        MR. DOAN: All right, Amy, we are back
16 from our brief break. Mr. Agranoff has
17 requested a 15-minute break at noon, so we will
18 do our best to give him that.
19        MR. AGRANOFF: Or within a couple minutes,
20 I'm fine.
21        MR. DOAN: Okay.
22    Q   All right. I'm going to hit "play" again.
23 This time I'm going to do my best to really skip all
24 of the hold music and stuff and just get right to
25 the meat of the call. So with that in mind, I'll

60

1  try not to screw it up.
2         (Audio recording plays.)
3  BY MR. DOAN:
4     Q   Okay, Ms. Deese. I have played for you a
5  recording made by an FTC investigator on
6  November 19, 2015 of a call that he received from
7  248-215-0437 from someone named Melissa, who listed
8  her employee ID as 1016. Do you recognize the voice
9  of Melissa in that call with Mr. Tyndall?
10    A   I take the Fifth.
11    (Exhibit No. 8 was marked for identification.)
12 BY MR. DOAN:
13    Q   Okay. I'm going to hand you what's been
14 marked Deese Exhibit 8.
15    A   (Witness reviews document.)
16    Q   Have you had a chance to look at Deese
17 Exhibit 8, Ms. Deese?
18    A   Uh-huh (yes).
19    Q   Okay. So this, I will represent to you,
20 is a transcript of the call that we just listened to
21 between Mr. Tyndall and Melissa, which was from
22 November 19th, 2015. You'll see at the bottom it's
23 stamped PX 52. That's because it was an exhibit
24 submitted by the plaintiffs in support of their
25 motion for a temporary restraining order.

15 (Pages 57 to 60)

Page 61

1    Could you turn to page 6 of Deese
2 Exhibit 8 for me, please. Down at the bottom, line
3 22, you'll see that Melissa says to Mr. Tyndall:
4 "Customer service. Thank you for holding." Do you
5 see that there, Ms. Deese?
6    A   Yes.
7    Q   That's a statement that you made to
8 Mr. Tyndall on November 19th, 2015, isn't it?
9    A   I take the Fifth.
10   Q   Okay. If you could turn to page 7 of
11 Deese Exhibit 8, please, line 10, you'll see that
12 Melissa says to Mr. Tyndall: "You were selected and
13 put up for review to see if you qualify to have all
14 of your current interest rates reduced." Do you see
15 that, Ms. Deese?
16   A   Yes.
17   Q   That's a statement that you made to
18 Mr. Tyndall on November 19th, 2015, isn't it?
19   A   I take the Fifth.
20   Q   Okay. Moving down on page 7 of Deese
21 Exhibit 8, line 19, Ms. Deese says -- I'm sorry,
22 strike that. Melissa says to Mr. Tyndall: "The
23 name of our company is the Credit Assistance
24 Program. We are a licensed enrollment center with
25 Visa, MasterCard, American Express and Discover."

Page 62

1 Do you see that, Ms. Deese?
2    A   Yes.
3    Q   That's a statement that you made to
4 Mr. Tyndall on November 19th, 2015, isn't it?
5    A   I take the Fifth.
6    Q   Okay. Turn to page 8, please. You'll see
7 at the top, Mr. Tyndall says, "And so you're
8 associated with a credit card company?"
9        And Melissa says in response: "The credit
10 merchants, yes, sir. Those are the merchants of 551
11 nationwide lending institutions. The lending
12 institutions are the banks and credit card companies
13 that issue credit cards." Do you see that there,
14 Ms. Deese?
15   A   Yes.
16   Q   That's a statement that you made to
17 Mr. Tyndall on November 19th, 2015, isn't it?
18   A   I take the Fifth.
19   Q   Okay. Page 10 of Deese Exhibit 8, please.
20 The very top, Melissa says to Mr. Tyndall when asked
21 "What's the name of your company," "It's called the
22 Credit Assistance Program." Do you see that there,
23 Ms. Deese?
24   A   Yes.
25   Q   That's a statement that you made to

Page 63

1 Mr. Tyndall on November 19th, 2015?
2    A   I take the Fifth.
3    Q   Okay. And at the bottom of page 10 on
4 Deese Exhibit 8, line 20: "So the Consumer
5 Protection Act is a law that was passed in 1981 for
6 all credit card holders," dash, dash, "or all
7 consumers that hold credit card accounts. And it
8 does specifically state that you're fully protected
9 against any loss, theft, fraud, unauthorized use or
10 services not rendered to you." Do you see that
11 there, Ms. Deese?
12   A   Yes.
13   Q   That's a statement you made to Mr. Tyndall
14 on November 19, 2015?
15   A   I take the Fifth.
16   Q   Okay. Page 11, line 7 on Deese Exhibit 8.
17 Melissa says to Mr. Tyndall: "As long as you -- as
18 long" -- I'm sorry, strike that.
19       Melissa says to Mr. Tyndall: "As long
20 as," dash, dash, "as long as you qualify, there's no
21 out of pocket expense to you."
22       Mr. Tyndall says, "What?"
23       Melissa says, "Your financial obligation
24 is just to make your monthly payments on time." Do
25 you see that, Ms. Deese?

Page 64

1    A   Yes.
2    Q   That's a statement you made to Mr. Tyndall
3 on November 19th, 2015?
4    A   I take the Fifth.
5    Q   Okay. All right, on page 12 of Deese
6 Exhibit 8, line 14, Mr. Tyndall says again: "And
7 this won't cost me any money?"
8        And Melissa says, "As long as you qualify,
9 there's no out-of-pocket expense, that's correct."
10 Do you see that there, Ms. Deese?
11   A   Yes.
12   Q   That's a statement you made to Mr. Tyndall
13 on November 19th, 2015?
14   A   I take the Fifth.
15   Q   Okay. Page 13 of Deese Exhibit 8 down at
16 the bottom, line 24, Melissa says to Mr. Tyndall, in
17 response to the question "And what company are you
18 calling from," "The name of our company, again, is
19 the Credit Assistance Program." Do you see that,
20 Ms. Deese?
21   A   Yes.
22   Q   That's a statement you made to Mr. Tyndall
23 on November 19th, 2015?
24   A   I take the Fifth.
25   Q   And then on page 14 of Deese Exhibit 8,

**Page 65**

```
 1   line 11, Mr. Tyndall asks Melissa whether she has an
 2   ID number or anything. And Melissa replies, "Yes.
 3   My employee ID is 1016." Do you see that,
 4   Ms. Deese?
 5       A   Yes.
 6       Q   That's a statement you made to Mr. Tyndall
 7   on November 19th, 2015?
 8       A   I take the Fifth.
 9       Q   Okay. You're currently employed by a
10   company called Higher Goals Marketing, LLC?
11       A   Yes.
12       Q   Okay. When did you start working there?
13       A   I believe it was June.
14       Q   In June?
15       A   Or August. I don't know. I don't know.
16   This year.
17       Q   Okay.
18       A   A few months back.
19       Q   Okay. It was after you worked at Life
20   Management Services?
21       A   Yes.
22       Q   Did you work anywhere else between Life
23   Management Services and Higher Goals Marketing?
24       A   No.
25       Q   Okay. And so you worked at Life
```

**Page 66**

```
 1   Management Services from July 2014 until June 2016;
 2   is that right?
 3       A   Correct.
 4       Q   And then you started at Higher Goals
 5   Marketing, you think, in -- sometime this year,
 6   maybe June, maybe August?
 7       A   It was the end of August.
 8       Q   The end of August, okay.
 9           What position do you hold at Higher Goals
10   Marketing?
11       A   I take the Fifth.
12       Q   Okay. You understand, do you not, that
13   Higher Goals Marketing is not a party to the lawsuit
14   in connection with your deposition that's being
15   taken today?
16       A   Yes, I do.
17       Q   Okay. And you nonetheless are taking the
18   Fifth as to what your position is at Higher Goals
19   Marketing?
20       A   Yes.
21           MR. DOAN: Do you want to consult on that,
22   or no, Mr. Agranoff?
23           MR. AGRANOFF: Can we take a couple
24   minutes? Can we take a two-minute break?
25           MR. DOAN: Of course.
```

**Page 67**

```
 1   Amy, we're going to go off the record for
 2   a couple minutes.
 3           MS. TALISMAN: All righty. Thanks.
 4           MR. DOAN: And if you need a slightly
 5   longer break too, Ms. Deese, that's fine,
 6   because we've been going for about two hours.
 7   Just let me know.
 8           (Recess taken.)
 9           MR. DOAN: All right, we're back on the
10   record.
11   BY MR. DOAN:
12       Q   Ms. Deese, you've had an opportunity to
13   consult with counsel; is that correct?
14       A   Yes.
15       Q   Okay. And having had the opportunity to
16   consult with counsel, are you able to answer my
17   question about what role you play at Higher Goals
18   Marketing?
19       A   I take the Fifth.
20       Q   You still take the Fifth, okay.
21           Is Higher Goals Marketing still operating?
22       A   I believe so.
23       Q   Okay. You plan to go there today after
24   you get done here?
25       A   I take the Fifth.
```

**Page 68**

```
 1       Q   Okay. All right. Let's step back then
 2   and talk a little bit more about Life Management
 3   Services of Orange County.
 4           What was your impression of Kevin Guice as
 5   a boss?
 6       A   Can I speak freely?
 7       Q   I would love if you would, Ms. Deese.
 8       A   I found him to be an arrogant prick, to be
 9   honest.
10       Q   Okay. Was there any particular reason?
11       A   The fact that you own a company, and I was
12   there roughly a year and a half, seen him twice, and
13   then the first time face to face meeting him at his
14   sister's birthday party, alls he can talk about is
15   his money this and his money that and he's going
16   here to this game and going and doing this, to me
17   it's just sickening.
18       Q   Okay.
19       A   It's just my opinion.
20       Q   Okay. You talk about him going to a game.
21   Is there a particular game that you're referring to?
22       A   Probably football.
23       Q   He's a Cowboys fan?
24       A   Yes.
25       Q   Okay. And do you know anything about him
```

17 (Pages 65 to 68)

Deese
FTC v. Life Management Services, et al.                                    11/17/2016

181

1  more questions at the moment, Ms. Deese. I
2  appreciate your coming in today. Again, I
3  appreciate your accepting service of the
4  subpoena by e-mail. And I know this went a
5  little longer than I had anticipated, so I
6  appreciate your sticking with us through all of
7  that.
8      I don't have any other questions at the
9  moment. If I think of any other questions, I
10 have your phone number, is it okay if I call
11 you?
12     THE WITNESS: I guess.
13     MR. DOAN: Okay. Well, thank you very
14 much. I think that concludes today's
15 deposition.
16     Your counsel can explain to you that you
17 have the right to read and sign the transcript,
18 if you'd like, and I'll let him do that now on
19 the record.
20     MR. AGRANOFF: The short version is, the
21 court reporter is going to likely be making a
22 transcript of the proceedings today, and I
23 believe they may have already ordered a copy.
24 You have the right to read it and sign and
25 annotate if you believe something is misstated

182

1  or inaccurately reflected. It doesn't mean you
2  get to change it, but you have the opportunity
3  to review it.
4      Would you like the opportunity to review
5  the transcript if one is provided to you? I
6  would say yes.
7      THE WITNESS: Okay.
8      MR. AGRANOFF: There's no charge for her
9  to come in and read, right?
10     THE COURT REPORTER: Yeah, I guess we
11 could arrange for her to come in and read it.
12     THE WITNESS: Okay.
13     MR. DOAN: I don't normally have anything
14 to do with that. That magic all happens
15 somewhere else.
16     And I should say, I said that we were
17 concluded, but for something that may be a
18 formality, I just need to make sure.
19     Ms. Talisman, do you have any questions
20 for the witness before we end here today?
21     MS. TALISMAN: I do not have any
22 questions.
23     MR. DOAN: Okay. And did anybody else
24 ever join us on the phone, Mr. Hill or anybody?
25     MS. TALISMAN: I don't think so.

183

1      MR. DOAN: Okay.
2      THE COURT REPORTER: I have a question for
3  Amy.
4      MR. DOAN: Okay. And, Ms. Talisman, the
5  court reporter has a question for you.
6      MS. TALISMAN: Okay.
7      THE COURT REPORTER: Would you like a copy
8  of the transcript, Ms. Talisman? Would you
9  like a copy --
10     MS. TALISMAN: No, thank you.
11     THE COURT REPORTER: Okay.
12     Did anybody else want to order a copy?
13 No? All right, thank you.
14     MR. DOAN: All right. I think that
15 concludes our proceedings today.
16     Thank you again, Ms. Deese, for coming in.
17     THE WITNESS: Thank you.
18     (At 3:26 p.m., the deposition concluded.)

184

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA:
4  COUNTY OF CITRUS:
5
6      I, the undersigned authority, certify that
7  MELISSA M. DEESE personally appeared before me on
8  November 17, 2016, in Orlando, Florida, and was duly
9  sworn.
10     WITNESS MY HAND AND SEAL this 25th day of
11 November 2016.
12
13                _____
14                Lorraine Yerdonek
15                Notary Public
16
17 Commission No.: FF 897252
18 Expiration: 07/08/2019

46 (Pages 181 to 184)

185

1    CERTIFICATE OF REPORTER
2
3    CASE NO.:   6:16-CV-982-ORL-41TBS
4
5    CASE TITLE:  FTC v. LIFE MANAGEMENT SERVICES OF
6
7         ORANGE COUNTY, LLC., ET AL.
8
9
10        I HEREBY CERTIFY that the transcript
11   contained herein is a full and accurate transcript
12   of the steno notes transcribed by me on the above
13   cause before the FEDERAL TRADE COMMISSION to the
14   best of my knowledge and belief.
15
16        DATED:  NOVEMBER 25, 2016
17
18        _____
19        LORRAINE YERDONEK
20
21
22
23
24
25

186

1              CERTIFICATE OF DEPONENT
2
3       I hereby certify that I have read and examined
4    the foregoing transcript, and the same is a true and
5    accurate record of the testimony given by me.
6
7       Any additions or corrections that I feel are
8    necessary, I will attach on a separate sheet of
9    paper to the original transcript.
10
11          _____
12          MELISSA M. DEESE
13
14       I hereby certify that the individual
15   representing herself to be the above-named
16   individual appeared before me this _____ day
17   of _____ 2016, and executed the above
18   certificate in my presence.
19
20
21          _____
22          NOTARY PUBLIC IN AND FOR
23          _____
24   MY COMMISSION EXPIRES:
25   _____

187

1    WITNESS: MELISSA M. DEESE
2    DATE: NOVEMBER 17, 2016
3    CASE: FTC v. LIFE MANAGEMENT SERVICES
4         OF ORANGE COUNTY, LLC, et al.
5
6    Please note any errors and the corrections thereof
7    on this errata sheet.  The rules require a reason
8    for any change or correction.  It may be general,
9    such as "To correct stenographic error," or "To
10   clarify the record," or "To conform with the facts."
11
12   PAGE LINE CORRECTION              REASON FOR
13
14
15
16
17
18
19
20
21
22
23
24
25