## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**FEDERAL TRADE COMMISSION** and

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,**

          Plaintiffs,

v.

**LIFE MANAGEMENT SERVICES OF ORANGE COUNTY, LLC, a Florida Limited Liability Company,**

**LOYAL FINANCIAL & CREDIT SERVICES LLC, a Florida Limited Liability Company, also d/b/a FOC Credit and Reward Services,**

**IVD RECOVERY, LLC, a Florida Limited Liability Company,**

**KWP SERVICES, LLC, a Florida Limited Liability Company,**

**KWP SERVICES OF FLORIDA, LLC, a Florida Limited Liability Company,**

**LPSOFFLA, LLC, a Florida Limited Liability Company,**

**LPSOFFLORIDA, LLC, a Florida Limited Liability Company,**

**PW & F CONSULTANTS OF FLORIDA, LLC a Florida Limited Liability Company,**

**UAD SECURE SERVICES LLC, a Florida Limited Liability Company,**

**UAD SECURE SERVICE OF FL, LLC, a Florida Limited Liability Company,**

Case No.: 6:16-cv-00982-CEM-TBS

**URB MANAGEMENT, LLC a Florida**
**Limited Liability Company,**

**YCC SOLUTIONS. LLC, a Florida**
**Limited Liability Company,**

**YFP SOLUTIONS, LLC, a Florida**
**Limited Liability Company,**

**KEVIN GUICE, individually, and as**
**An officer of LOYAL FINANCIAL**
**CREDIT SERVICES, LLC**

**CHASE P. JACOWSKI, individually**
**and as an officer of LPSOFFLA, LLC,**
**LPSOFFLORIDA, LLC, and YFP**
**SOLUTIONS, LLC,**

**LINDA N. MCNEALY, individually,**
**And as an officer of LOYAL FINANCIAL**
**CREDIT SERVICES, LLC,**

**CLARENCE H. WHAL, a/k/a, Harry**
**C. Whal, individually and as an officer**
**of KWP SERVICES OF FLORIDA, LLC,**
**and LIFE MANAGEMENT SERVICES**
**OF ORANGE COUNTY, LLC,**

**KAREN M. WHAL, individually and as an**
**officer of KWP SERVICES, LLP**

   **Defendants and**

**ROBERT GUICE, individually,**

**TIMOHTY WOODS, individually,**

   **Relief Defendants.**

_____

**DEFENDANT KEVIN GUICE'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LEGAL AUTHORITY**

Defendant, Kevin Guice ("Defendant"), by and through undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Case Management and Scheduling Order (Doc. 110), hereby files his Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 163 "Plaintiff's Motion").

Plaintiffs, The Federal Trade Commission ("FTC"), and the State of Florida, Attorney General's Office ("AG"), have alleged that Defendant Kevin Guice sold fraudulent debt-relief services to more than 10,000 consumers and marketed a fraudulent credit-card debt-elimination program through various defendant companies. Neither the debt-relief services nor the credit-card debt-elimination program were fraudulent. Consumers saved money through the debt-relief services and had substantial debt eliminated through the credit-card debt-elimination program.

Summary Judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant must satisfy this initial burden by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact. *Norfolk S Ry. Co. v. Groves*, 586 F.3d 1273(11th Cir. 2009).  In response, a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 US 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISPUTED MATERIAL FACTS

**The Defendant's lower interest rate services were a legitimate and helpful service to consumers:**

The Defendant Companies sold debt-relief services through Loyal Financial and Credit Services, LLC,  that saved money for consumers. The employees who were responsible for selling the lower interest rate services to the consumers were instructed by management that they were to follow all state and federal laws, and that they were not to misrepresent that they were affiliated with Visa, Mastercard, or a lending institution[1].

The services were pitched to consumers who had significant credit card balances on credit-cards at interest rates of nine percent or higher. Depending upon the consumer, the company would help save the consumer money by either putting them into a hardship status or by transferring their credit card balances into a lower interest rate credit-card (typically zero percent). The hardship status worked by closing the account with the lender who would allow the balance to be paid off at a significantly lower interest rate within sixty months.[2]

The balance transfer would work by transferring the consumer's present balance in one or more credit-cards with high interest rates and transferring to a zero percent card or a low interest rate card so that monthly payments could be made upon the principle of the balance. Typically, the zero or low interest rate lasted from twelve to twenty-four months. At the end of the twelve to twenty-four months, if the consumer had been making at least the minimum balance payments, a new transfer could be made into another zero or low percent interest rate credit-card or, the initial balance-transfer would be turned into a hardship status for the remainder of the

---

[1] DX 1, DX 7, DX 34
[2] DX 2 through DX 6

payments.[3]

     A typical example of these principles is shown in Plaintiff's Exhibit PX-19, which is a transcribed recording of a conversation between a Defendant Company representative and consumer Patricia Grinnan. Patricia Grinnan possessed ten credit cards at the time of the conversation[4] that included a MasterCard at 15.9 percent interest[5], a Target Visa at 22.9 percent interest[6], and a USAA card at 8.99 percent interest.[7] Patricia Grinnan was told that the company was not a lending institution and that she was not receiving credit card offer from the company.[8]

     During the time on the phone, the representative obtained a zero percent interest credit-card for Patricia Grinnan for a credit line of $6,600.00 so that she could transfer the two high interest rate balances from her Capital One cards.[9] Patricia Grinnan then canceled the zero percent card the next day and canceled all the work performed by the representatives during the course of the recorded conversation.[10] In the Affidavit of Patricia Grinnan prepared by an investigator for one of the Plaintiffs, Patricia Grinnan stated that the Defendant company never transferred any of her balances to a lower interest rate or reduced any of her interest rates as of the time of the writing of the affidavit.[11] But by that time she already admitted that she canceled all the Defendant company's work with the credit card companies.

     All the consumers who were sold the lower interest rate services were recorded and informed during the recording that the company was not affiliated with Visa or Mastercard and

---

[3] DX 2 through DX 6
[4] PX 19 Page1, line 12
[5] PX 19 Page 26, Line 8
[6] PX 19-page 43, Line 15
[7] PX 19-Page 31, Line 17
[8] PX 19-Page 46, Lines 12 - 18
[9] PX 19-Page 121
[10] PX 19-Page 7
[11] PX 19-Page 7)

was not a lending institution.[12] It was not possible for the consumer to have been misled as to

that fact by the time that they entered into a contract. Patricia Grinnan's recording confirms this

fact.

All balance transfers to a lower interest rate card were obtained through a three-way

phone conversation among the company, the consumer, and the credit card issuing bank or

lending institution.[13] The credit card issuing company informed the consumer if there was a

transfer fee involved.[14] In the Patricia Grinnan recording, the bank representative for Capital One

explained that there was no fee for that particular transfer.[15]

Lower interest rate fulfillers Angivette Rivera, Tanya Dodd, Amaris Lennon, Samantha

ODonnel, and Travis Teel state in their affidavits that they have each saved several hundred

consumers money on their credit-card balances to the satisfaction of the consumers.[16]

Plaintiffs' claims that few, if any, consumers received lower interest rates is out right

false. Several thousand consumers benefitted from the lower interest rate program.[17] The

majority of consumers who entered the lower interest rate program received a permanent lower

interest rate credit-card. Additionally, many more consumers received a zero percent interest rate

card for 12 to 24 months that was then transferred into a new zero percent intertest card or made

into a hardship at zero percent for 60 months.[18]

The following ten examples are consumers' files that were picked at random from huge

boxes of files filled with records of consumers who benefited from the lower interest rate

---

[12] PX 19 Page 46, DX7
[13] DX 7, PX 19, PX 22, Page 1, Line 10
[14] DX 7 and PX 19, Page 104 Lines 24 – 25, Page 105 lines 1 – 25, Page 106 Lines 1 – 4
[15] PX 19 Page 105, Line 4
[16] DX 2 through DX 6
[17] DX 7
[18] DX 7

program that were stored at the receiver's warehouse after the records were seized. In DX 10 are the records for consumer Evan Masser who had four credit-cards. He had a balance of $4,390 owed on a Pay Pal account at 19.99 percent. The company negotiated the account into a hardship at sixty months at zero percent. He had a Bank of America Card with a balance of $17,793.72 at 19.99 percent. The company negotiated a reduced rate down to 3 percent permanently. He had a Barclays Card with a balance of $6,307.96 at 20.99 percent that the company negotiated into hardship a 5.9 percent permanently. He also had an Old Navy Card with a balance of $1,384.51 at 23.99 percent that was negotiated into hardship at zero percent permanently.[19]

DX 11 are the records of consumer Barbara Bungard who owed $16,279.67 on a Discover Card. The company placed her balance into a hardship for sixty months at a significantly reduced rate of .99 percent. That represents a savings of thousands of dollars in interest. DX 12 are the records of consumer Marjorie Brock who owed $6,590.89 on a Sears Card at 25.25 percent. The company negotiated a permanent reduced rate to 17.24 percent. DX 13 are the records of consumer Victoria Brenner Reis who had a Citi Card at 15.25 percent interest. The company negotiated a lower interest rate of 10.49 for the life of the card.

DX 14 are the records of Phyllis Burkes who had three Bank of America Cards. One had a balance of $4,499.30 at 9.24 percent interest. The company reduced the rate down to 2 percent permanently. Her next card had a balance of $5,724.01 at 13.99 percent interest. The company reduced the rate down to 2 percent permanently. The third card had a balance of $3,264 at 10.99 percent. The company reduced the rate down to 2 percent permanently. Phyllis Burkes also had a JC Penny Card with a balance of $4.122 at 26.99 percent. The company negotiated the card down to zero percent permanently. No reasonable person could claim that this consumer's life

---

[19]   DX 10

was not improved by the Defendant company.

DX 15 are the records for consumer Carolyn Burnes who had a Citi Card at 20.49 percent with a balance of $11,514. The company negotiated a reduced rate down to 15.24 percent permanently. Even a 5 or 6 percent change in interest can help a consumer save thousands of dollars. DX 16 are the records for consumer at Victoria Burr who had a Sam's Club Card with a balance of $2,513.77 at 25.24 percent. The company negotiated a reduced rate down to zero percent permanently. DX 17 are the records for consumer Judith Comfort who had a balance of $6,612.08 on a Citi Card at 26.99 percent. The company negotiated a reduced rate down to 15.24 percent permanently. DX 17 are the records of consumer Martha Martin who had a discover Card at 23.24 percent and a balance owing $6871.73. The company reduced the rate to 18 percent permanently.

DX 18 are the records for Virginia Martin who had a balance of $3,863.02 at 14.74 percent on a Mastercard. The company negotiated a reduced rate down to 9 percent permanently. DX 19 are the records of consumer Jilianne Breitsprecher who owed $7,926.64 on a Barclays Credit Card at 22.99 percent. The company obtained a reduction on the card to 16.24 percent permanently.

These are just ten examples taken at random from boxes of consumer files. The Defendant could go on listing examples of consumers who received exactly what they contracted for with the Defendant Company. There are over ten thousand of such files in which consumers either received balance transfers to lower interest rates, received hardship status at very low rates, or simply had a significant reduction of their interest rate.[20]  In almost every instance, the consumer who was promised a savings in their contract with a defendant company did in fact see

---

[20] DX 7

that promise fulfilled[21].  Lower interest rate fulfillers Angivette Rivera, Tanya Dodd, Amaris Lennon, Samantha ODonnel, and Travis Teel state in their affidavits that they have each saved several hundred consumers money on their credit-card balances to the satisfaction of the consumers. [22]

Plaintiffs' claim that the Defendants misrepresented to the consumers that they would save thousands of dollars in a short period of time on the lower interest rate program is false. This fact is rebutted in the Patricia Grinnan recording on PX 19 page 137 lines 6 - 15 in which the employee explains that only the lower interest rate will be completed within 60 days. Through the course of the conversation it was made clear that the consumer had to make payments on the lower interest rate card for a period time to see the savings. The company employee stated to Patricia Grinnan, "You're not paying all that interest within 60 days, honey. Okay? So, that's just saying that I have to complete your work and get your debt within a lower interest rate in sixty days or we automatically have to give you a refund."[23]  Again, the employee states, "But the sixty days is to make sure that I complete the work. It has nothing to do with the savings. It's to make sure the work is done so that you start the savings."[24] The employee later explains to the consumer that it would take more than 15 months for her to save the $2000 that was promised by the company.[25]

Additionally, Patricia Grinnan was told that the zero percent interest can be maintained for longer than the initial 12 months of the card.[26] That was a true statement. There were several

---

[21]  DX 7
[22]  DX 2 through DX 6
[23]  PX 19 page 137 lines 6 – 1
[24]  PX 19 Page 139, Lines 8 – 11
[25]  PX 19, Page 139 Lines 4 – 6
[26]  PX 19 Page 69lines 2 – 8

ways that the card could be have been kept at zero percent such as a hardship on the card, or by utilizing direct deposit options with balance transfer offers.[27] This is something that a consumer would never achieve on their own.

Plaintiffs' claim that consumers were not told of the balance transfer fees is false. The bank or the lending institution charges the fee and therefore the bank or lending institution informs the customer of any transfer fee during the three-way phone conversation when the lower interest rate credit-card is obtained. [28]

It is a disputed material fact that any of the Defendant companies received upfront fees for the lower interest rate program.  In PX 13, the affidavit of Lynne Demarco, Plaintiffs' own witness states that she received a zero percent interest credit-card and yet did not pay the fee owed to the company pursuant to the contract that she entered.   In PX 13, Page 2, the consumer confirms that the Defendant company did not charge a fee to any credit card and that the consumer was supposed to mail the company a check. In PX 24, The consumer received the benefit of the bargain and yet decided not to pay the fee. In PX 33, consumer Gerald Schallon received three zero percent credit-cards in the mail.[29] Gerald Schallon did not send the company a check for its fees.  In PX 24 consumer Nona Knauss received a zero percent credit-card from the company but failed to pay the company a fee. [30]  In PX 34 the consumer received two zero percent interest credit-cards and the consumer declined to send the company a check. [31] In PX 35, consumer Ann Scholzen received two zero percent credit cards and decided not to send a check for the fee to the Defendant Company.  In PX 37, consumer Joan Wedemeyer received

---

[27] DX 7
[28] DX 7, PX 19 Page 105 Lines 1 - 10
[29] PX 33, Page 3 Line 30
[30] PX 24 Page 2
[31] PX 34 Page 3

zero percent credit-cards from Barclays and Bank of America and declined to mail the company

a check for its fees.  Even Patricia Grinnan in PX 19, who recorded the process of the company

obtaining zero percent credit-cards failed to pay the company a fee.

In PX 201 Plaintiffs' investigator recorded an employee of a company named Melissa

Deese who made misrepresentations about that company's affiliation with lending institutions.

However, she is the only employee who made such a statement and she would have been fired

had management known what she was doing.[32]  Melissa Deese was just one of twenty employees

selling lower interest rates at any given time. [33]  No other employees were recorded making such

a statement. Melissa Deese signed a contract stating that she was not allowed to make such

statements just as all other employees signed. [34]

**The Defendant's Debt-Elimination Services were a legitimate and helpful service to**

**consumers:**

Consumers who were already enrolled in the lower interest rate services were then asked

if they wanted to have the benefit of the debt-elimination services.[35] Employee Lee Ann

Brownell then asked those consumers if they wanted the benefit of having their debt reduced. If

they said yes, she would explain the program to the consumer.[36]  Consumers were told that they

could have forty to eighty percent of their debt eliminated.[37]  The consumers had to be enrolled

in the lower interest rate program from six to seven months before they were given the

opportunity to enroll in the deb- elimination program.[38]  Only Consumers who were enrolled in

---

[32] DX 7
[33] DX 7
[34] DX 34
[35] Brownell Dep. Page 84, Lines 1 – 9
[36] Brownell Dep. Page 85, Lines 1 – 5
[37] Brownell Dep. Page 80, Lines 14 – 17
[38] Brownell Dep. Page 81, Lines 12 – 17

the lower interest rate program were offered the debt-elimination program. [39]

The debt-elimination program was successful because consumers were already happy with the results of the lower interest rate program. If the lower interest rate program was a scam, then no consumers would have enrolled in the debt-elimination program. However, as Plaintiffs stated in their Motion for Summary Judgment, 2,500 consumers went from the Defendants' lower interest rate program to their debt-elimination program. The logical conclusion to that fact is that the 2,500 consumers who went on to enroll in the Defendants' debt-elimination program benefited from the lower interest rate program.

Clerk Hampton worked in fulfillment in the debt-elimination program. He stated that the debt-elimination program was a legitimate business to help consumers, and that he went to work every morning to help consumers reduce the amount of their debt.[40] Mr. According to Mr. Hampton, most consumers became debt free through the debt-elimination program.[41] By the time consumers reached Clark Hampton, they had been advised that their credit scores would go down for a time, but that their scores would go back up as their debt to income ratio increased.[42]

The debt-elimination contract that the consumer signs offers credit repair.  The consumer would not be offered credit repair if they were not warned about the possibility of the lowered credit score.[43]

The debt-elimination contract that the consumer signed also offered to assist the

---

[39] Andrews Dep. Page 187, Lines 19 – 25
[40] Hampton Dep. Page 168, Lines 11 – 25
[41] Hampton Dep. Page 173, Lines 1 – 9
[42] Hampton Dep.  Page 55, Lines 19 – 25 and 56, Lines 1 – 12
[43] PX 7, Page 15, PX 16 Page 18, PX 18, Page 16, PX 20, Page 18, PX 27, Page 15, PX 28, Page 23, PX 30, Page 9, PX 31, Page 17, and PX 36, Page 15

consumer with any collections suits that may occur.[44] Therefore, the consumer was made aware that there could be litigation during the 18-month process. However, the company would pay from its own money any judgment that the consumer would receive from the debt-relief service.[45]

Clark Hampton kept an activity log that is listed as DX 9 that shows how many consumer debts he worked to eliminate in any given day. There are 380 pages of activity logs for Clark Hampton's work. DX 8 is an abbreviated version of the activity log showing that in one day, July 10, 2015, Clark Hampton reduced debt for fifteen consumer accounts. Clark Hampton single-handedly eliminated substantial debt for several hundred consumers.

Kara Andrews was the manager of the debt-elimination program. She stated that consumers were warned two times before entering the program that they would have a temporary lowering of their credit score.[46] Many consumers declined the debt-elimination program because they were warned upfront about the possibility of their credit score going during the process.[47] Lee Ann Brownell, the person who sold the debt-elimination program to the consumers, was told by the management that she was not allowed to tell any consumers that there was a government fund to pay for debt-elimination.[48] Consumers enrolled into the debt-elimination program because they wanted to have less debt.[49] Consumers did in fact get their debt eliminated.[50]

Kara Andrews also stated that when some consumers could not afford to pay off their

---

[44] PX 7, Page 16, PX 16 Page 19, PX 18, Page 14, PX 20, Page 21, PX 27, Page 12, PX 28, Page 23, PX 30, Page 7, and PX 31, Page 13
[45] Andrews Dep. Page 182, Lines 19 – 25 and Page 183, Lines 1 - 9
[46] Andrews Dep. Page 186, Lines 2 – 10
[47] Andrews Dep. Page 186, Lines 21 – 25
[48] Andrews Dep. Page 185, Lines 13 – 16
[49] Andrews Dep. Page 187, Lines 4 – 12
[50] Andrews Dep. Page 187, Lines 8 – 14

debt payments, the company would spend its own money to get the consumer out of debt. [51] Sometimes the company paid an amount of money out of its pocket to get the consumer out of debt that was greater than the fees that were collected from the consumer.[52] The company paid its own money on hundreds of consumer accounts to help the consumers get out of debt. [53] Plaintiffs' claim that few if any consumers received any relief from the debt elimination program is false. The following ten examples are consumers' files that were picked at random from boxes of files filled with consumers who benefited from the lower interest rate program that were stored at the receiver's warehouse.

DX 20 are the records for consumer Cynthia Stein. Cynthia Stein had had four credit-cards with a total debt of $33,034. A Capitol One Card had a balance of   $5,796. The card was paid off at $2,781. A Discover Card had a balance of $7,094. The card was paid off at $2,128. A QVC card had a balance of $14,044. That card was paid off at $7,022. A Barclays Card had a balance of $6,100. That card was paid off at $3,161. All the debt owed by this consumer was paid by the Defendant company. The Defendant company paid $14,050 of its own money to get this consumer out of debt. That amount was $5,957 more than the fee that the company collected from this consumer.[54]

Kara Andrews stated in her deposition that the company had a budget of $40,000 per week to spend helping their clients get out of debt.[55] Consumer Cynthia Stein is an example that this Defendant not deceive or scam consumers. No other debt elimination company would spend its own money helping consumers get out of debt.

---

[51] Andrews Dep. Page 177, Lines 11 – 25
[52] Andrews Dep. Page 181, Lines 12 – 20 and see Consumer Cynthia Stein DX 20
[53] Andrews Dep. Page 195, Lines 1 – 5, DX 7
[54] DX 20 AND 21
[55] Andrews Dep, Page 177, 21 – 25 and Page 178, Lines 1 – 4

DX 22 are the records for consumer Donald Keller. Donald Keller had a Chase Card with a balance of $16,339.08. The company negotiated the entire debt down to zero. DX 23 are the records for consumer John Kasporek. Mr. Kasporek had a Barclays Card with a balance of $$11,224.66. The company eliminated sixty percent of the debt and Mr. Kasparek paid off the card for $4,490. DX 24 are the records for consumer Dorothy Becker who had two credit cards. Dorothy Becker had a Cabelas Visa Card with a balance of $6,416 that was paid off at $3,017 and a Capitol One Card with a balance of $9,249.47 that was paid off at $4,624.

DX 25 are the records for consumer Ruby Belcher who had three credit-cards. A Chase card with a balance of $17,643.39 was eliminated at one hundred percent. A Barclays Card had a balance of $7,760.94 that was paid off at $3,888 and a Bank of America Card with a balance of $12,443.84 that was paid off for $6,222. Consumer Ruby Belcher had $27,753 of debt eliminated. Plaintiffs cannot claim that Ruby Belcher was not helped to a significant degree.

DX 26 are the records for consumer Warren Benner who had a balance of $14,113 owed on a US Bank Card. The company negotiated the debt down to $5,650 and then paid the entire debt off for the consumer. DX 27 are the records for consumer Steven Ber who had Citi Card with a balance of $14,326.49 that was paid off for $5,014.

DX 27 are the records of consumer William Bies who had three credit-cards. A Chase Card with $3,188 was eliminated at one hundred percent. A Citi card with a balance of $9,797.77 was paid off for $3,430 and a Barclays Card with a balance of $4,475 was paid off for $2,238.

DX 28 are the records for consumer Charlie Blair who had five credit cards. A Barclays Card with a balance of $3,084 was paid off for $1,100. A Capitol One Card with a balance of $13,503.60 was paid off for $6,572. A second Capitol One Card with a balance of $25,437.02 that was paid off for $12,718. A Bank of America Card with a balance of $15,322.60 was paid

off for $7,200 and an American Express Card with a balance of $7,943 was paid off by the company for $5,560. This consumer saved $37,707. This is a real and significant gain for any consumer.

DX 29 are the records for consumer Richard Blyshak who had two credit cards. A Barclays Card with a balance of $12,030 was paid off for $4,813 and a Bank of America Card with a balance of $30,055 was paid off at $7,520. This consumer who got himself into $42,085 of debt saved $29,752 by the Defendant company.

DX 30 are the consumer records for Leonard Belyeu who had five credit cards. An HSBC Card with a balance of $7,455 was paid off for $5,197. The remaining cards were paid off by the company. A Bank of America card with a balance of $3,960 was paid off by the company for $$1,280. Another Bank of America Card had a balance of $4,893 that was negotiated to $3,500 and paid by the company. And another HSBC Card with a Balance of $2,478 was paid by the company for $783.

There were just ten files picked at random. Defendant could go on for one hundred pages listing consumers who benefitted from the debt-elimination program. Consumers often called back to tell Lee Ann Brownell that they were very happy with the program.[56]  Whatever rogue employees did or did not do at random at the Science Drive address where Kevin Guice was not present, a line was drawn in the sand at fulfillment, and consumers received exactly what they bargained for with these companies.

Even some of the few consumers who complained about the debt-relief services to Plaintiffs' agencies received a reduction of significant debt. In PX31, consumer James Pompati had the benefit of $23,000 of debt wiped clean from his discover card. The Defendant company

---

[56] Brownell Dep. Page 87, Lines 7 – 21

paid off the reminder of Mr. Pampatti's debt out of their own money.[57] The company then made

sure that Mr. Pampatti's deceased wife's accounts were discharged.[58] It is difficult to imagine

Mr. Pamapatti's complaint, after saving tens of thousands of dollars in the lower interest

program, and after having one hundred percent of his debt eliminated.

In PX 2, consumer Jason Adkins managed to get himself into $47,000 of credit-card debt.

The Defendant company worked many hours on his file and received many offers to eliminate

his debt. Jason Adkins stated that before he declared bankruptcy that the Defendant Company

called him to ask for more money. That is a false statement. The company asked him to make the

payments on the offers to eliminate his debt.[59] Nine months into the debt elimination program,

they were offered 40 percent eliminated on a discover card. Three months later Jason Adkins

chose bankruptcy instead. Mr. Adkins contract specifically stated that bankruptcy would void the

contract. Mr. Adkins initialed the bankruptcy clause in his contract.[60]  It was not the Defendant

company's fault that Jason Adkins declared bankruptcy. The company did its job and received

offers to eliminate the debt. It is more likely that Mr. Adkins simply did not want to pay any

money back on his debts.

Plaintiffs' claim that Lee Ann Brownell tailored her debt-relief pitch to senior citizens is

false. The Debt-relief consumer pool consisted of people who had already enrolled in lower

interest rate program.[61]

**Defendant Kevin Guice did not participate in any misrepresentations**:

Kevin Guice did not participate in any misrepresentations to consumers. Employees

---

[57] DX 7
[58] Hampton Dep. Page 174, Lines 9 – 25 and Page 175, Lines 6 – 8 and DX 7
[59]  DX 7
[60]  DX 7 and PX 2, Page 20
[61] Brownell Dep. Page 81, Lines 12 – 17, Page 84, Lines 1 – 9

signed agreements that they were not to misrepresent facts to consumers.[62]  Management

instructed the employees that they were not to mislead the public. [63]

It is a disputed material fact whether Kevin Guice controlled any Defendant company

other than Loyal Financial & Credit Services, LLC. Kevin Guice was the registered agent of

Loyal Financial & Credit Services, LLC at one time which had an address on Lake Underhill

Road in Orlando, Florida.  However, all the other Defendant companies had an address at

Science Drive, in Orlando, Florida.  Employee Randi Stickles says she never saw Kevin Guice at

the Science Drive Address.[64]   Randi Stickles did not consider Kevin Guice to be her boss at the

Science Drive Address. [65] Lee Ann Brownell stated that Kevin Guice was never present at

Science Drive. [66]Lee Ann Brownell believed Harry Wahl to be the owner and the boss at the

Science Drive location.[67]  Jessica Hernandez believed Harry Wahl to be the owner of the Science

Drive Companies.[68]

Contrary to Plaintiffs' claim, Kevin Guice was not named on any bank signature cards

pertaining to any of the Defendant Companies except Loyal Financial & Credit Services, LLC

in PX 115 through PX 154. PX 115 through PX 154 show each owner of each company as the

sole signor of that bank account. Employee payroll issues at the Science Drive location were

decided by Harry Wahl.[69] Matthew Roberts owned 100% of UAD Secure Services of FL, LLC.

---

[62]   DX 34
[63]   Andrews Dep. Page 195 Lines 1 - 15
[64]   Stickles Dep. Page 58, Lines 4 – 6
[65]   Stickles Dep. Page 58, Lines 2 – 5
[66]   Brownell Dep. Page 62 Lines 5  - 7
[67]   Brownell Dep. Page 71, Lines 17 – 24
[68]   Hernandez Dep. Page 34, Lines 1 – 24
[69]   Andrews Dep. Page 173, Lines 17 – 23

[70] Harry Wahl owned 100% of KWP Services, LLC.[71]

## ARGUMENT

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(A). In ruling on a motion for summary judgment, the court construes the facts and all reasonable inferences therefrom in the light most favorable to the non-moving party.[72] "At the summary Judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is genuine issue for trial."[73] "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must prevail as a matter of law."[74]

The crux of Plaintiffs' claim is that the Defendant sold fraudulent debt relief services and that he could not and did not deliver on his promises. The crux of the Defendant's response is that he produced legitimate and helpful debt relief to over ten thousand consumers and that they received exactly the services for which they contracted.

Plaintiffs argue that the Defendant, Kevin Guice violated Section 59(a) of the FTC act. To be unfair under of Section 5(a) of the of the FTC Act, a practice must be one that (1) causes or is likely to cause substantial injury to consumers, and (2) which is not reasonably avoidable by the consumers and (3) is not outweighed by countervailing benefits to consumers or competition.

---

[70] Roberts Dep. Page 30 Lines 3 - 5
[71] Wahl Dep. Page 71 Lines 1- 20.
[72] *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 150 (2000)
[73] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).
[74] *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1263 (D. Kansas 2003)

Kevin Guice's practices did not cause injury to consumers. Over ten thousand consumers benefitted from the debt relief services that were offered.[76] In contrast, Plaintiffs present less than fifty consumers who claim to have entered into a contract with a Defendant company and who claim to have suffered injuries. Of that number, seventeen of those consumers either did not spend any money and did not lose any money.[77]   Eleven of those consumers received a zero percent interest card and yet did not pay a fee to any of the Defendant Companies.[78] Any losses that those consumers perceived was outweighed by the enormous benefit experienced by ten thousand consumers. There is no business that can service ten thousand consumers and not have at least fifty unsatisfied customers.

The Plaintiffs claim that the Defendant Kevin Guice is responsible for five misleading representations: (1) That the companies claimed to be affiliated with banks or credit card companies. This claim is rebutted by the recording of Patricia Grinnan in which she was advised that the company was not a lending institution and that she was not receiving credit-card offer from the company.[79] All consumers were recorded and told the same message. (2) That the companies guaranteed that consumers would receive permanent reduction in credit-card rates. The companies did in fact deliver such permanently reduced rates to thousands of consumers.[80] (3) Consumers were promised savings in a short time. This was proved to be a false accusation in Particia Grinnan's transcribed recording. [81]  (4) That consumers could pay off their credit-cards three to five times faster. Any person understands that a balance is paid-off at a much faster rate

---

[75] *FTC v. Accusearch Inc*.,570 F.3d 1187, 1193 (10th Cir. 2009).

[76] DX 7

[77] PX numbers 1,4,8,9,11,12,13,17,23,32,33,34,35,37, and 38.

[78] PX Numbers 3,4,8,12,13,17,23,24,33,35 and 35.

[79] PX19-Page 46, Lines 12 – 18

[80] DX 1 through 6, consumer examples DX 10 through DX 19, and DX7

[81] PX 19 page 137 lines 6 – 15 and PX 19, Page 139 Lines 4 – 6

when the payments go towards the principal and not the interest. [82] (5) That consumers were led to believe that their debt would be eliminated within 18 months through a government fund. Lee Ann Brownell was the person who pitched the debt elimination. She was instructed by management that no such statement could be made. If she did make such a statement, it was to a small number of people for a short time.[83]  Regardless, the consumers who purchased the product received a great reduction in their debt, and, many consumers had their entire debt paid by the altruism of the company. [84]

Plaintiffs' remaining accusations that the Defendant did not inform consumers about balance transfer fees and possible lowering of consumer scores have been rebutted by Plaintiffs' and Defendant's exhibits and the recording of Patricia Grinnan. There are factual disputes as to every material allegation in Plaintiff's Motion.  Plaintiffs have failed to allege that the corporate defendants other than Loyal Financial & Credit Services, LLC and Life Management of Orange County, LLC took any action other than regarding the handling of money. Therefore, there is no "common enterprise" as to any interactions with consumers.

To establish personal liability the Plaintiffs must establish actual knowledge of material representations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. [85] These are all material factual issues that are in dispute. The employees were instructed to follow the law and they signed agreements to follow the law. [86]

---

[82]DX 7
[83] DX 7
[84] DX 20, DX 26, DX 29 and DX 30 and DX 7
[85]  FTC V. Kitco of Nevada, Inc. 612 F.Supp.1282, 1292(D. Minn.1985)

[86] DX 1 through DX7

Material factual disputes exist as to damages. Plaintiffs must show that they reasonably calculated the amount of consumers' net losses.[87] However, as shown in DX 10 through DX 30, customers of the businesses in dispute saved thousands to tens of thousands of dollars through the lower interest rate and debt elimination programs. The receiver presently holds a warehouse filled with hundreds of boxes showing the savings of thousands of consumers. [88]  Examples of the consumers who complained are Jason Adkins who dug himself into $47,000 of credit-card debt and chose bankruptcy over negotiating his way back out of debt,[89] and James Pompatti who had a $23,000 Chase Card completely eliminated and the remainder of his debt paid by the defendant company and then complained because the IRS sent him a 1099 form.[90]  Those consumers suffered no damages. The Defendant maintains that the companies paid significantly more money out of their own pocket to help consumers than the Plaintiffs contend were lost by the consumers who complained.

Additionally, Plaintiffs' figure for damages do not account for hundreds of consumer refunds. Therefore, damages remain an issue for the trier of fact in trial.

## **CONCLUSION**

The Motion for Summary Judgment should be denied. The Defendants' debt elimination programs were not fraudulent. Over ten-thousand consumers benefitted from the Defendants' services. Most of the material misrepresentations claimed by the FTC and the AG are rebutted by their own exhibits. Most of the material facts presented by the Plaintiffs are in dispute.

---

[87] *FTC v. Febre,* 128 F.3d 530 (7th Cir. 1997)
[88] DX 7
[89] PX 2 and DX 7
[90] Hampton Dep. Page 82, lines 21-25, Page 83, Lines 1 – 4, Page 150, lines 23 – 25 and Page 151, Lines 1 – 14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing Motion for Substitution of Counsel was E-filed and served upon the following:

Counsel for Plaintiffs: Jennifer Knutton, Assistant Attorney General, Office of the Attorney General, Consumer Protection Division, 135 W. Central Blvd., Suite 670, Orlando, Florida 32801, Jennifer.knutton@myfloridalegal.com, Denise Beamer, Assistant Attorney General, Office of the Attorney General, Consumer Protection Division, 135 W. Central Blvd., Suite 670, Orlando, Florida 32801, denise.beamer@myfloridalegal.com, Tejasvi M. Srimushnam, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Mail Stop H-286, Washington DC, 20580, , tsrimushnam@ftc.gov, Joshua A. Doan, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Mail Stop H-286, Washington DC, 20580, jdoan@ftc.gov, and Mark J. Bernet, 401 E. Jackson Street, Tampa, Florida 33602, mark.bernet@akerman.com.

Counsel for Defendants: Mario Ceballos, Esquire, mceballos@ceballos-law.com, Elias R. Hilal, Esquire, elais.hilal@erhlaw.com, David Hill, Esquire, dphillpa@cfl.rr.com, and Amy B. Talisman, Esquire, ABT@covelaw.com.

Respectfully Submitted this 3rd Day of April, 2017

I HEREBY CERTIFY that a copy of the foregoing has been electronically filed on June 2, 2017 via the CM/ECF Electronic Filing System which will provide electronic notice to all interested parties.

*/s/ Matthew A. Leibert, Esq.*
Matthew A. Liebert, Esq.
Fla. Bar No. 0752266
200 S. Orange Avenue, Ste. 2000
Orlando, Florida 32801
Tel.   407-245-8352
Fax    407-245-8361
leibert@urbanthier.com